# EXHIBIT B

E17284

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

FILED
Stephen M. Kelly, Clerk
JAN 16 1991
Court of Appeal Fourth District

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| Plaintiff and Respondent, | ) | |
| v. | ) | |
| PABLO JULIAN AGRIO, | ) | D010237 |
| Defendant and Appellant. | ) | (Super. Ct. No. CRN95364) |

APPEAL from a judgment of the Superior Court of San Diego County, Terry B. O'Rourke, Judge. Affirmed.

Pablo Julian Agrio (Pablo) appeals a conviction based on jury verdicts finding him guilty of second degree murder (Pen. Code, § 189) and affirming that a firearm was used in the commission of the offense (Pen. Code, § 12022.5). The victim of the killing was Pablo's wife, Alma Agrio (Alma). Pablo grounds his appeal on the contention that erroneous or confusing jury instructions, the effect of which was exacerbated by prejudicial prosecution argument, must be deemed to have misled the jury, resulting in prejudicial and

reversible error.[1]   A second ground for appeal is the con-
tention of a nonrepresentative jury panel.   Pablo was sentenced
to a prison term of 17 years to life.

FACTS OF THE OFFENSE

Alma was killed by a gunshot wound to her head which
occurred during an altercation with Pablo in the bedroom of
their home in March 1988.   Although Pablo and Alma at the time
of her death had been married slightly less than one year, they
had known each other for a considerably longer period and had a
child born in July 1986.   Pablo was the only witness to the
killing, and hence much of the evidence adduced at trial
pertained to the apparent relationship between Alma and Pablo,
which might indicate circumstantially Pablo's mental state at
the time of Alma's death, leading to a correct characterization
of the homicide.

At the time of the crime Pablo was a police officer with
the City of San Diego.   Alma had been attending the San Diego

---

[1]   Appellant captions his grounds for appeal in three parts:
instructional error, prosecutorial misconduct and nonrepre-
sentative jury panel.   We treat the first two categories of
appeal as one, denominated "instructional error." Our review
of the record indicates no viable claim of attorney
misconduct.   The prosecutor's view of the law obviously varied
from that of the judge, but when admonished the prosecutor
reasonably adjusted his argument, and we find no intentional
violation of court orders or unreasonable abridgement of the
bounds of argument.   We do take the prosecutor's erroneous
argument into consideration, however, in terms of its possibly
prejudicial accentuation of what may be deemed erroneous jury
instructions.

sheriff's department's academy and was about to graduate therefrom. She intended to work in the San Diego County Jail as a correctional officer. The couple had had interpersonal problems and fights, which led to periods of separation before their marriage and altercations after marriage. One such incident, on Super Bowl Sunday in 1988, led to Alma's leaving their home for a night and then seeking the assistance of a mediator to facilitate her return. After that incident the mediator noticed scratches on Pablo's cheek and bruises on Alma's wrist.

Pablo drank little alcohol, and the couple generally did not have alcohol in their home, but Alma had previously experienced drinking problems, had attended AA sessions, and on the occasion of the Super Bowl incident became noticeably intoxicated, causing her to be boisterous, agitated and aggressive with Pablo.

Notwithstanding their occasional marital disputes, all witnesses agreed that Alma and Pablo were a loving couple. Their babysitter and housekeeper of 11 months testified she thought they loved each other. A friend who witnessed the Super Bowl argument acknowledged that each knew how to "push [the other's] buttons," but thought they loved each other very much. Their activities and relationship in the period just preceding Alma's death did not seem unusual. On Saturday, March 26, the day of the death, Pablo had played tennis,

3

which was his usual Saturday custom. He picked Alma up in the afternoon from her academy session and, in fact, came early to watch her participate in exercise and group races. They were planning for Alma's graduation exercises and had printed invitations for same.

The testimony about the events immediately preceding Alma's death came from Nelly Cordova, the baby-sitter who was present in the home on Saturday; Tami Hahn, a fellow student of Alma's at the academy who had accompanied her to a social event on the evening of her death; and Pablo. Nelly testified that everything in the Agrio household seemed normal until late in the afternoon. At that time Alma and Tami came home and Alma changed clothes. Pablo was on the phone talking to his mother. Alma spoke briefly to the mother, then kissed Pablo and departed the residence for the party along with Tami. After they had left, Pablo evidenced anger at Alma's going to the party without his specific consent, threw their child's shoes in the house, and made comments such as "She wants to do like the fucking American whores" (Pablo was originally from Panama). When Alma did not return from the party when expected, Pablo insisted on taking Nelly home. At that time he was still angry and, Nelly testified, stated "What Alma just did is going to cost her; [it] is going to cost her a lot."

Tami Hahn testified that late Saturday afternoon she and Alma went to the Agrio residence, where Alma changed clothes.

4

Leaving while Pablo was talking on the telephone, Hahn and Alma arrived at the party between 7 and 7:30 p.m. They departed at around 10 p.m., Alma having drunk at least three glasses of wine. Hahn did not enter the Agrio residence with Alma, but later called there to check on her, being concerned about her inebriation. Pablo answered the phone, sounded agitated, and when asked if Alma were there said "Yes, but I'm not finished with her."

Pablo testified he was irritated that Alma wished to spend time on Saturday evening with her classmates rather than at home and with her family. He became angry when Alma brought Hahn with her to the home to change clothes, the presence of the third party making it indelicate for Pablo to raise objections to the party. He expected Alma to return from the party much earlier than she did, and when she was so late he became concerned and angrier. When Alma did arrive she was obviously drunk, and she declined to participate in a discussion of her conduct, even though Pablo angrily demanded explanations. Their dispute eventually erupted into a physical confrontation in their bedroom, including Alma's locking the door followed by Pablo's breaking it in, the pulling of telephones out of the wall, the striking of each by the other, and Pablo's tearing up Alma's graduation invitations.

The Agrios had three guns in their home. At one point Alma opened the bedroom cabinet where the guns were kept, took one

5

out, and according to Pablo pointed it at him as if she were going to fire. Pablo wrestled the gun from Alma, forcing her to the floor. A video reenactment of the struggle, which Pablo testified was accurate, showed him shaking her by the shoulders while holding the gun. The gun went off, impacting Alma at very close range in the back of the head. Pablo denied any intent to pull the trigger and testified he did not know how the weapon had been caused to fire. He immediately called 911, reported the shooting, and thereafter gave statements to investigating police officers. The police officers testified Pablo was in tears, affirmed that he loved his wife, and evidenced great concern and regret over her death. They also testified, however, that he made certain deprecatory statements about his wife, complaining that she was a young girl who wanted to party instead of staying home and serving as mother and wife. At one point he stated: "You can't buy a Toyota and turn it into a Cadillac."

Expert testimony added some significant evidence. Alma's blood alcohol at the time of her death was .26 percent, meaning she could have had as many as 11 drinks during the evening. The weapon which had caused the death was in working order, with a light but not hair trigger. A ballistics expert testi-fied as to the various ways in which the gun might have been cocked and fired, including accidental cocking and firing during Pablo's tussling with Alma. Alma's body showed minor

bruising injuries other than the gunshot wound and minor abrasions. She died from a single gunshot wound to the back of her head, administered when the gun was partially touching her skin.

## TRIAL BACKGROUND

A first trial resulted in a not-guilty verdict as to first degree murder. The jury was unable to reach a verdict as to lesser offenses, and a mistrial was declared. The charge at the time of the second trial therefore was second degree murder (which embraced the possibility of lesser included offenses of voluntary or involuntary manslaughter) and an enhancement for weapons use. The defense's position was that Pablo was justified through self-defense in grabbing the gun, that the homicide was excusable as an accident, and that if Pablo were guilty of anything it would be a lesser included offense of manslaughter.

Since there was no issue as to the cause of death or the fact that Pablo had the gun in his hand at the time it fired, the jury's sole task was to determine the nature of the homicide. It would be second degree murder if found to be an intentional killing accompanied by malice (but not with premeditation, which was ruled out by the verdict in the first trial). If the jury were to find no malice but an unlawful killing, it would return a verdict of manslaughter. If the jury were to conclude the killing was accidental and that

7

Pablo's attempts to wrest the gun from Alma were justified by self-defense, then a not-guilty verdict would result.

Hence, the court's instructions on the subject of malice were of unusual importance in the case. Malice can be either express or implied. It is express when there is "manifested an intention unlawfully to kill a human being." (CALJIC No. 8.11 (5th ed. 1988).)[2] Since there was little or no evidence of Pablo's actual desire to kill Alma or his objective for doing so, at any time, the prosecution's case for second degree murder rested, as a practical matter, on a showing of implied malice. The standard instruction is that malice is implied when a killing results from an intentional act, the natural consequences of which are dangerous to human life, and the act is deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. (CALJIC No. 8.11.)

## INSTRUCTIONAL ERROR

The court gave the jury basic instructions on the definition of murder and explained the concepts of express and implied malice. Relating malice to second degree murder, the court stated that "Murder of the second degree is also the unlawful killing of a human being when: one, the killing resulted from an intentional act; two, the natural consequences

---

[2]  All CALJIC instructions referred to are from the fifth edition unless otherwise noted.

8

of the act are dangerous to human life; and three, the act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life." To this point the wording of the instruction is straight from CALJIC No. 8.11, is applicable to this case, and is unobjectionable.

Next the court gave a tailored instruction designed (presumably) to deal with the possibility of mixed views of jurors on the source of their possible finding of malice. The instruction, given both orally and later delivered in writing, was as follows:

> "In order to convict the defendant of second degree murder, the jury must unanimously agree beyond a reasonable doubt that a second degree murder as defined in these instructions has been committed, but it is not necessary for the jury to unanimously agree as to the theory of second degree murder; to wit, as to whether it was an unlawful killing with malice aforethought or a killing resulting from an unlawful act dangerous to human life."

It can be seen that this instruction is technically defective in that it classifies the two kinds of second degree murder as "an unlawful killing with malice aforethought" and a "killing resulting from an unlawful act dangerous to human life." Any finding of second degree murder requires a determination of malice. The court evidently was attempting to distinguish between express and implied malice. The error in the instruction asserted by appellant to be damaging, however, is the suggestion that second degree murder can be "a killing

9

resulting from an unlawful act dangerous to human life." At a later point the court commenced an instruction by saying "If a person causes another's death while committing a felony inherently dangerous to human life, the crime is murder." The court recognized its error, and after a discussion with counsel at side bar, advised the jury that it would "start the last instruction over again," and proceeded to give a correct instruction on manslaughter resulting from the commission of a misdemeanor.

As more fully developed later in the trial, it became the defense's position that the prosecution improperly argued second degree felony murder to the jury. While no objection to the above referenced "tailored" instruction or the false start on felony murder was made at trial, on appeal it is argued that these court references constituted a partial erroneous instruction on second degree felony murder, which, when combined with later prejudicial prosecution argument, misled the jury.

We cannot accept this contention. It is true that the phrasing of the second degree murder instruction was technically incorrect and insofar as reflecting the require-ments for implied malice was incomplete. We must note, however, that the instruction immediately followed a complete and accurate instruction on second degree murder resulting from implied malice. The fragmentary instruction was immediately

corrected. There had not, at this point in the trial, been any reference to second degree felony murder. We deem any minor error in these instructions to be harmless beyond a reasonable doubt, at least <u>at this point</u> in the proceedings.

Appellant's contention is not so much that these missteps by the court were prejudicial, but that when combined with improper argument by the prosecution the end result was a misleading of the jury.

The prosecution had requested the court give CALJIC No. 8.32, entitled "Second Degree Felony Murder," which (as modified by the prosecution) would have instructed that death occurring during the commission of "spouse beating" is second degree murder. The court refused to give this instruction upon the authority, correctly we believe, of <u>People</u> v. <u>Smith</u> (1984) 35 Cal.3d 798. Had the prosecution been able to rely on this instruction, it would have had to prove only (1) an unlawful felony spouse beating and (2) resultant death. The implied malice instruction previously given by the court required <u>three</u> elements: (1) an unlawful killing of a human being resulting from an intentional act, (2) the natural consequences of the act are dangerous to human life, and (3) the act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.

Even though the prosecutor had been educated by the court as to the inappropriateness of his proffered felony-murder

11

instruction, his argument failed to give recognition to the problem. He stated at one point that one kind of second degree murder is "a killing resulting from an unlawful act dangerous to human life." The serious transgression in his argument, however, came in rebuttal. Referring to Pablo's beating of Alma, he said:

> "Well, if a parent does that to a child, we call it child abuse, if one person does it to a stranger, we call it assault, and if a husband does it to a wife or a wife does it to her husband, it is called spousal abuse, and if you kill any person under these circumstances we call it second degree murder . . . ."

Defense counsel at this point objected; the court after a bench conference sustained the objection and admonished the prosecutor; the court required the prosecutor to remedy the improper argument by a correct statement to the jury. The prosecutor thereafter complied with reasonably accurate corrective statements. Notwithstanding, defense counsel continued to argue that the confusion probably created by the prosecutor's statements had not been corrected. In response to the defense's position, the court interrupted the prosecutor's closing argument and gave the following instruction:

> "In order to arrive at the degree of second-degree murder, you must find there was an unlawful killing with malice aforethought or the killing resulted from an intentional act dangerous to human life as I have previously defined both of these to you in my instructions. If the jury is unable to agree that a murder in the second degree

12

> as defined in the court's instructions has
> occurred, you cannot find the defendant
> guilty of murder in the second degree merely
> because the killing occurred during any
> spousal abuse you may believe to have
> occurred."

Appellant recognizes that this instruction was correct and met his objection. He continues, however, to urge that the totality of the message to the jury was confused and probably prejudicial. Appellant urges reversal and retrial because he contends this was a particularly close case. We agree with this position, recognizing that the first trial resulted in a hung jury and that the facts presented to the second jury created what must have been a difficult call between manslaughter and second degree murder (assuming rejection of the self-defense argument). We therefore review the entire record for an assessment of prejudice.

We conclude that whatever error was created by the above recited statements to the jury cannot have been prejudicial. The several erroneous comments by court and counsel set forth above have been taken out of context. When put back into context they seem not so likely to have caused confusion.

It should be noted at the outset that the discussion of the felony-murder instruction, originally requested by the prosecution, never reached the jury's ears. The jury in fact never was given anything approaching a felony-murder instruction.

13

The prosecution's reference to a killing during the course of spousal abuse being murder came not out of the blue, but following accurate statements by the prosecution to the jury as to the requisites of implied malice supportive of second degree murder. The prosecution recited for the jury the three-pronged requirement not once, but _three_ _times_: twice before and once following the objectionable reference to spousal abuse.

Perhaps most persuasive in measuring the effect of the "spousal abuse" argument is an understanding of the circumstance in which the argument was made. Defense counsel during the course of his argument had displayed to the jury a chart which accurately set forth CALJIC No. 8.31. Counsel then directed extended argument to the three specific requirements for a finding of implied malice. When the prosecutor later presented closing argument he referred to the chart, which evidently remained before the jurors, telling them: "There is another type of murder, and that was the murder that Mr. Espinoza put up on the board there, a jury instruction number 8.31. You should read that one very carefully." This chart was apparently before the jury throughout argument, including the "spousal abuse" argument of the prosecutor. In light of the jury's continuing ability to focus on all three of the specific requirements of CALJIC No. 8.31 during argument, the reference by the prosecutor (and, it can be argued, by the judge) to implied malice for second degree murder by shorthand

14

phrases which did not include all three elements cannot, we find, be deemed misleading.

## JURY PANEL COMPOSITION

Appellant challenged the jury composition at the trial court level, and appeals the denial of his motion to quash the jury panel. The claim was two-fold: (1) that although the master jury pool contained proportionate representation of Hispanics, the actual panels assembled therefrom were disproportionately low in Hispanic representation, and (2) that the appropriate community from which to draw the jury should have been that within a radius of 25 miles of the courthouse, rather than the entire county.

In order to establish a violation of the requirement that the jury constitute a fair cross section of the community, the defendant must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (People v. Sanders (1990) 51 Cal.3d 471, 491, quoting from Duren v. Missouri (1979) 439 U.S. 357, 364.) The defendant acknowledges that he introduced no evidence to show any "systematic exclusion," and hence the challenge on this ground must be denied.

15

Appellant's second challenge to the jury panel, relating to the vicinage from which it was chosen, has been resolved by <u>Hernandez</u> v. <u>Municipal Court</u> (1989) 49 Cal.3d 713, 719. A vicinage comprised of the county in which the case is tried is proper.

### DISPOSITION

The judgment is affirmed.

_____
FROEHLICH, J.

WE CONCUR:

_____
HUFFMAN, J.

_____
LIM, J.*


*Assigned by the Chairperson of the Judicial Council.

16