# EXHIBIT C
# Part 1 of 3

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:            )        CDC Number E-17284
                       )
PABLO AGRIO            )
                       )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

DECEMBER 06, 2005

1:58 A.M.

PANEL PRESENT:

TOM SAWYER, Presiding Commissioner
BRUCE MITCHELL, Deputy Commissioner

OTHERS PRESENT:

PABLO AGRIO, Inmate
PAT FOX, Attorney for Inmate
PHYLLIS SHESS, Deputy District Attorney
LAURA MORTON, Translator
MS. MEDINA, Mother of victim
JOHN BARNES, Victim Services Coordinator
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No      See Review of Hearing
_____ Yes     Transcript Memorandum

**Felicia Townsend, Peters Shorthand Reporting**

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 3 |
| Case Factors | 12 |
| Pre-Commitment Factors | 22 |
| Post-Commitment Factors | 41 |
| Parole Plans | 25 |
| Closing Statements | 78 |
| Recess | 97 |
| Decision | 98 |
| Adjournment | 106 |
| Transcriber Certification | 107 |

--oOo--

1

1       **P R O C E E D I N G S**

2       **DEPUTY COMMISSIONER MITCHELL:**  We're on

3   record.

4       **PRESIDING COMMISSIONER SAWYER:**  Thank

5   you. This is a subsequent parole consideration

6   hearing for Pablo Agrio.  Did I pronounce that

7   correctly?

8       **INMATE AGRIO:**  Yes

9       **PRESIDING COMMISSIONER SAWYER:**  Agrio.

10  Thank you. CDC number E-17284.  Today's date is

11  Tuesday December 6, 2005.  The time is 1:58

12  p.m., correctional training facility in Soledad.

13  The date received is 5/15/1989.  The date -- the

14  life term started in 5/1/ of 1990, the

15  commitment county is San Diego.  The offense was

16  murder in the second degree with a use of a

17  firearm, case number CR, Charles Robert, 95364

18  count number one is 187 of the penal code as

19  well as 12022.5.  The term was 15 to life plus

20  two years.  Minimum eligible parole date is 4/30

21  of the year 2000.  This hearing is being tape

22  recorded.  For the purpose of voice

23  identification, each of us is required to state

24  our first and last name, spelling our last name.

25  When it comes to your turn Mr. Agrio, you spell

26  your last name and then also give us your CDC

27  number, okay?  Okay.  I'll start.  Tom Sawyer S-

2

1   A-W-Y-E-R, Commissioner.

2          **DEPUTY COMMISSIONER MITCHELL:** Bruce

3   Mitchell, M-I-T-C-H-E-L-L, Deputy Commissioner.

4          **TRANSLATOR MORTON:** Laura Morton, M-O-

5   R-T-O-N, Translator Support Person.

6          **MS. MEDINA:** (Indiscernible) M-B-O-R-A-

7   M-E-V-A-N-I, (indiscernible) mother.

8          **DEPUTY DISTRICT ATTORNEY SHESS:** Phyllis

9   Shess, S-H-E-S-S, District Attorney, County of

10  San Diego.

11         **CORRECTIONAL COUNSELOR BARNES:** John

12  Barnes, B-A-R-N-E-S, Correctional Counselor

13  Victim Services Coordinator.

14         **ATTORNEY FOX:** Pat Fox, F-O-X, Attorney

15  for Mr. Agrio.

16         **INMATE AGRIO:** Pablo Agrio, A-G-R-I-O,

17  Echo, 17286.

18         **PRESIDING COMMISSIONER SAWYER:** Thank

19  you. We also have two correctional peace

20  officers in the room for security purposes. The

21  record reflects that you signed a BPT form 1073,

22  which is a reasonable accommodation notice in

23  request in accordance with the provisions of the

24  American With Disabilities Act. You signed it

25  on 1/13/ of 05. I'm going to send this over to

26  you if you and your attorney can look at it and

27  make sure the information is (indiscernible) and

3

1   correct.  I do notice that for the record you're

2   wearing glasses, do you need those to read Mr.

3   Agrio?

4          INMATE AGRIO:  Yes, sir.

5          PRESIDING COMMISSIONER SAWYER:  Okay.

6   That is considered a disability but -- of which

7   quite a few of us have.  Is the information

8   current and correct on that, sir?

9          INMATE AGRIO:  Yes.

10         PRESIDING COMMISSIONER SAWYER:  Okay.

11  May I have that back, please?  You can see that

12  all right with those glasses, sir?

13         INMATE AGRIO:  Yes, I can.

14         PRESIDING COMMISSIONER SAWYER:  Okay,

15  very good.  Also, your counsel has given us a

16  copy of the accommodations for disabilities,

17  which we've talked a little about and then the

18  outline for the hearing procedure that we

19  normally -- I would normally read as long as the

20  inmate's rights and confidential material.  It's

21  been signed by today December 5 -- December 6,

22  05, and it's signed by your attorney, Patricia

23  Fox, and you.  Do you understand what this was

24  for?  Did she talk to you about this?

25         INMATE AGRIO:  Yes, I do.

26         PRESIDING COMMISSIONER SAWYER:  Okay.

27  And you're going to waive the reading of the

.4

1  disabilities hearing transcripts -- or the

2  hearing procedure, the rights have all been met?

3          ATTORNEY FOX:  Yes.

4          PRESIDING COMMISSIONER SAWYER:  Okay.

5  Very good, thank you.

6          ATTORNEY FOX:  You're welcome.

7          PRESIDING COMMISSIONER SAWYER:

8  Commissioner Mitchell, is there any confidential

9  material to be used in this hearing.

10          DEPUTY COMMISSIONER MITCHELL:  There is

11  confidential, but not that it will be used.

12          PRESIDING COMMISSIONER SAWYER:  Okay,

13  very good.  I'm going to pass over Exhibit One,

14  Counsel, this is the hearing checklist and if

15  would pass it on to the district attorney, Ms.

16  Shess, did I pronounce that right?

17          DEPUTY DISTRICT ATTORNEY SHESS:  Shess.

18          PRESIDING COMMISSIONER SAWYER:  Shess.

19          ATTORNEY FOX:  Yes, I do have the

20  documents.  Additionally, I was served with a

21  letter for the officer of the district attorney

22  just today, so I'll be objecting to that, and

23  also from the officer of the chief of the police

24  that was just served on me today.  There is also

25  an impact statement from the victim's mother,

26  and so I'd about to that being considered by the

27  panel today.  I understand that the victim's

5

1    mother is here and I think perhaps she could

2    speak for herself today through her support

3    person, an interpreter.  Also included are -- it

4    appears to be a packet of selective newspaper

5    reports as well as an investigator's report from

6    the San Diego Police Department, so I would be

7    objecting to all that.  However, I did receive

8    it just today.

9              PRESIDING COMMISSIONER SAWYER:  I'll

10   sustain that objection.

11             ATTORNEY FOX:  Thank you, and --

12             PRESIDING COMMISSIONER SAWYER:  In

13   violation the 10-day rule.

14             ATTORNEY FOX:  That's correct, thank

15   you.  Other than that, I have the items, and I

16   will pass the checklist to the deputy district

17   attorney.

18             PRESIDING COMMISSIONER SAWYER:  And in

19   your packet there is -- or I should say in my

20   packet, which should be in your packet, there is

21   a letter from the City of San Diego dated

22   November 15, 2005, not that packet.  In your

23   board packet under --

24             ATTORNEY FOX:  Notices --

25             PRESIDING COMMISSIONER SAWYER:  -- and

26   responses.

27             ATTORNEY FOX:  The only letter I have

6

1    there is from Raymond Olaverez.  I have no other

2    official letters in my packet.

3         **PRESIDING COMMISSIONER SAWYER:**  In the

4    board packet?

5         **ATTORNEY FOX:**  In the board packet,

6    correct.

7         **PRESIDING COMMISSIONER SAWYER:**  Well,

8    then I guess I won't be using them unless you --

9    is it okay if I read that letter from San Diego?

10        **ATTORNEY FOX:**  No, I'd object to that.

11        **PRESIDING COMMISSIONER SAWYER:**  Okay.

12        **ATTORNEY FOX:**  Based on the 10-day

13    rule.

14        **PRESIDING COMMISSIONER SAWYER:**  All

15    right. Thank you.  Is there any other documents

16    to be submitted?

17        **ATTORNEY FOX:**  Not that we haven't

18    already, however, if it develops through the

19    hearing that there are things that are not in

20    the Central File that are relevant, we'd ask

21    that we be granted leave to present them at that

22    time.

23        **PRESIDING COMMISSIONER SAWYER:**  Okay.

24    Let the record reflect that I did receive from

25    you today a packet containing letters and a

26    booklet that says parole plans that you brought

27    in?

7

1           **ATTORNEY FOX:**  Yes, that's correct.  It

2  was prepared by Mr. Agrio.

3           **PRESIDING COMMISSIONER SAWYER:**  Okay.

4           **DEPUTY DISTRICT ATTORNEY SHESS:**  Does

5  counsel have a copy of that for the district

6  attorney?

7           **ATTORNEY FOX:**  No.

8           **PRESIDING COMMISSIONER SAWYER:**  I will

9  have a copy made for you and this also includes

10  letters of support, which you will have --

11           **DEPUTY DISTRICT ATTORNEY SHESS:**  I do

12  have some letters of support, which likewise

13  I've just received today.  I do not obviously

14  have a copy of that.

15           **PRESIDING COMMISSIONER SAWYER:**  Okay.

16           **DEPUTY DISTRICT ATTORNEY SHESS:**  Could

17  I ask for clarify case on one earlier point,

18  Commissioner?

19           **PRESIDING COMMISSIONER SAWYER:**  Sure.

20           **DEPUTY DISTRICT ATTORNEY SHESS:**  You

21  referred to the November 15, 2002, letter?

22           **PRESIDING COMMISSIONER SAWYER:**  Five.

23           **DEPUTY DISTRICT ATTORNEY SHESS:**  Oh.

24           **PRESIDING COMMISSIONER SAWYER:**  Was

25  that in your packet.

26           **DEPUTY DISTRICT ATTORNEY SHESS:**  The

27  November 15, 2002, letter is in my packet should

8

1    be --

2              **PRESIDING COMMISSIONER SAWYER:**   Two or

3    five?

4              **DEPUTY DISTRICT ATTORNEY SHESS:**   Two.

5    It should be in counsel's packet.   It was used

6    at previous hearings and actually the current

7    letter, which the court I believe did sustain

8    the 10-day objection to, referred back to that

9    letter.   I'm asking the board does consider the

10   November 15, 2002, letter certainly has been in

11   there for a number of years.   With regard to the

12   parole plans packet, although I do not have a

13   copy.   If I can get a copy before I would leave,

14   that would be fine.   I don't want to delay the

15   hearing --

16             **PRESIDING COMMISSIONER SAWYER:**   Okay.

17             **DEPUTY DISTRICT ATTORNEY SHESS:**   -- to

18   have a copy made however.

19             **PRESIDING COMMISSIONER SAWYER:**   Thank

20   you.   And I also have a --

21             **ATTORNEY FOX:**   No objections to the

22   2002 letter.

23             **PRESIDING COMMISSIONER SAWYER:**   Pardon?

24             **ATTORNEY FOX:**   No objections to the

25   2002 letter.   I think it's in the Central File.

26             **PRESIDING COMMISSIONER SAWYER:**   Thank

27   you.

9

1          **ATTORNEY FOX:**  It's not practice of the

2   institution to include all past letters in our

3   slow --

4          **PRESIDING COMMISSIONER SAWYER:**  That's

5   correct.

6          **ATTORNEY FOX:**  -- packets, so I don't

7   object to that one.

8          **DEPUTY DISTRICT ATTORNEY SHESS:**  And

9   the 2002 letter includes with it photographs,

10  the videotape impact statement, the coroner's

11  report, and the autopsy report as a part of it.

12  And although this -- Mrs. Medina, of course, ·

13  will be making her comments whatever they making

14  be today.  Those reflect her feelings in 1994,

15  and I think they're appropriately considered by

16  the panel.

17         **PRESIDING COMMISSIONER SAWYER:**  Okay.

18  We'll see if we can kind that, and I will give

19  you -- when we're finished, I'll give you my

20  copy of the parole plans.  How's that?

21         **DEPUTY DISTRICT ATTORNEY SHESS:**  I

22  don't want to take the only one, Commissioner.

23         **PRESIDING COMMISSIONER SAWYER:**  It's

24  not the only one.

25         **DEPUTY DISTRICT ATTORNEY SHESS:**  Okay,

26  good.

27         **PRESIDING COMMISSIONER SAWYER:**  We have

10

1   two (indiscernible)

2           **DEPUTY DISTRICT ATTORNEY SHESS:**  That

3   would be good, thank you.  Do you mind giving

4   her this one?

5           **DEPUTY COMMISSIONER MITCHELL:**  No, not

6   at all.

7           **PRESIDING COMMISSIONER SAWYER:**  Okay.

8   We solved that problem.

9           **DEPUTY DISTRICT ATTORNEY SHESS:**  Okay.

10          **PRESIDING COMMISSIONER SAWYER:**

11  (Indiscernible) that's fine.

12          **DEPUTY DISTRICT ATTORNEY SHESS:**  Thank

13  you.

14          **PRESIDING COMMISSIONER SAWYER:**  It's

15  mostly letters; isn't it?  And then the parole

16  plans are three or four pages?

17          **INMATE AGRIO:**  Yes, sir.

18          **PRESIDING COMMISSIONER SAWYER:**  Okay.

19  And we'll get down into that.  I think I

20  probably have duplicates and triplicates between

21  my file, the ones that came in that you brought,

22  and the ones that I got in late May, so we'll

23  sort that out.

24          **DEPUTY DISTRICT ATTORNEY SHESS:**  Okay.

25          **ATTORNEY FOX:**  And Commissioner, could

26  I just finally before I get started ask for

27  clarification is the board then going to

11

1  consider the November 15, letter and its

2  attachments?

3         PRESIDING COMMISSIONER SAWYER:  Of '02,

4  yes.

5         ATTORNEY FOX:   Thank you.

6         PRESIDING COMMISSIONER SAWYER:  Let me

7  have the documents then.

8         DEPUTY COMMISSIONER MITCHELL:  The C-

9  File?

10        PRESIDING COMMISSIONER SAWYER:  This is

11 not in the C. file.  This will be sent in by the

12 D.A.'s officer impact statement, photographs?

13        DEPUTY DISTRICT ATTORNEY SHESS:  Yes, I

14 have copies if --

15        PRESIDING COMMISSIONER SAWYER:  We have

16 all of those.

17        DEPUTY DISTRICT ATTORNEY SHESS:  Oh, I

18 thought you did, thank you.

19        PRESIDING COMMISSIONER SAWYER:  We have

20 both the tape and the transcription of the tape.

21        PRESIDING COMMISSIONER SAWYER:  All

22 righty then.  Any other objections, Counsel?

23        ATTORNEY FOX:  No, I think that handles

24 it for now.

25        PRESIDING COMMISSIONER SAWYER:  Okay,

26 good.  We'll just relax (indiscernible).  Will

27 the inmate be speaking with the panel?

12

1          **ATTORNEY FOX:**  Yes.

2          **PRESIDING COMMISSIONER SAWYER:**  You'll

3     be speaking with the panel?

4          **INMATE AGRIO:**  Yes, sir.

5          **PRESIDING COMMISSIONER SAWYER:**  Okay.

6     Thank you.  Would you raise your right hand,

7     sir?  Do you solemnly swear or affirm that the

8     testimony you are about the give in this hearing

9     will be the truth, the whole truth, and nothing

10    but the truth?

11         **INMATE AGRIO:**  I do.

12         **PRESIDING COMMISSIONER SAWYER:**  Thank

13    you.  And I'm going to be reading the summary of

14    the crime, which is very brief, but -- and then

15    I'll either read or ask the inmate if he'd like

16    to give me his version:

17              On the evening of 3/26/1988

18              approximately 11:30 p.m. Alma

19              Agrio was shot to death by Pablo

20              Agrio during a domestic

21              argument.  She died from a

22              single gunshot wound to the back

23              of her head.  Following the

24              shooting, Agrio called for

25              paramedics and police.  Mrs.

26              Agrio was already dead by the

27              time they arrived.

13

1    Can you tell me what happened?  Or would you

2    rather have me read it?

3              **INMATE AGRIO:**  I would prefer if you

4    read it, sir, and I'll explain why.  In the

5    past, when I've tried to speak to previous

6    panels about what happened, because of any

7    nervousness and anxiety about what's going on

8    here, I've had a tendency to ramble on and talk

9    about things that really weren't relevant, sir,

10   and what I end up doing is I get myself in

11   trouble, and I've talked to my attorney about

12   this, and I'm prepared to answer questions that

13   you ask of me but when it comes to the facts of

14   the crime, I would rather you just go by what's

15   in the record and I would stipulate to do that.

16   It item accurate and I accept everything that is

17   in there as being correct in truth or fiction of

18   what happened on that night.

19              **PRESIDING COMMISSIONER SAWYER:**  Okay.

20   That's fair enough.

21              **DEPUTY DISTRICT ATTORNEY SHESS:**

22   Commissioner, I'm sorry to do this, but is he

23   accepting the facts of the offense as outlined

24   in the Appellate Decision, which would normally

25   be the factual basis that we would work with, or

26   simply the several summary lines, which you have

27   read.  I just need to know which direction he's

14

1   going?

2          **PRESIDING COMMISSIONER SAWYER:**   Okay.

3   She's asking me that question.  And I'll -- the

4   question is the same to you.  Is it the facts

5   from --

6          **INMATE AGRIO:**  My feeling and it is

7   that the facts that you've read and the facts

8   that appear in the appellate version are both

9   accurate, and I don't have any objections to

10  either one of them.

11         **PRESIDING COMMISSIONER SAWYER:**   Okay.

12         **DEPUTY DISTRICT ATTORNEY SHESS:**   Thank

13  you.

14         **PRESIDING COMMISSIONER SAWYER:**   Thank

15  you.  During an interview with Agrio, he stated

16  that the version -- that his version of events,

17  as stated in the probation officer's report, are

18  still valid but with minor changes.  Chancing

19  the words angry and infuriated for upset:

20          At about 5:00 p.m. Mrs. Agrio

21          had gone out with a girlfriend

22          to celebrate her impending

23          graduation from sheriffs

24          correctional officers school.

25          Mr. Agrio had made -- Mrs. Agrio

26          had made Agrio upset by

27          requesting permission from him

15

1    to go out while a third person

2    was present.  Mrs. Agrio was

3    supposed to return home by 9:00

4    p.m. so she could take the

5    babysitter home.  As the evening

6    progressed, Agrio became more

7    upset about his wife being out

8    partying.  Around 8:30 p.m. he

9    took the babysitter home

10    returning to his own home at

11    proximately 9:00 p.m.  At this

12    time, Agrio put the baby to bed,

13    took a shower, then dressed

14    because he decided to go out for

15    a drink on his own when his wife

16    came home.  During the next hour

17    and a half, Agrio found himself

18    getting upset -- more upset

19    because his wife was late coming

20    home.  She finally came home at

21    proximately 10:30 p.m.  Agrio

22    could tell that she had been

23    drinking.  She went to the

24    master bedroom with Agrio

25    yelling at her in regards to her

26    behavior.  He did not argue --

27    she did not argue with Agrio but

16

1    seemed contrite.  When she tried

2    to go to the bathroom, Agrio

3    would not let her go and held

4    her on the bed.  Eventually

5    Agrio let her go to the

6    bathroom, but Agrio wouldn't let

7    her close the door as she used

8    it.  She then reentered the bath

9    -- bedroom from the bathroom.

10    She began to actively argue with

11    him requesting his authority as

12    to tell her what to do.  At one

13    point, Agrio walked from the

14    bedroom and then she closed the

15    door.  This further upset him.

16    Agrio kicked the door in causing

17    it to splinter and ruin parts of

18    the door jam.  He grabbed her,

19    through her on the bed.  She

20    grabbed the phone to call the

21    police but he took it from her

22    and put it in a drawer.  While

23    doing so, she went to the

24    kitchen and tried to use the

25    kitchen phone.  Agrio came after

26    her and grabbed that phone too.

27    She grabbed her car keys and

17

1    Agrio wrestled with her for
2    control of them.  While
3    wrestling, they fell to the
4    floor.  After getting up, she
5    followed Agrio to the bedroom
6    where Agrio attempted to put the
7    kitchen phone in the drawer.
8    She grabbed a jacket that had
9    been lying on the bed and began
10   hitting with it.  When one blow
11   struck Agrio in the face, he
12   kicked her in the leg very hard.
13   He was also -- he was so upset
14   with her behavior that Agrio
15   began tearing up her graduation
16   announcements that were stacked
17   on the dresser drawer.  As Agrio
18   tore up the invitations, he told
19   her that he'd already -- she
20   already done her partying that
21   she would not be going to the
22   graduation.  At this point, she
23   went to the drawer, located in
24   the headboard, where guns were
25   kept.  She took a gun out and
26   pointed it at him.  Agrio
27   stopped tearing up the

18

```
 1              invitations, ran towards her,
 2              grabbed her hand and then got
 3              around her.  Pushing her to the
 4              floor while trying to grab the
 5              gun from her, Agrio was able to
 6              grab the gun and pulled it away
 7              from behind it discharged into
 8.             the back of her head killing
 9              her.  Agrio said his finger must
10              have been on the trigger and the
11              gun went off accidentally.
12  Is that what happened?
13          INMATE AGRIO:  Yes, sir.
14          PRESIDING COMMISSIONER SAWYER:
15  Anything you want to clarify there or anything I
16  said wrong?
17          INMATE AGRIO:  (Indiscernible)
18          PRESIDING COMMISSIONER SAWYER:  I'm
19  sorry?
20          INMATE AGRIO:  The only thing that I
21  would want to clarify in regards to what you
22  read there, sir, as to not confuse anyone here
23  is that in the past also we've -- I've had a
24  little problem with the use of the word
25  accident, and I just want to make it clear to
26  the panel, sir, that accidental shooting was my
27  legal defense.  That was the defense that my
```

19

1   attorney presented in court, but that -- I've

2   always maintained since the day that I was

3   interrogated that the shooting was the result of

4   an unintentional act on my part and I just want

5   you to know that.  That I'm not claiming that

6   the death was a result of an accident but it was

7   a result of an unintentional act on my part.

8        PRESIDING COMMISSIONER SAWYER:  Uh-huh.

9   Okay.  I've got a question for you that's not

10   addressed here?  You were getting ready to go

11   out for a drink when she got home.  Were you

12   drinking while you were at home?

13        INMATE AGRIO:  No, sir.

14        PRESIDING COMMISSIONER SAWYER:  You

15   hadn't had anything to drink before this

16   incident?

17        INMATE AGRIO:  No, sir.  I have with me

18   a copy of my opening brief on appeal and I have

19   reviewed the events of that day, and it is

20   clearly stated in that document that I did not

21   have anything to drink and the homicide

22   investigator stated that, and I have that with

23   me if you wish to see it, sir.

24        PRESIDING COMMISSIONER SAWYER:  Did

25   they do a blood alcohol on you?

26        INMATE AGRIO:  Yes, they did.

27        PRESIDING COMMISSIONER SAWYER:  And

20

1   that result?

2           INMATE AGRIO:   It came out negative.

3           PRESIDING COMMISSIONER SAWYER:   Okay.

4   Any drugs?

5           INMATE AGRIO:   No drugs.

6           PRESIDING COMMISSIONER SAWYER:   Okay.

7   How old is your child at this time?

8           INMATE AGRIO:   He was born in 1986.

9   That would make him about 19, I think.

10          PRESIDING COMMISSIONER SAWYER:   I'm

11   sorry, at the time of the offense?

12          INMATE AGRIO:   Oh, he was about a

13   little under two years old.

14          PRESIDING COMMISSIONER SAWYER:   Was he

15       --

16          INMATE AGRIO:   A little over two.

17          PRESIDING COMMISSIONER SAWYER:   Was he

18   walking?

19          INMATE AGRIO:   Yes.

20          PRESIDING COMMISSIONER SAWYER:   And

21   where were the guns kept?

22          INMATE AGRIO:   It's a big -- big bed.

23   It had a huge headboard with cabinets in them,

24   and I kept my service revolvers there.   You

25   know, in the morning when I got dressed, I just

26   reached over and take with me what I was going

27   to take with me to work.

21

1          PRESIDING COMMISSIONER SAWYER:  Uh-huh.
2   Was the baby ever on the bed?
3          INMATE AGRIO:  No, it was a two story
4   condominium, you know, the master bedroom was
5   downstairs --
6          PRESIDING COMMISSIONER SAWYER:  Right.
7          INMATE AGRIO:  -- and the baby -- and
8   the babysitter lived upstairs.
9          PRESIDING COMMISSIONER SAWYER:  Okay.
10  But was the baby ever on your bed?
11         INMATE AGRIO:  No.
12         PRESIDING COMMISSIONER SAWYER:  Never?
13         INMATE AGRIO:  Not when -- with guns
14  around, not if that is what you are employing.
15         PRESIDING COMMISSIONER SAWYER:  That's
16  where I'm going.
17         INMATE AGRIO:  No, not like that.
18         PRESIDING COMMISSIONER SAWYER:  Okay.
19  So you didn't feel you needed the guns to have a
20  handcuff through them or be unloaded?
21         INMATE AGRIO:  Well, in retrospect that
22  you have been a good idea, but no at the time
23  I'd have to say that I didn't have any safe-use
24  measures because I kept the revolver in my
25  holster.
26         PRESIDING COMMISSIONER SAWYER:  Uh-huh.
27         INMATE AGRIO:  My Sam Brown is what

22

1   they call it.

2           PRESIDING COMMISSIONER SAWYER:  Right.

3           INMATE AGRIO:  With the hook on it, so

4   -- and it was pretty high up, so at the -- I

5   felt that that was safe enough for that

6   particular time.

7           PRESIDING COMMISSIONER SAWYER:  The

8   whole Sam Brown fitted in the drawer?

9           INMATE AGRIO:  Yes, sir.

10          PRESIDING COMMISSIONER SAWYER:  Fit in

11  the drawer.

12          INMATE AGRIO:  It's not a drawer.  It

13  was like just a cabinet with a door that just

14  kind of lodged to it.

15          PRESIDING COMMISSIONER SAWYER:  Okay.

16  And you obviously had been trained?  You went

17  through the academy?

18          INMATE AGRIO:  Yes, sir.

19          PRESIDING COMMISSIONER SAWYER:  And how

20  long were you in the academy?

21          INMATE AGRIO:  I think the academy

22  lasted close to two months, maybe a little bit

23  over that.

24          PRESIDING COMMISSIONER SAWYER:  And was

25  gun safety and weapons qualifications part of

26  your academy?

27          INMATE AGRIO:  Yes, sir.

23

1          **ATTORNEY FOX:**  And prior to that I

2     believe he served in the Marines?

3          **INMATE AGRIO:**  Yes, ma'am.

4          **ATTORNEY FOX:**  And did you receive

5     weapons training there as well?

6          **INMATE AGRIO:**  I did.

7          **PRESIDING COMMISSIONER SAWYER:**  Okay.

8     Thank you.

9          **ATTORNEY FOX:**  Your welcome.

10         **PRESIDING COMMISSIONER SAWYER:**

11    Obviously you have no rap sheet?

12         **INMATE AGRIO:**  No, sir.

13         **PRESIDING COMMISSIONER SAWYER:**  Okay,

14    only the commitment offence.  It says here you

15    were born in Panama?

16         **INMATE AGRIO:**  Yes, sir.

17         **PRESIDING COMMISSIONER SAWYER:**  Okay.

18    At age 17 you came to the United States with

19    your mother.  After arriving in this country,

20    you joined the Marines and served for seven

21    years?

22         **INMATE AGRIO:**  Yes, sir.

23         **PRESIDING COMMISSIONER SAWYER:**  Toward

24    the end of your career, you applied to the San

25    Diego Police Department and had been accepted,

26    and educationally you have a Bachelors of Arts

27    degree.

24

1      INMATE AGRIO:   Public Administration.

2      PRESIDING COMMISSIONER SAWYER:   Public

3  Administration, so that's a BS.  And did you get

4  that before you within the to the police

5  department?

6      INMATE AGRIO:   No, I worked.  While I

7  was working I would go to school at night.

8      PRESIDING COMMISSIONER SAWYER:  Uh-huh.

9  Did you get that before the commitment offence?

10      INMATE AGRIO:   Yes, sir.

11      PRESIDING COMMISSIONER SAWYER:  Okay.

12      INMATE AGRIO:   When the offense

13  happened, I was attending law school at night

14  also.

15      PRESIDING COMMISSIONER SAWYER:   I see.

16  Which school did this Bachelor of Science

17  degree?

18      INMATE AGRIO:   National University out

19  of San Diego.

20      PRESIDING COMMISSIONER SAWYER:   Okay.

21  Family consist of an elderly mother who lives in

22  Philadelphia.  Is she still with us?

23      INMATE AGRIO:   Yes.

24      PRESIDING COMMISSIONER SAWYER:   Okay.

25  Two brothers, one living and one dead.  Where

26  does your brother live?

27      INMATE AGRIO:   My brother lives in

25

1  Philadelphia also.

2          PRESIDING COMMISSIONER SAWYER:  Okay.

3  Your father lives somewhere in Costa Rica?

4          INMATE AGRIO:  He was in Panama at the

5  time.  I'm not sure if he's still around or not

6  though.

7          PRESIDING COMMISSIONER SAWYER:  Okay.

8  You haven't had any contact with him?

9          INMATE AGRIO:  No, sir.

10          PRESIDING COMMISSIONER SAWYER:  Do you

11  have contact with your mother and your brother?

12          INMATE AGRIO:  Constantly.

13          PRESIDING COMMISSIONER SAWYER:  Okay.

14  And how about your -- is it a son or a daughter?

15          INMATE AGRIO:  Son?

16          PRESIDING COMMISSIONER SAWYER:  Son.

17          INMATE AGRIO:  Junior.

18          PRESIDING COMMISSIONER SAWYER:  Are you

19  in contact with him?

20          INMATE AGRIO:  No, sir, unfortunately

21  not.

22          PRESIDING COMMISSIONER SAWYER:  Okay.

23  You'd been married less than a year at the time

24  of your wife's death?

25          INMATE AGRIO:  Yes, sir.

26          PRESIDING COMMISSIONER SAWYER:  And you

27  claim no alcohol or drug abuse?

26

1          INMATE AGRIO:  None, sir.

2          PRESIDING COMMISSIONER SAWYER:  No

3   psychological problems noted as well?

4          INMATE AGRIO:  No, sir.

5          PRESIDING COMMISSIONER SAWYER:  Okay.

6   Okay, parole plans.  Your parole plans have

7   changed from your '03, hearing.  You listed a

8   Rosy Hall --

9          INMATE AGRIO:  No sir, if

10   I may clarify sir?

11          PRESIDING COMMISSIONER SAWYER:  Yes.

12          INMATE AGRIO:  The parole plans remain

13   the same, sir.  I have since remarried to

14   Cathleen Boyd.  She lives out of Morro Bay and

15   she's been supporting me since 1992, and those

16   are my parole plans.  I would like to go live

17   with her if I'm found suitable for parole.

18          PRESIDING COMMISSIONER SAWYER:  Uh-huh.

19          INMATE AGRIO:  However, during one of

20   my previous hearings, the commissioner stated

21   that if I was to ever to be found suitable for

22   parole that I would have to have parole plans

23   for San Diego San Diego, because of that I

24   contacted my dear friend Rosy Hall and asked her

25   if in the event that I was -- that I needed to

26   parole to San Diego, would she take me in and

27   she said yes, she would love to, and that's the

27

1    reason why I've listed her as an alternative,

2    and of course as you notice there there's also

3    the alternative of Philadelphia where my mom

4    resides where I have many friends and supporters

5    and if I was to go will that they would also

6    take care of me.

7              PRESIDING COMMISSIONER SAWYER:  Okay.

8    You do indicate here alternatively if you have

9    to reside in San Diego with Rosy Hall -- what's

10   your relationship to Rosy Hall?

11             INMATE AGRIO:  I met Rosy -- she's a

12   friend.  I met her when I was stationed in San

13   Diego with the Marines and we became roommates,

14   and I lived with her for a long time until I was

15   transferred to Camp Pendleton, but we've

16   remained close friends since then, and she's

17   been a star supporter of mine and was there with

18   me during the time of this tragedy, sir.

19             PRESIDING COMMISSIONER SAWYER:  Did she

20   live with you at the time?

21             INMATE AGRIO:  Not at the time, but I

22   lived with her prior to that --

23             PRESIDING COMMISSIONER SAWYER:  Yeah.

24             INMATE AGRIO:  -- as roommates when I

25   was in the Marines.

26             PRESIDING COMMISSIONER SAWYER:  Okay.

27   And how's Cathleen feel about Rosy?

28

1        INMATE AGRIO: She doesn't know about

2   her.

3        PRESIDING COMMISSIONER SAWYER:  Okay.

4   I'm not going to tell.

5        INMATE AGRIO:  And by that I mean to

6   say that she doesn't know that she's part of my

7   parole plans in the event that I have to go to

8   San Diego, but she knows Rosy, yes.

9        PRESIDING COMMISSIONER SAWYER:  Oh,

10  okay.

11        INMATE AGRIO:  They met.

12        PRESIDING COMMISSIONER SAWYER:  She

13  just doesn't know about the deal?

14        INMATE AGRIO:  No, because she's

15  expecting me to fully come to Morro Bay and live

16  with her.

17        PRESIDING COMMISSIONER SAWYER:  Okay.

18        INMATE AGRIO:  And I'm just using that

19  as an alternative because I wouldn't want to be

20  denied parole just because I don't have parole

21  plans for San Diego.

22        PRESIDING COMMISSIONER SAWYER:  Right.

23  Well, the policy of the board is to generally

24  speaking, and it's primarily driven by local law

25  enforcement and the D.A.'s officer, is that they

26  don't want what's referred to as imports, people

27  from large counties going to small counties, do

29

1  you see what I mean?

2            INMATE AGRIO:  Yes, sir.

3            PRESIDING COMMISSIONER SAWYER:  Because

4  a lot of people would say yeah if I'm getting

5  out I've committed from San Diego or Los Angeles

6  or Orange and I'd sure like to go to -- I'd sure

7  like to live in Redding, you know, or Shasta

8  County so all of a sudden Redding's got a lot

9  more parolees from other counties than they've

10  committed into and, so it's the policy of CDC to

11  try to keep -- keep that down, however, this

12  board has the authority to order and it's not

13  uncommon for us to order a person to another

14  county and the -- we have to have a reason

15  obviously and usually it's because of support.

16  It's because you're going to be more likely to

17  succeed, you know, I'll give you an example I

18  person who has support in -- in Ventura County,

19  because their family's there or they can live

20  there they got a job perhaps there and all these

21  things are positive factors, if they go back to

22  where they came from in Los Angeles and they

23  hook up with their old gang and start running

24  with their old gang then you got -- it's obvious

25  isn't it?

26            INMATE AGRIO:  Yes.

27            PRESIDING COMMISSIONER SAWYER:  So in a

30

1    case like that we might order a person to go to

2    Ventura County.  And out-of-state transfers are

3    very difficult.  It takes a long time to do that

4    because usually what we're doing is we're

5    exchanging so if Pennsylvania has somebody that

6    they wanted to California vice versa we exchange

7    -- exchange parolees.  It says here your family

8    will provide financial support and aid to you

9    transportation living expenses.  I'm sure that's

10   in the letters?

11           **INMATE AGRIO:**  Yes, sir.

12           **PRESIDING COMMISSIONER SAWYER:**  Okay.

13   Also it indicated offers of employment in

14   attached letters.  You would -- in addition

15   during my incarceration I have upgraded

16   vocationally, educationally contained --

17   obtained a paralegal certificate from Blackstone

18   School of law in 1996.  Is that an accredited

19   school?

20           **INMATE AGRIO:**  I believe it is, yes,

21   sir.

22           **PRESIDING COMMISSIONER SAWYER:**

23   Graduated from North Western California,

24   University School of Law in 1999, completed

25   vocational computer refurbishing in 2001,

26   vocational data processing in 2002, also

27   attended several writing journalism classes

1    between 2001 and 2002.  I feel with my law

2    degree, my knowledge of computer, my prior

3    professional experience provide a marketable

4    skill, which enable me to secure employment

5    quickly in the event of the present job offers

6    have expired upon release.  As indicated above

7    education, you got your law degree, paralegal

8    certificate, and your certificates in the

9    vocations I just talked at as well as a BA from

10   the National University in San Diego, completed

11   one-on-one therapy at CMC and at Soledad State

12   Prison, completed parenting, anger management,

13   participated in Impact, narcotic's anonymous as

14   well as a 12-step recovery -- spiritual recovery

15   program from Miracle's Prison Ministry in

16   Wisconsin, still involved in the latter two and

17   you're a member of the California State Poetry

18   Society, is that right?

19           **INMATE AGRIO:**  Yes.

20           **PRESIDING COMMISSIONER SAWYER:**  Okay.

21   Attached is a résumé.  I'm not going to read the

22   whole résumé but it's nicely done.  I have some

23   letters of support March 25, 2004, from Steven

24   Roberts.  This is from Bellsure and Becker

25   Attorneys at Law in San Louis Obispo, so you

26   helped this organization?  You've helped this

27   attorney translate documents for the -- his

32

1   clients?

2         INMATE AGRIO:  No, sir.  The law firm

3   of Bellsure and Becker are known to my wife Mrs.

4   Cathleen Boyd, and they're aware of my

5   qualifications, my law degree etcetera, and they

6   would like to hire me in the event that I --

7         PRESIDING COMMISSIONER SAWYER:  Oh,

8   okay.

9         INMATE AGRIO:  -- get released.

10        PRESIDING COMMISSIONER SAWYER:  Okay.

11        INMATE AGRIO:  They feel that my

12   bilingual skills will be an asset to their law

13   firm in other words.

14        PRESIDING COMMISSIONER SAWYER:  That's

15   correct.  Okay, I have another letter from Mr.

16   Becker.

17        INMATE AGRIO:  It's probably

18   essentially the same one only the other one is

19   more recent one.

20        PRESIDING COMMISSIONER SAWYER:  Yeah,

21   this -- the Becker letter is 2000, this is 2004

22   from Mr. Roberts.  The Next Step Program.

23        INMATE AGRIO:  This is a professional

24   company that works with ex felons and I have

25   contacted -- hired them to do research in the

26   San Diego area.  In the event that I'm paroled

27   to the San Diego area, they have promised that

33

1  they would have no trouble at all me employment

2  based on my skills.

3          **PRESIDING COMMISSIONER SAWYER:**  Uh-huh.

4  And this is the letter you sent them?

5          **INMATE AGRIO:**  Yes, sir.

6          **PRESIDING COMMISSIONER SAWYER:**  The

7  Next Step?

8          **INMATE AGRIO:**  Right, sir.

9          **PRESIDING COMMISSIONER SAWYER:**  Okay.

10  That was dated August 27, 2002, and then a

11  letter back from them from Next Step.  They

12  said, as you say, that we found that there will

13  be numerous law firms in San Diego interested in

14  you.  And then there's a letter here that says

15  that they sent a letter, and another letter

16  duplicate actually from Mr. White in 2002.

17          **INMATE AGRIO:**  Most of those were the

18  same thing but they're just different dates.

19          **PRESIDING COMMISSIONER SAWYER:**  Yeah,

20  this is October 2002, from them and then we've

21  got Gordon and Bails Law Office.

22          **INMATE AGRIO:**  If I'm not mistaken, I

23  believe that one is from Philadelphia and that -

24  - again that applies to the alternative plan in

25  the event that I have to go to Philadelphia.  I

26  would also have an offer of employment there.

27          **PRESIDING COMMISSIONER SAWYER:**  They

34

1  talk about part time right now.

2         INMATE AGRIO: Yes, sir.

3         PRESIDING COMMISSIONER SAWYER: Okay.

4  And then a letter from your wife Cathleen Boyd

5  dated October 21, 2002. When did you marry her?

6         INMATE AGRIO: 1997.

7         PRESIDING COMMISSIONER SAWYER: Okay.

8  There's supposed to be a more recent letter,

9  sir, I think that I never received it, but I'm

10 quite sure that she forwarded it to the board.

11        PRESIDING COMMISSIONER SAWYER: Okay.

12 November 26, 2005. Let me just -- because you

13 have so many letters here. I'm just going to

14 kind of go easy on them, okay? This letter is

15 dated October 22, 2002, and she talks about your

16 accomplishments and certainly in support. Feels

17 you are suitable for parole. Then I have a

18 letter from Dan Mrotek, M-R-O-T-E-K, Attorney at

19 Law in San Louis Obispo and he's -- wrote this

20 letter of support. Has he been an attorney for

21 you?

22        INMATE AGRIO: He helped work with me

23 in issues of Rita Havious Corpus (phonetic) in

24 regards to previous hearings --

25        PRESIDING COMMISSIONER SAWYER: Uh-huh.

26        INMATE AGRIO: -- and he's familiar

27 with my case, sir.

35

1          PRESIDING COMMISSIONER SAWYER:  Okay.

2   And then this is from Juana, J-U-A-N-A, Agrio

3   that's your mother?

4          INMATE AGRIO:  Juana Agrio, yes, sir.

5          PRESIDING COMMISSIONER SAWYER:  Okay.

6   She resides in Philadelphia.  She's certainly in

7   support, talks about what you've done and this

8   is November 14, 2005, and then Nilsa, N-I-L-S-A-

9   U-R-E-N-A, in Philadelphia.  She's your niece?

10         INMATE AGRIO:  Yes, sir.

11         PRESIDING COMMISSIONER SAWYER:  Okay.

12  She's in support, and that's dated November 12,

13  2005.  I have a letter from Marie Urena, Pablo's

14  sister-in-law.  She certainly is in support.  I

15  have a letter from Ernesto Wilson, a friend of

16  yours?

17         INMATE AGRIO:  Yes, sir.

18         PRESIDING COMMISSIONER SAWYER:  You

19  attended high school.  It says you deserve a

20  second chance.  It's dated November 20, 2005.

21  Rosy's kids?

22         INMATE AGRIO:  Yes, sir.

23         PRESIDING COMMISSIONER SAWYER:  Okay,

24  Rosy Hall's kids Kimberly and Jamar, November 7,

25  2005, San Diego.  In support Rosy Hall she

26  indicates she would be -- you would be welcome

27  to live with her and her family.  Does she have