# EXHIBIT C
# Part 2 of 3

36

1   a husband?

2            **INMATE AGRIO:**  They're divorced.

3            **PRESIDING COMMISSIONER SAWYER:**  Okay.

4   November 7, 2005, St. Vincent Seminary in

5   Philadelphia November 19, 2005, and the Reverend

6   John Kennedy is a friend of your mother?

7            **INMATE AGRIO:**  Yes, sir.

8            **PRESIDING COMMISSIONER SAWYER:**  In

9   support, Franco Urena from Philadelphia.  This

10  is your nephew?

11           **INMATE AGRIO:**  Nephew, sir, yes.

12           **PRESIDING COMMISSIONER SAWYER:**  In

13  support.  Another letter from Philadelphia,

14  Peter, B-E-R-E-Z-I-A-K, a letter of support

15  dated November 10, 2005, Franklin Urena,

16  Philadelphia, November 15, 2005, a letter of

17  support and this is your brother?

18           **INMATE AGRIO:**  Yes, sir.

19           **PRESIDING COMMISSIONER SAWYER:**  Olga

20  Robertson from Carson, California.  November 6,

21  2005, a friend of the family for years.  She's

22  writing in support of parole, a letter of

23  November 15, 2005, from Catherine, M-U-H-S,

24  Mammoth Lakes, in support, Raymond Olivarez

25  Soledad, California.  He is an inmate?

26           **INMATE AGRIO:**  Yes, sir.  That's my

27  celli.

37

1          **PRESIDING COMMISSIONER SAWYER:**  That's

2  your celli?

3          **INMATE AGRIO:**  He's a former

4  professional too who was here in a similar

5  situation such as mine.  We've been living

6  together now for over a year, and he felt he

7  wanted to write in support of me.

8          **PRESIDING COMMISSIONER SAWYER:**  Okay.

9  That's dated September 1, 2005.  Is he still

10  your celli?

11          **INMATE AGRIO:**  Yes, sir.

12          **PRESIDING COMMISSIONER SAWYER:**  Okay.

13  And he's in support.  Buddhist Chaplaincy [sic]

14  from Max?

15          **INMATE AGRIO:**  Yeah, that's a program

16  that I'm currently attending, sir.  Buddhist

17  meditation.  I go once a week on Tuesday, and

18  this is the gentlemen that is the coordinator.

19          **PRESIDING COMMISSIONER SAWYER:**  Okay,

20  and that's January 20, 2005.  It says they're

21  not a candidate for laudatory Chrono but -- so

22  he's writing this letter.  It says you got good

23  attendance there.  He doesn't know anything

24  about the circumstances of your incarceration,

25  but participating on your behavior and attitude

26  in his study program he'd deserve serious

27  consideration.  And then I have a letter from

38

1   Robert Hedlund, H-E-D-L-U-N-D, from Tehachapi,

2   California, dated October 30, 2002, talks about

3   some of your accomplishments.

4            **INMATE AGRIO:**  He worked here, sir.  He

5   used to be the supervisor of the correctional

6   educational program, and he was my monitor while

7   I was doing the law school program here.

8            **PRESIDING COMMISSIONER SAWYER:**  Uh-huh.

9            **INMATE AGRIO:**  He's since past away

10  unfortunately, sir, so I don't have a more

11  current letter, but I thought his comments were

12  still relevant.

13           **PRESIDING COMMISSIONER SAWYER:**  Okay.

14  Last (indiscernible) says give this man a date.

15  Elizabeth Vazquez from San Diego.  This is your

16  sister?

17           **INMATE AGRIO:**  No, sir, that was just a

18  friend that I knew when I was living in San

19  Diego also.

20           **PRESIDING COMMISSIONER SAWYER:**  She

21  refers to you as my beloved brother.

22           **INMATE AGRIO:**  She's a minister now,

23  sir in the spiritual world.

24           **PRESIDING COMMISSIONER SAWYER:**  May 4,

25  2004, a letter of support.  It says my son-in-

26  law.  This is Susan Franklin DDS, Banesbridge

27  Island, son-in-laws --

39

1           INMATE AGRIO:  This is Cathleen's

2   mother, yes, and she since has past away too,

3   sir.

4           PRESIDING COMMISSIONER SAWYER:  April

5   15, 2004.  Another letter from Nilsa, 2003.

6   Another letter from Marie.  A letter dated

7   November 14, 2003, from Milatza, M-I-L-A-T-Z-A,

8   (indiscernible) Philadelphia.  She's in support.

9   (Indiscernible) Ramiro from Panama, November 7,

10  2003.  It's a friend of yours from school?

11          INMATE AGRIO:  Yes, sir.

12          PRESIDING COMMISSIONER SAWYER:  Okay,

13  Supporting.  Stephanie Ball, Bizmo (phonetic)

14  Beach.  She's a personal friend of Cathleen,

15  your wife?

16          INMATE AGRIO:  Yes, sir.

17          PRESIDING COMMISSIONER SAWYER:  Has she

18  ever been to visit you?

19          INMATE AGRIO:  No, sir.

20          PRESIDING COMMISSIONER SAWYER:  A

21  letter of support (indiscernible) Agrio.  Elaina

22  Wardon, August 2002, it's Philadelphia.  She

23  knows your family and knows you and certainly is

24  a letter of support.  Okay.  Now, bear with me

25  I've read that letter.  This is Jacqueline, B-U-

26  I-T-R-A-G-O, my son's uncle.  About his release

27  a support letter by William Schmitt, Attorney,

40

1  in Bizo Beach.

2          INMATE AGRIO:  He represented me in the

3  last hearing also, sir.

4          PRESIDING COMMISSIONER SAWYER:  I read

5  that.  We know Mr. Schmitt.  A letter from

6  Samuel Evans, who wrote some -- he writes a

7  little different letter, doesn't he?

8          INMATE AGRIO:  Yes, sir.  This

9  gentlemen is the oldest living democrat in the

10  United States.  It's a big thing in

11  Philadelphia.

12          PRESIDING COMMISSIONER SAWYER:  How old

13  is he?

14          INMATE AGRIO:  103.

15          PRESIDING COMMISSIONER SAWYER:  Wow.

16          INMATE AGRIO:  He just had a birthday

17  recently and he's still going strong, and he's a

18  founder of AFNA, an organization that is very

19  involved in the community in Philadelphia.  My

20  mother is associated with them, and he happens

21  to know Governor Schwarzeneggar personally.

22          PRESIDING COMMISSIONER SAWYER:  Well,

23  he says he met him.

24          INMATE AGRIO:  Met him.

25          PRESIDING COMMISSIONER SAWYER:  Yeah, I

26  read the letter earlier and it says he shook his

27  hand and met him and he wrote him a letter.

41

1          **INMATE AGRIO:**  Yes.

2          **PRESIDING COMMISSIONER SAWYER:**  And

3   this is a copy of the letter and this is July 8,

4   2004.  He's also listed all the -- all the

5   letters --

6          **INMATE AGRIO:**  Supporters, yes, sir.

7          **PRESIDING COMMISSIONER SAWYER:**  -- that

8   you've got there.  And he's in support of you.

9   And I got a letter from your spouse dated 2005,

10  in support.  Olga Robertson, Peter, Rosy,

11  Kimberly and Jamar.  (Indiscernible) know these

12  people.

13          **INMATE AGRIO:**  I think -- I do believe

14  those are duplicates now, sir.

15          **PRESIDING COMMISSIONER SAWYER:**  Yes,

16  yes they were.  I'm not fighting you here.  I'm

17  just doing my paperwork, and there's Mr. Evans

18  again.  Okay.  Now -- okay in your file I have

19  essentially a triplicate.  You're covered.

20  Would you do me a favor?

21          **INMATE AGRIO:**  Yes, sir.

22          **PRESIDING COMMISSIONER SAWYER:**  Take a

23  deep breath.  There you go.  Okay.  We also have

24  just for the record we have an impact statement

25  that I read earlier.  I actually read it last

26  night from the mother of the victim, also I read

27  the San Diego Union Newspaper articles that were

42

1    in the file, and that covers it.  I'm going to -

2    - so it doesn't get messed up I've got some

3    original letters here.  Although I think you

4    probably have duplicates of them but I'm going

5    to return those to you at this time.

6        INMATE AGRIO:  Thank you.

7        PRESIDING COMMISSIONER SAWYER:  And

8    then turn it over to Commissioner Mitchell

9        DEPUTY COMMISSIONER MITCHELL:  It's

10   about out of tape, so I'm going to stop the

11   tapes ask turn them over.

12       PRESIDING COMMISSIONER SAWYER:  Very

13   good.

14              (off the record)

15       DEPUTY COMMISSIONER MITCHELL:  We're

16   back on record.  With regard to your post-

17   conviction information, sir, I reviewed our

18   Central File.  The post-conviction progress

19   reports updated last on November 15, 2005, by

20   Correctional Counselor L.R. Baker, a life

21   prisoner evaluation report prepared for the May

22   2005, calendar by Correctional Counselor S, the

23   last name is spelled, A-R-N-O, and a

24   psychological evaluation prepared by Dr. Melvin

25   Macomber that's, M-A-C-O-M-B-E-R, Ph.D. and the

26   dictation date is June 26, 2003, that currently

27   is the most current one.  Is that the most

43

1    current one you have, Counsel?

2            **ATTORNEY FOX:**  Yes.

3            **DEPUTY DISTRICT ATTORNEY SHESS:** Yes.

4            **DEPUTY COMMISSIONER MITCHELL:**  Very

5    good, thanks.  This appears to be your third

6    subsequent parole consideration hearing looking

7    at the files.  Does that sound right to you?

8    You had an initial, two subsequent ones after

9    that, this will be the third subsequent?

10           **INMATE AGRIO:**  That's correct

11           PRESIDING COMMISSIONER 2:  Totaling?

12           **INMATE AGRIO:**  Yes, sir.

13           **DEPUTY COMMISSIONER MITCHELL:**  Okay,

14   because the last hearing it looks like they

15   identified it as your third.  When I looked at

16   the paperwork that appeared to be an error.  The

17   last hearing occurred on May 18, 2004.  You

18   received a one-year denial by the board.  The

19   recommendations were to remain -- or stay

20   disciplinary free, and to participate in self-

21   help program.  You've accomplished both.  Under

22   the housing and classification score area, you

23   have an actual classification score of zero.

24   You have a mandatory score of 19 that was true

25   during your last hearing.  You retain Medium A

26   custody, and just for the record 19 is the

27   lowest security score that you are allow today

44

1   have as a life term prison without a parole

2   date, the same with the medium A custody.

3   That's if lowest custody designation you can

4   have as a life term prisoner without a parole

5   date.  Do you understand that?

6           INMATE AGRIO:  Yes, sir.

7           DEPUTY COMMISSIONER MITCHELL:  Out of

8   the enemies confidential, there's some

9   identification of an enemy or so.  There's no

10  known confidential enemies and there's no gang

11  affiliation.  Currently assigned to disciplinary

12  clerk position; is that correct?

13          INMATE AGRIO:  Yes, sir.

14          DEPUTY COMMISSIONER MITCHELL:  Assigned

15  on September 17, 2004, according to the Chrono

16  and you got satisfactory grades.  Now, how

17  actually long have you held the position?

18          INMATE AGRIO:  It's been about a year

19  now.

20          DEPUTY COMMISSIONER MITCHELL:  Okay.

21  So that's an accurate date then?

22          INMATE AGRIO:  Yes, sir.

23          DEPUTY COMMISSIONER MITCHELL:  Previous

24  science I notice was a vocational data

25  processing, teacher's aide apprentice.  Is it

26  cook actually?

27          INMATE AGRIO:  Yes, sir.

45

1          DEPUTY COMMISSIONER MITCHELL:  Or it

2  wasn't apprentice clerk but cook.

3          INMATE AGRIO:  Cook.

4          DEPUTY COMMISSIONER MITCHELL:  Did you

5  complete anything within the cooking skills?

6          INMATE AGRIO:  No, sir, unfortunately

7  not.

8          DEPUTY COMMISSIONER MITCHELL:  You

9  didn't like cooking?

10          INMATE AGRIO:  No, sir.

11          DEPUTY COMMISSIONER MITCHELL:  Okay.

12  And then I see you got assigned as relief clerk

13  always receiving satisfactory to exceptional

14  grades.  In the educational area, as noted in

15  the original institutional staff recommendation

16  summary when you were received into the

17  reception center by the Department of

18  Corrections, it was noted that that you had a

19  Bachelors of Arts degree in public

20  administration, has that been clarified to a

21  Bachelors of Science now?

22          INMATE AGRIO:  No, sir.  That may have

23  been my error.  That's Bachelors of Arts.

24          DEPUTY COMMISSIONER MITCHELL:  All

25  right.  And you also have completed about one

26  year of law school at that time that's prior to

27  coming to state prison?

46

1          INMATE AGRIO:  Yes, sir.

2          DEPUTY COMMISSIONER MITCHELL:  Okay.

3     Subsequent to your arrival in the state prison,

4     educationally I found Chronos or certificates,

5     the first one is August 26, 2002, for completing

6     a journalism course -- pardon me, that's the

7     impact program.  You had a journalism course

8     that was May 22, the 2002, then a business

9     vocation course on June 26, 2002, your jurist

10    doctorate as you mentioned already on September

11    16, of '99, it's documented, and I believe

12    that's the date of the actual certificate,

13    February 2, 1996, before that was legal

14    assistant paralegal, May 5, 2000 -- and that's

15    actually not educational.  I was going to ask

16    you a quick question regarding your jurist

17    doctorate.  I believe you were asked if you knew

18    if it was an accredited school or not.  Do you

19    know what the difference is?

20          INMATE AGRIO:  Yes, sir, I believe I

21    do.

22          DEPUTY COMMISSIONER MITCHELL:  Okay.

23    First did you take a baby bar?

24          INMATE AGRIO:  No, sir.

25          DEPUTY COMMISSIONER MITCHELL:  Okay.

26    The baby bar is required after the first year on

27    a non- accredited law school.  Had you

47

1   registered with the state bar?

2          **INMATE AGRIO:** No, sir.

3          **DEPUTY COMMISSIONER MITCHELL:** You need

4   to be registered with the state bar for four

5   years before taking the exam unless something

6   has changed, so I'm not sure that's accredited.

7   All it means is that you would be entitled once

8   the bar accepts you to take to exam, and if you

9   pass the State Bar if you are allowed to, then

10  you'd be as good as any attorney from an

11  accredited school, but until that time, if it's

12  not accredited then you're not allowed to use it

13  for certain positions that request a graduate

14  from law school where they expect to be

15  accredited.  Like the FBI will not accept a non-

16  accredited law school, but if you pass the state

17  bar then they accept it, so it might be worth

18  your while taking a look at it to see if you are

19  accredited or not and see if I would have the

20  impact on any kind of future assignment or job.

21  Were you planning to try to apply to the state

22  bar to become an attorney?

23          **INMATE AGRIO:** I've done some research

24  in that area, sir, and my understanding is that

25  I have to at least have seven years of parole

26  time and then apply somehow to the office of the

27  Governor to get some kind of a clearance so that

48

1  I can then be allowed to practice also.  It's a

2  long process.

3          DEPUTY COMMISSIONER MITCHELL:  Well,

4  they have a certificate of rehabilitation that

5  can be awarded after a period of time and after

6  the Board of Prison Terms (indiscernible) does

7  the investigation for that and --

8          INMATE AGRIO:  Exactly.

9          DEPUTY COMMISSIONER MITCHELL:  -- there

10 is a couple of things you have to go through I

11 imagine before you can be accepted by the state

12 board.  The bar also has restrictions on certain

13 offenses like moral turpitude.  I do not know if

14 this is going to restrict you from becoming an

15 attorney.  We have -- on occasion I have met

16 attorneys who have spent time in state prison

17 for certain offenses, so you may want to contact

18 state board write them a letter and find out if

19 you can or not down the road based on the

20 criminal offense itself.

21         INMATE AGRIO:  I will do that, sir.

22         DEPUTY COMMISSIONER MITCHELL:  It might

23 be worth your while.  You've done very well so

24 I'm not trying to knock it, I just want to

25 subject that you may want to clarify a few

26 things for yourself.  Under the laudatory Chrono

27 section, I notice here numerous Chronos going

49

1    from the list that I wrote down November 13,

2    2005, outstanding work, third watch clerk,

3    disciplinary clerk, that Captain Pope, P-O-P-E,

4    September 23 2005 another one regarding your

5    outstanding work by Lieutenant D.M., last name

6    is spelled B-E-M-E-D-E-T-T-I, August 31, 2005,

7    personal observation made by sergeant G.G., last

8    name is V-E-R-D-E-S-T-O, about how well you

9    worked and got a long with the unit, December

10   15, 2002, voluntary worker.  Let's see, this was

11   the 2002 Annual Children's Holiday Festival you

12   participated in, November 7, 2002, vocational

13   instruction, supervisor E.R. Parham, P-A-R-H-A-

14   M, wrote a laudatory Chrono, September 4, 2001,

15   arts in corrections a laudatory Chrono.  The

16   last one I noted here was August 15, 2000

17   material safety -- let's see, hazardous

18   materials that you completed that program.  Is

19   that correct, sir?

20        INMATE AGRIO:  Yes, sir.

21        DEPUTY COMMISSIONER MITCHELL:  In the

22   vocational training programs, we're talking

23   about computer repair, we're talking about

24   cooking, have you completed vocational training

25   itself?

26        INMATE AGRIO:  Yes, sir.

27        DEPUTY COMMISSIONER MITCHELL:  And

50

1   which programs have you completed so far?

2           INMATE AGRIO:   The computer

3   refurbishing program here at Soledad and I've

4   also completed the paralegal certificate program

5   through correspondents --

6           DEPUTY COMMISSIONER MITCHELL:   Those

7   are considered vocational?

8           INMATE AGRIO:   Yes.

9           DEPUTY COMMISSIONER MITCHELL:   I saw

10  the computer refurbishing.  How long is the

11  program as that?

12          INMATE AGRIO:   It's a self-paced

13  program, and I completed it in a little bit over

14  eight months.

15          DEPUTY COMMISSIONER MITCHELL:   What can

16  you do after the completion of that program?

17          INMATE AGRIO:   Well, it basically

18  teaches you how to break down the computer and

19  install certain things like maybe a hard drive

20  and change surgeon parts and what have you.

21          DEPUTY COMMISSIONER MITCHELL:   Chance

22  the memory?

23          INMATE AGRIO:   Month, not the memory

24  but, you know, you can increase the power of the

25  computer.

26          DEPUTY COMMISSIONER MITCHELL:   How

27  about the little cards you drop in to increase

51

1   your memory?

2           **INMATE AGRIO:**  Oh, yeah.  Memory cards

3   you are talking about, yes.

4           **DEPUTY COMMISSIONER MITCHELL:**  Okay.

5           **INMATE AGRIO:**  There are certain

6   things, you know, the course itself is very

7   basic but it gives you an idea more or less of

8   how the computer work --

9           **DEPUTY COMMISSIONER MITCHELL:**  It is a

10  correspondent in that course or is there someone

11  an academic instructor here?

12          **INMATE AGRIO:**  No, sir, this is a

13  program that they had here that was operating

14  out of the education department here at Soledad.

15          **DEPUTY COMMISSIONER MITCHELL:**  Very

16  good.  Under the mental health section I found

17  no indication of a severe mental disorder.

18  There is a reference here in the DSM, which is

19  the manual, you might say, that the psychologist

20  or psychiatrist used to provide a diagnosis and

21  they're called Axis I through Axis V.  The Axis

22  I diagnosis; no contributory clinical disorder,

23  Axis II; no contributory personality disorder,

24  Axis III; no contributory physical disorder,

25  Axis IV; deals with your life term

26  incarceration, and Axis V; is your current GAF

27  score, which is 90, as the global assessment of

52

1    functioning 90 is a very high functioning score,

2    which means you get along with people. You do

3    well. Under the self-help groups, Macalister

4    noted that and I looked at all the Chronos that

5    are in the file. Macalister'S report notes that

6    you have continued your participation in

7    Narcotic's Anonymous program. He says has been

8    attending meditation classes for the past year.

9    Is it meditations? Is that correct?

10          INMATE AGRIO:  Yes, sir, Buddhist

11    meditation.

12          DEPUTY COMMISSIONER MITCHELL:  Pardon?

13          INMATE AGRIO:  Buddhist meditation.

14          DEPUTY COMMISSIONER MITCHELL:  Okay.

15    Are you Buddhist?

16          INMATE AGRIO:  No, sir. It's a program

17    that is open to all denominations.

18          DEPUTY COMMISSIONER MITCHELL:  Okay.

19    On a weekly basis from one hour per night or per

20    week?

21          INMATE AGRIO:  Yes, sir.

22          DEPUTY COMMISSIONER MITCHELL:  These

23    classes provide you with insight, concentration,

24    and relaxation in a way of dealing with stress.

25    Going through your Central File, I laundry

26    listed Chronos for Narcotic's Anonymous

27    participation going back to the year 2000. They

53

1  are consistent 2000, 2001, 2002, 2003, 2004, and

2  2005.  Those intervening years, there are

3  several Chronos for each year, as you each month

4  or two months go by you get a Chrono, so you've

5  been actively participating for many years in

6  it.  You also have a notation of Chrono here for

7  completing the impact workshop on August 26,

8  2000, and the Parent Education class on February

9  16, 2000.  Do you remember those?

10          INMATE AGRIO:  Yes, sir.

11          DEPUTY COMMISSIONER MITCHELL:  Okay.

12  And that computer refurbishing there was two

13  Chronos on that.  One did not have a date or I

14  believe an active certificate.  The other one

15  had a certificate date of November 27, 2000.  I

16  don't know what the other date is.  Were these

17  done about the same time?

18          INMATE AGRIO:  About the same time, but

19  the other one I believe had to do with data

20  processing, and I was -- that's when I was

21  working for Mr. Parham, and I was just taking it

22  upon myself to learn a little bit more about the

23  other side.

24          DEPUTY COMMISSIONER MITCHELL:  All

25  right, because it said November 25, and it was

26  blank.  They didn't put the year in, so about

27  the same your 2000?

54

1          **INMATE AGRIO:** Yes, sir.

2          **DEPUTY COMMISSIONER MITCHELL:** Okay.

3     And you've also completed 60 days of spiritual

4     recovery, that's May 5, 2000. Does that have

5     anything to do with the Buddhist issue or

6     something different?

7          **INMATE AGRIO:** No, sir, this was

8     something different.

9          **DEPUTY COMMISSIONER MITCHELL:** Okay.

10    Disciplinary is always a significant issue the

11    board's concerned with. You've never received

12    that I could find a rule violation report or a

13    counseling Chrono, which referred to as CC 120

14    days, is that correct?

15         **ATTORNEY FOX:** There is 1128A for

16    possession of a television --

17         **DEPUTY COMMISSIONER MITCHELL:** Let's

18    see if I if I got it here. The counselor didn't

19    put it in or I didn't see it anyway. Let's look

20    in here. Here you go. This is the one that's

21    the 1991?

22         **ATTORNEY FOX:** Yeah.

23         **DEPUTY COMMISSIONER MITCHELL:** All

24    right. Thank you very much. While conducted a

25    search of the third floor building apparently,

26    which the room was assigned to you, and this was

27    what excess issue of state towels, Sears brand

55

1  of an a.m, f.m. transistor radio, a Goldstar

2  brand television.  Who did those belong to?

3          INMATE AGRIO:  Usually, sir, when

4  people parole around here and they leave stuff

5  behind, if you are friendly with them, they

6  might bless you with something.

7          DEPUTY COMMISSIONER MITCHELL:  It was

8  the policy?

9          INMATE AGRIO:  It's not totally legal,

10  sir, but you know, sometimes we need a little

11  entertainment and, you know, we accept it.

12          DEPUTY COMMISSIONER MITCHELL:  It used

13  to be the policy of the Department of

14  Corrections if someone were to donate, you'd go

15  down through the receiving release unit and they

16  have a property card they usually maintain on

17  prisoners and then you could have the property

18  assigned to.  In an above board manner I won't

19  ask anybody here if that's still lack of it or

20  it used to be at least that's how you got

21  permission to.  Did you ever think about doing

22  it legally?

23          INMATE AGRIO:  Yes, sir.  That's the

24  policy, and I've since become familiar with it,

25  but back in 1991, I was fresh to the system and

26  I just didn't think about doing that.

27          DEPUTY COMMISSIONER MITCHELL:  Okay.

56

1        INMATE AGRIO:  I didn't see any problem

2    with just having it, but then I found out it was

3    not the right thing.

4        DEPUTY COMMISSIONER MITCHELL:  All

5    right.  Other comments I found on your file that

6    you participate in the -- this facility as the

7    Veteran's group?  How long have you been

8    participating in that group?

9        INMATE AGRIO:  Just a little bit over a

10   year now.  The group is brand new sir, and we

11   just celebrated our first anniversary banquet

12   and Veterans Day.

13       DEPUTY COMMISSIONER MITCHELL:  What do

14   you do in that group, sir?

15       INMATE AGRIO:  I'm just a member right

16   now, sir.

17       DEPUTY COMMISSIONER MITCHELL:  And

18   what's the purpose of the group?

19       INMATE AGRIO:  To make sure that

20   Veterans who are incarcerated here are, you

21   know, walk the line in a professional and proud

22   manner that brings credit to the service that

23   they were a part of.

24       DEPUTY COMMISSIONER MITCHELL:  You also

25   participate in the Cage of Rage anger management

26   program; is that correct?

27       INMATE AGRIO:  Yes, sir.

57

1            **DEPUTY COMMISSIONER MITCHELL:**  And when

2   did that occur?  I didn't get a date on it?

3            **INMATE AGRIO:**  I'm not exactly sure,

4   sir, but I think I have a Chrono here about

5   that.  While your looking, let me just read the

6   summary in the correctional counselor's report.

7   The summary section just notes that prior to

8   release the prison could benefit from remaining

9   disciplinary free, and participating in

10  available programs.  Do you have one there,

11  Counsel?

12           **ATTORNEY FOX:**  Yes, if I may.  This is

13  an anger management course, a Chrono from

14  September 4, of 2002.

15           **DEPUTY COMMISSIONER MITCHELL:**  Does

16  that refer to Cage of Rage?

17           **ATTORNEY FOX:**  I don't see those words

18  on it.

19           **DEPUTY COMMISSIONER MITCHELL:**  It's a

20  different one then.

21           **ATTORNEY FOX:**  It's a different one.

22           **INMATE AGRIO:**  Yeah, a different one.

23           **DEPUTY COMMISSIONER MITCHELL:**  All

24  right.  I'll continue and just for information

25  Macalister used to summarize risk assessment for

26  the community upon release, which is no longer

27  done by policy, so it's not in your counselor's

1   report.

2           **ATTORNEY FOX:** Okay. If I may

3   interject?

4           **DEPUTY COMMISSIONER MITCHELL:** Yes.

5           **ATTORNEY FOX:** This is a psychiatric

6   Chrono dated March 28, of this year 2005, with

7   Mr. Agrio's name and it says:

8               The above identified inmate

9               asked to participate in Cage of

10              Rage anger management group on

11              this date an interview was held

12              to assess his eligibility.

13              Since he is not in the triple

14              CMS program, I was not able to

15              accept him into the only anger

16              management treatment group being

17              held at CTF. The inmate is to

18              be commended for his efforts to

19              seek out help dealing with this

20              very important issue.

21          **DEPUTY COMMISSIONER MITCHELL:** So he

22   has not completed that program then?

23          **ATTORNEY FOX:** No, it's not been

24   completed.

25          **DEPUTY COMMISSIONER MITCHELL:** All

26   right. Okay.

27              **INMATE AGRIO:** If I may add, sir,

59

1   briefly. As a result of that interview, Mr.
2   Roscoff recommended that I participate in music
3   therapy with psych tech, Mary Martinez, and I'm
4   presently doing that every Thursday at 1:00
5   o'clock.
6           DEPUTY COMMISSIONER MITCHELL:    What do
7   you do in the music therapy?
8           INMATE AGRIO:    We do stretching
9   exercises and a lot of meditation based on yoga.
10          DEPUTY COMMISSIONER MITCHELL:    You do
11  that to song though you are saying?
12          INMATE AGRIO:    Yes, sir.
13          DEPUTY COMMISSIONER MITCHELL:    Okay.
14  Already.   I thought maybe you were going to tell
15  me that you play an instrument now.
16          INMATE AGRIO:    No, sir.
17          DEPUTY COMMISSIONER MITCHELL:    Okay.
18  It was that kind of therapy.
19          INMATE AGRIO:    And if I may just sir?
20          DEPUTY COMMISSIONER MITCHELL:    Yes.
21          INMATE AGRIO:    Also in addition to
22  that, as a recommendation of Mr. Roscoff, I
23  bought this book 'Beyond Anger' by Dr. Thomas
24  Harvey, and I've read the entire book and done
25  the exercises too, and this is strictly about
26  anger management.
27          DEPUTY COMMISSIONER MITCHELL:    Did you

60

1  learn anything from it?

2          **INMATE AGRIO:**  Yes, sir.

3          **DEPUTY COMMISSIONER MITCHELL:**  What did

4  you learn?

5          **INMATE AGRIO:**  I've learned that anger

6  is a feeling just like hate, love, and that it's

7  not the kind of thing that you can get rid of

8  but you can recognize what the symptoms of anger

9  are and how destructive or constructive they can

10  be.

11          **DEPUTY COMMISSIONER MITCHELL:**  What are

12  the symptoms?

13          **INMATE AGRIO:**  Well, there's some body

14  changes that take place when you start to get

15  angry.  There's certain things that happen to

16  you.  For instance, you can start feeling

17  tension in your neck area.  You can start

18  getting sweaty palms.  These kinds of things are

19  maybe a hollow feeling in your stomach.

20          **DEPUTY COMMISSIONER MITCHELL:**  Now that

21  you have learned this what would you do with it?

22          **INMATE AGRIO:**  Well, my intention is to

23  recognize whenever I find myself in these

24  situations and I start noticing the changes in

25  me that I can step back and take a moment and

26  reassess what is happening with me and make sure

27  that I don't react or act out in an

61

1    inappropriate manner.

2            **DEPUTY COMMISSIONER MITCHELL:**    Thank

3    you.    In reviewing the psychological report, the

4    psychologist noted that:

5                Your feelings of remorse were

6                sincere and genuine, that you,

7                as far as your parole social and

8                individual, he was employed at

9                the time as a law enforcement

10                officer.    He notes here that at

11                the time of the offense you were

12                overwhelmed and the situation

13                got out of control.    In the 15

14                years of your incarceration, you

15                have changed significantly.    You

16                have strong values about never

17                engaging in violence towards

18                woman at this point.    He is able

19                to explain how he should have

20                handled the situation instead of

21                the way you handled it.    He

22                stated that he simply should

23                have left the situation and

24                waited until later to try to

25                talk with his wife.    He

26                understands now that he could

27                reach out for help from others.

62

1          Mr. Agrio does not have a

2          substance abuse problem but he

3          has certainly been attending

4          Alcoholic's Anonymous --

5   and I think it's Narcotic's Anonymous isn't it?

6          **INMATE AGRIO:** Yes.

7          **DEPUTY COMMISSIONER MITCHELL:**

8          Over the years in an effort to

9          understood the 12 Steps and how

10         it could apply to presenting

11         problems in the future.  He

12         spoke about his relapse

13         prevention problem for marital

14         problems that could occur in the

15         future.  It is evidence that

16         inmate Agrio has thought a great

17         deal about his behavior during

18         the commitment offence and the

19         underlining causes and does

20         accept responsibility for his

21         immaturity, inappropriate

22         reaction, and his villous

23         efforts to keep control of the

24         situation.  Under the assessment

25         of dangerousness, inmate Agrio

26         has remained entirely

27         disciplinary free throughout his

63

1       15 years of custody.  His

2       potential for violence within

3       the institutional environment is

4       definitely below average in

5       comparison to other inmates.

6       Inmate Agrio has matured.  He no

7       longer is driven by his

8       perfectionist affection and his

9       tendencies to maintain control

10      of his life.  He has learned how

11      to negotiate differences with

12      others and come to positive

13      resolutions of conflicts.  He

14      has a good since of concern and

15      empathy towards others.  At this

16      point in his life his potential

17      violence in the unstructured

18      setting of the community is

19      definitely below average in

20      comparison to other inmates.  In

21      comparison to the average

22      citizen in the community, and

23      based upon his knowledge and

24      experiences, his potential for

25      violence is even lower than

26      that.  There are no significant

27      risk factors in this case at

64

1     this time. This inmate does not

2     have a history of problem of use

3     of drugs. Under clinical

4     observations, there are no

5     psychological problems evident

6     in this case that would

7     interfere with his being granted

8     parole. He is a pro-social

9     individual. He has no evidence

10    of personality disorder. He has

11    completed his law degree, which

12    is a remarkable achievement. He

13    does have a support program in

14    San Diego, which is the county

15    of commitment. With his law

16    degree and skills, he will not

17    have any difficulty obtaining

18    employment in the community as a

19    legal clerk. He has support

20    (indiscernible) that will help

21    him. The prognosis for

22    successfully community

23    adjustment in this case is

24    excellent and he has no need for

25    further psychological

26    evaluations at this time or

27    participation in therapy.

65

1    Counsel, is there anything that I failed to

2    address in the post-conviction factors you would

3    like me speak to?

4         **ATTORNEY FOX:**  Yes, and it's not that

5    you failed to it just may not be in the C-File.

6    Mr. Agrio has also earned a certificate of

7    completion in anger management.  This is dated

8    November 8, of 2005, so it's relatively recent

9    if you'd like that.

10        **DEPUTY COMMISSIONER MITCHELL:**  Is it a

11   second course?

12        **INMATE AGRIO:**  Yes, sir.

13        **DEPUTY COMMISSIONER MITCHELL:**  You've

14   taken two anger management classes?

15        **INMATE AGRIO:**  Yes, sir.

16        **DEPUTY COMMISSIONER MITCHELL:**  Okay.

17   When did you complete the other anger

18   management?

19        **INMATE AGRIO:**  Pardon me, sir?

20        **DEPUTY COMMISSIONER MITCHELL:**  When did

21   you complete the other anger management course?

22        **INMATE AGRIO:**  The first one that was

23   May 5, 2002.

24        **DEPUTY COMMISSIONER MITCHELL:**  2002.

25        **INMATE AGRIO:**  From Miracle's Prison

26   Ministry -- Prisoner's Ministry.

27        **DEPUTY COMMISSIONER MITCHELL:**  Oh,

66

1   okay.

2           INMATE AGRIO:  And this one is from

3   Creative Options with Sister Marcella.

4           DEPUTY COMMISSIONER MITCHELL:  Okay,

5   very good.  Anything else, Counsel?

6           ATTORNEY FOX:  No, thank you.

7           DEPUTY COMMISSIONER MITCHELL:  All

8   right.  Chairman?

9           PRESIDING COMMISSIONER SAWYER:  Okay.

10  Thank you.  I'd like you respond to what I've

11  got to read here from 1989 when you were

12  originally brought into the institution when you

13  were dealing with (indiscernible) classified?

14          INMATE AGRIO:  Yes, sir.

15          PRESIDING COMMISSIONER SAWYER:  And

16  they always write a little something and I

17  always read it, and I thought it was pretty

18  interesting, and it says:

19          Although appearing somewhat

20          depressed you've never

21          demonstrated any remorse for

22          causing his wife's death.

23          Although not directly addressed,

24          he alluded to the fact that it

25          was an accident culminating from

26          his wife being drunk resulting

27          in a family fight.  He spoke in

67

```
 1        terms of what have I done to my
 2        life.  I lost my house and car.
 3        He addressed the incident in
 4        cultural terms saying that it
 5        was -- that in a Latin family
 6        the man is the boss of house.
 7        Ordinarily the wife jumps with
 8        the snap of a finger.  He
 9        indicated that today's younger
10        people are not traditionalist
11        and in an attempted to explain -
12        - in an attempt to explain his
13        position, stated that no matter
14        how much time he has to do here,
15        there is no guarantee that he
16        would not ultimately end up in a
17        similar position under similar
18        circumstances.
19   Do you remember saying that?
20        INMATE AGRIO:  I don't remember saying
21   it, but I have read that, sir.
22        PRESIDING COMMISSIONER SAWYER:  You've
23   read it in your file?
24        INMATE AGRIO:  Yes, sir.
25        PRESIDING COMMISSIONER SAWYER:  Yeah.
26   Can you respond to that for me?
27        INMATE AGRIO:  I completely
```

68

1  (indiscernible) that, sir.  That was the

2  ramblings of irrational thinking.  I think that

3  since that time, sir, I have subjected myself to

4  extensive therapy.  I've had an opportunity to

5  look at some of the things that were part of my

6  belief system and realize how destructive they

7  were --

8             PRESIDING COMMISSIONER SAWYER:  Uh-huh.

9             INMATE AGRIO:  -- and I have made

10 extreme efforts to try to change that kind of

11 thinking, sir, and I can honestly tell you

12 today, sir, that I no longer feel that way, and

13 if I said that, it was wrong.  I don't believe

14 that anymore.  I don't subscribe to it, and I

15 completely reject any of those statements.

16            PRESIDING COMMISSIONER SAWYER:  Let me

17 ask you this, and this is from 1989, and I'm not

18 saying that that's what I believe that you would

19 -- just -- I just saw that and I found it

20 interesting because isn't it true that in some

21 cultures that's true?

22            INMATE AGRIO:  Yes, sir.

23            PRESIDING COMMISSIONER SAWYER:  Okay.

24            INMATE AGRIO:  And it is true in my

25 culture.

26            PRESIDING COMMISSIONER SAWYER:  And was

27 it true at the time of the offense?

69

1          **INMATE AGRIO:**   I believe that was part

2    of the reason why I got myself in that

3    situation, yes, sir.

4          **PRESIDING COMMISSIONER SAWYER:**   Okay.

5    Good answer because I do too.  I truly believe

6    that and I think that chose me some insight in

7    terms of dealing with -- dealing with your

8    problems.  It's a little too late but you're not

9    the only one that believes this either, sir.

10         **INMATE AGRIO:**   It's unfortunate, sir,

11   but that's the way we grow up, you know, with --

12   we're conditioned to think things like that.  I

13   don't know where they come from.  They certainly

14   didn't come from my mother.  God bless her.  She

15   didn't teach me that, but I grew up thinking

16   these things.  I didn't even realize that that's

17   how I felt, and I've read the transcripts of the

18   trial, and I've read some of these statements

19   and today I'm appalled that I even thought or

20   felt that way.

21         **PRESIDING COMMISSIONER SAWYER:**   Uh-huh.

22         **INMATE AGRIO:**   I have a great deal of

23   respect for woman, and I would never advocate

24   any kind of violence against them.

25         **PRESIDING COMMISSIONER SAWYER:**   Okay.

26   Thank you.  Ms. Shess?  Pronounce that again for

27   me?

70

1          **DEPUTY DISTRICT ATTORNEY SHESS:**   Shess.

2          **PRESIDING COMMISSIONER SAWYER:**   Oh, I

3   did do it right, Shess.

4          **DEPUTY DISTRICT ATTORNEY SHESS:**   You

5   did it right.

6          **PRESIDING COMMISSIONER SAWYER:**   Shess

7   like chess?

8          **DEPUTY DISTRICT ATTORNEY SHESS:**   Yes,

9   correct, yes.  Commissioner at the outset, the

10  inmate corrected some earlier statements, which

11  he had been repeating over and over again, where

12  he had referred today this as an accidental

13  shooting and he clarified today saying that was

14  his criminal defense.  It was an accidental

15  shooting.  It was the result, in his mind today,

16  of an unintentional act.  Would you ask the

17  inmate to explain how an unintentional act

18  results in a bullet wound, a contact lethal

19  bullet wound to the base of the skull similar to

20  an execution?

21         **INMATE AGRIO:**   I was grossly negligent

22  in the handling of the weapon once I disarmed

23  Alma, and my actions and behavior at that time

24  were motivated by anger and in some instances

25  perhaps rage.  I've had a difficult time

26  admitting that to myself, but I have come to

27  grips with that situation, and all that combined