**EXHIBIT C**
**Part 3 of 3**

71

1  led to a terrible tragedy, sir.  I definitely

2  did not take the weapon away from her intending

3  to shoot her.

4      **DEPUTY DISTRICT ATTORNEY SHESS:**  Can

5  the inmate explain then how the gun got placed

6  at the back of her skull and the gun was fired,

7  since it didn't fire itself?

8      **ATTORNEY FOX:**  Objections.  Move to

9  strike.  That's argumentative.

10      **PRESIDING COMMISSIONER SAWYER:**  I'll

11  sustain that objections, but -- and we're really

12  not retrying the case here, Counsel.  We're just

13  trying to determine suitability for parole.

14      **DEPUTY DISTRICT ATTORNEY SHESS:**  I

15  understand that Commissioner, but he

16  specifically said today that this was an

17  unintentional act.  The act of firing a gun is

18  an intentional act.  Pulling a trigger is an

19  intentional act.  The placement of a gun is an

20  intentional act.  I think it certainly goes to

21  his insight, and his understanding, and his

22  ability to accept response ability, which is a

23  fundamental threshold issue prior to determining

24  suitability.  I'd ask that commissioner

25  reconsider?

26      **PRESIDING COMMISSIONER SAWYER:**  Well,

27  now then bring it up in your closing argument as

72

1    opposed to questions.

2              **DEPUTY DISTRICT ATTORNEY SHESS:**  With

3    regards then to the psychiatric report, which

4    Mr. McNeil referred to in 2003, in the

5    psychiatric report, the inmate stated -- this is

6    the one August 11, '03, stated that he never

7    battered his wife.  My question, Commissioner,

8    to the inmate then is if he could explain the

9    statements that he made to Sergeant Parker about

10   battering his wife in October of 1987, including

11   trying to slap her, kicking at her, hitting her

12   with his hand, and saying to her that he was

13   going to kick her ass?

14             **ATTORNEY FOX:**  Was that the same one

15   where she threatened to slash the tires on his

16   car, the internal investigation?

17             **DEPUTY DISTRICT ATTORNEY SHESS:**  I'm

18   referring to the October 20, 1987, incident --

19   and I'm specifically asking the question,

20   Commissioner, because he has said to the

21   psychiatrist in '03, I never battered my wife.

22   This is the most recent report we have.  Some of

23   the conclusions reached by this psychiatrist are

24   based on his representations, so I'm asking him

25   to clarify how he can reconcile those two issues

26   what he said to Sergeant Parker and what he told

27   the psychiatrist?

73

1              **PRESIDING COMMISSIONER SAWYER:**  Can you

2    do that, sir?

3              **ATTORNEY FOX:**  And that is from the

4    investigator's report.

5              **INMATE AGRIO:**  During the time that I

6    was being interviewed by the psychiatrist and we

7    were talking about the situation, I honestly had

8    no recollection of this particular incident

9    being reported.  I was going based on what my

10   belief was of our relationship.  Now since that

11   time and this report has surfaced, and I have

12   read it in its entirety, and it is true that we

13   did have a bad situation at that time, and if

14   the report is read entirely, then you will see

15   that, without blaming anyone else for anything,

16   that there was fault on both sides, and my wife

17   acknowledged that and asked the investigators to

18   drop the report.  However, that's not to say

19   that I acted inappropriately on that day and

20   this was again an ongoing manifestation of a

21   problem that I had then but I no longer have.

22             **ATTORNEY FOX:**  I think you misspoke.  I

23   think you just said that this was not

24   inappropriate behavior?

25             **INMATE AGRIO:**  No, inappropriate

26   behavior on my part.

27             **ATTORNEY FOX:**  Okay.  It was

74

1   inappropriate behavior?

2           **INMATE AGRIO:**  It was inappropriate

3   behavior on my part.

4           **ATTORNEY FOX:**  I just wanted that to be

5   clear.

6           **PRESIDING COMMISSIONER SAWYER:**  In

7   retrospect it's inappropriate?

8           **INMATE AGRIO:**  No, sir not in -- it is

9   inappropriate always.

10          **PRESIDING COMMISSIONER SAWYER:**  Okay.

11          **DEPUTY DISTRICT ATTORNEY SHESS:**  So I

12   just want to make sure we are both hearing the

13   same thing.  Is the inmate admitting that in

14   fact he did batter his wife?  Regardless of the

15   circumstances of that incident, he did batter

16   his wife --

17          **INMATE AGRIO:**  Yes.

18          **DEPUTY DISTRICT ATTORNEY SHESS:**   -- in

19   the past?  So what he told the psychiatrist in

20   2003, was incorrect because he did not think it

21   had been reported, but since then he has read

22   the report?  Is that correct?

23          **INMATE AGRIO:**  I didn't mention it to

24   the psychiatrist because I didn't have a present

25   recollection at that time.

26          **DEPUTY DISTRICT ATTORNEY SHESS:**  Okay.

27   He also indicated to the psychiatrist that he

75

1   was no longer -- excuse me, to the probation

2   officer very early on he talked about himself

3   being a very much perfectionist, and the

4   psychiatrist then in 2003, alludes to that

5   saying he know longer exhibits the tendency to

6   maintain control of his life.  My question,

7   Commissioner, is we have a situation this

8   afternoon where he is just described to a very,

9   I think, kind of complicated effort to control

10  not only his life but the life of his friend

11  Rosy Hall and that of Cathleen Boyd, his wife --

12          **PRESIDING COMMISSIONER SAWYER:**  What's

13  the question?

14          **DEPUTY DISTRICT ATTORNEY SHESS:**  The

15  question is he says that his wife does not know

16  about Rosy Hall --

17          **ATTORNEY FOX:**  Objection --

18          **DEPUTY DISTRICT ATTORNEY SHESS:**  --

19  correct?

20          **ATTORNEY FOX:**  -- misstates the

21  evidence.

22          **DEPUTY DISTRICT ATTORNEY SHESS:**  I

23  believe the commissioner asked the question does

24  your wife know about Rosy Hall.

25          **PRESIDING COMMISSIONER SAWYER:**  Yes,

26  she does.  He doesn't -- his wife doesn't know

27  that Rosy Hall is his second alternative for his

76

1  parole plan.

2          **DEPUTY DISTRICT ATTORNEY SHESS:**  Okay.

3  And then my question is why has he not been

4  honest with his wife about parole plans with

5  another woman?

6          **PRESIDING COMMISSIONER SAWYER:**  That's

7  a good question.

8          **INMATE AGRIO:**  Because I fully except

9  to be paroled to Morro Bay and in the event that

10  that's not the case, then I would have to

11  explain to her what the alternative is.

12          **PRESIDING COMMISSIONER SAWYER:**  Okay.

13          **DEPUTY DISTRICT ATTORNEY SHESS:**  He

14  also said just a few moments ago that today the

15  man he sits -- that sits before you today has a

16  great deal of respect for woman.  Can he explain

17  how that attitude towards his own wife is

18  demonstrating the respect for woman, which he

19  says he has gained all these many years?

20          **ATTORNEY FOX:**  I'm not sure that

21  question makes since.  He's saying that he

22  gained the respect over the years since he's

23  been incarcerated.  Do you understand the

24  question?

25          **INMATE AGRIO:**  I this I understand what

26  the district attorney's getting at, and you know

27  she may very well have a point there, ho

77

1    however, respect is not simply in terms of

2    whether you're not totally and completely

3    forthright with something to of this regard.

4    Respect is in the way you treat someone and I've

5    always treated my wife with consideration, with

6    empathy, and understanding. We have a loving

7    relationship and I believe that if I'm found

8    suitable for parole and I'm granted parole to go

9    to Morro Bay and live with her that that would

10   allow us to grow in our relationship and then

11   there wouldn't be any need for letter to know

12   about anything else because what would be the

13   point. She's not trying to push me away from

14   her. She's trying to get me to go live with

15   her, and I'm just presenting to the board an

16   alternative situation in which if I'm to be

17   paroled to San Diego that, you know, the board

18   cannot say that I don't have parole plans for

19   San Diego therefore we cannot find you suitable.

20   I do have parole plans and it's with a friend

21   and she knows Rosy is my friend, so I don't see

22   where I would be disrespecting her by what I'm

23   doing.

24          **DEPUTY DISTRICT ATTORNEY SHESS:** I

25   don't have any other questions. Thank you,

26   Commissioner.

27          **PRESIDING COMMISSIONER SAWYER:** Ms.

78

1    Fox?

2              **ATTORNEY FOX:**    Just one.   Why is it you

3    have no contact with your son?

4              **INMATE AGRIO:**   Well, initially I was in

5    constant contact with my son, and he even came

6    to visit with me several times when I was housed

7    a San Louis Obispo.   Eventually it became

8    increasingly difficult to maintain contact with

9    him because I had to call Mrs. Medina's home and

10   request permission to speak with him.   This was

11   becoming traumatic for him, and during my last

12   conversation with him, he requested that I no

13   longer contact him so as to avoid any grief to

14   him and I honored his wishes.

15             **ATTORNEY FOX:**   And when was that?

16             **INMATE AGRIO:**   That was several years

17   ago.  He was still very young and I have not

18   attempted to get in touch with him anymore

19   because quite frankly I'm afraid that any

20   attempt on my part to get in touch with him

21   might be misconstrued by Mrs. Medina and by the

22   district attorney's office.   That has happened

23   before and I don't wish to bring harm to them or

24   to myself, so I have refrained from doing that.

25   At the request of my attorney I wrote a letter

26   to him to address an issue that was brought up

27   at my last hearing where I was accused of

79

1  abandoning my son and that's not true at all.

2  The explanation that I'm giving today, that's

3  the truth.  I love him very much, and I wish

4  that someday we could come together and talk as

5  adults about what happened and maybe I can offer

6  some guidance and support to him.

7          **ATTORNEY FOX:**  Did you bring that

8  letter with you today?

9          **INMATE AGRIO:**  Yes, ma'am.

10         **ATTORNEY FOX:**  Could I have that to

11  give to the commissioners?  Thank you.

12         **INMATE AGRIO:**  Should I sign it?

13         **ATTORNEY FOX:**  Yeah.  And then what I'd

14  request if its appropriate that it be given to

15  the office of the district attorney to be

16  forwarded in the event it's not to do more harm

17  than good.

18         **PRESIDING COMMISSIONER SAWYER:**  I don't

19  want anybody being injured here.

20         **ATTORNEY FOX:**  Okay, and then I'll have

21  no further question.

22         **PRESIDING COMMISSIONER SAWYER:**  Okay.

23  Would you like to close?

24         **DEPUTY DISTRICT ATTORNEY SHESS:**  Yes,

25  Commissioner.  I'd like to begin by quoting

26  something that his son wrote to this board in

27  1999, which was apparently about the time when

80

1    he decided he no longer wanted to have contact

2    with his father.  He said: I say my father

3    should stay in prison.  He took a life that will

4    never be replaced.  I only have her memory in my

5    heart.  I think the board needs to remember that

6    we are talking about the horrific death of a 23-

7    year-old woman, who had everything to live for,

8    as a result of the uncontrollable rage of this

9    inmate when, she could not be controlled by him.

10   Now, I recognize and I don't want to minimize

11   the fact that he clearly is bright.  He's

12   clearly used his time in prison well.  He's been

13   a model inmate.  He apparently was a model

14   police officer even though he was beating his

15   wife, at least on occasion, and having control

16   issues with her while he was a police officer.

17   He apparently was a model Marine and did very

18   well there.  He does very, very well in a

19   controlled situation, but based on what the

20   board has been presented here today and the

21   crime itself, he's not suitable for parole.  He

22   does not have insight into what actually led him

23   to do this to the extent that I think our

24   community should have any measure of comfort in

25   how safe we're going to be from him specifically

26   woman that he gets involved with.  He asked to

27   have certain words in his board report

81

1    mitigated.  He wanted to change angry and

2    infuriated to upset, and I noted as you were

3    reading the report upset is repeated over and

4    over and over again.  To his credit today he

5    does admit that he was in a rage over her

6    behavior, so those changes to that board report

7    were one other attempt on his part to try to

8    control the situation.  He has two women who

9    apparently care for him.  He's playing one off

10   against the other.  He's not being honest with

11   his wife, the person who you would think at this

12   point in time who has gone so far out of her way

13   for him to have her friend's write letters to

14   the board to try and get work for him, he would

15   at least be honest with her about what is

16   apparently just a minor issue, an alternative

17   parole plan.  He can't even bring himself to do

18   that.  He is so much one of these people that

19   has to be in control of everything that's going

20   on in his personal life with the woman in his

21   life.  I'm astounded to hear him refer to this

22   as an unintentional act given the physical

23   evidence and giving the record at trial in what

24   occurred here.  He was contacted periodically

25   during the course of this evening, which he was

26   assaulting his wife and have fighting with her,

27   and that is why I asked whether he was accepting

82

1    as true the appellate facts, because in there he
2    did make comments about what was going on at the
3    time when -- to the babysitter, who had just
4    been taken home, what Alma did is going to cost
5    her.  It's going to cost her a lot.  To the
6    babysitter as well, upset in a rage about his
7    inability to control her and to control what was
8    going on in their life.  She wants to do like
9    the fucking American whores.  A friend calls to
10   make sure she's all right, obviously getting a
11   since of the environment there in the home and
12   knowing the history between the two of them, and
13   when he picks up the phone and she asks for Alma
14   he says, "yeah, she's here but I'm not finished
15   with her."  I know we're not here to retry the
16   case but we are here to determine whether this
17   man actually understands what he did.  The
18   physical evidence shows an execution-style
19   shooting.  It is a contact wound.  The testimony
20   at trial was that the gun was against the skin.
21   The path of the bullet is an execution-style
22   path.  She was down on the floor.  They had, had
23   an argument --
24           **ATTORNEY FOX:**  Objection.  We're not
25   here to retry the case.  I think these comments
26   are calculated to appeal to the passions and
27   prejudices of the hearing panel.  This is a

83.

1   murder two conviction with a two-year

2   enhancement.  It's not a murder-one execution

3   style.  So I'd request admonition if the

4   district attorney can find her comments to the

5   suitability issues.

6              PRESIDING COMMISSIONER SAWYER:  I think

7   she's attempting to show the rage involved in

8   this of the inmate, but if you could wrap it up.

9              DEPUTY DISTRICT ATTORNEY SHESS:  I am.

10  The reason I bring all of these things up is

11  because he sits here today and says okay, I'm

12  not going to tell use it's an accident any

13  longer because nobodies ever going to buy that

14  but I'm going to tell you it's unintentional,

15  yet the physical evidence and his statements at

16  the time do not support what he is telling you

17  here today.  Those along with everything else he

18  has said and specifically the fact that he

19  continues to lie to and to attempt control

20  people in his personal life here today show that

21  he does not have insight into what occurred then

22  and he is at risk for this occurring again.  I

23  think the 2003 psychiatric report should be

24  disregarded in it's entirety given the fact that

25  he was dishonest with that therapist because he

26  didn't think that prior battery had been

27  reported.  With that we're urging that you give

84

1   a maximum denial.  We have the victim who he is

2   going to make a statement.  Every year she has

3   to come back here.  Every year she has to relive

4   this.  Every year she has to think about the

5   daughter who is lost to her.  I'd -- and it is

6   appropriate for the board to do this.  I would

7   ask the board consider the impact on the

8   victim's mother, on her family.  She can't speak

9   for herself but her mother is here to speak for

10  her.

11        PRESIDING COMMISSIONER SAWYER:  Thank

12  you.

13        DEPUTY COMMISSIONER MITCHELL:  Tape.

14        PRESIDING COMMISSIONER SAWYER:  We're

15  going to change the tapes.

16              (off the record)

17        DEPUTY COMMISSIONER MITCHELL:  We're

18  back on the record.

19        PRESIDING COMMISSIONER SAWYER:  Is this

20  tape two?

21        DEPUTY COMMISSIONER MITCHELL:  Yes.

22  This is tape two in the Agrio hearing and at

23  this time we will go do Ms. Fox for her closing.

24        ATTORNEY FOX:  Thank you.  Mr. Agrio

25  and I respectfully disagree with my colleague

26  from San Diego.  Mr. Agrio would be a suitable

27  candidate for parole and should be found

85

1  suitable for the follow reasons one; the board

2  report is supportive and that includes an

3  extensive survey of his achievements since he's

4  been incarcerated and a thorough discussion of

5  his personal factors. No criminal conduct prior

6  to coming to prison with the exception of

7  something the district attorney has called

8  battery but a reading of the internal

9  investigation report may emerge something as

10  more accurately characterizes mutual combat. It

11  should be remembered and we're not blaming Alma

12  for anything here, but she was trained in

13  weapons as well. It should be remembered that

14  Pablo was in love with Alma. This was his wife

15  and the relationship was suffering as was

16  apparent in the different reports that are

17  contained in the file. Mr. Agrio cannot go back

18  and changes the facts of the crime of commitment

19  if he could he would. He spoken very eloquently

20  and completely and honest today with the panel

21  regarding the changes he has made in his life

22  and he's upgraded in every reasonable way,

23  educationally there's really little else he can

24  do accept maintain what he's doing, and

25  vocationally he has upgraded and taken a

26  certificate in the computer area. Remarkably

27  he's been disciplinary free and that's no mean

86

1   achievement in prison, so turning to the

2   psychological evaluation I would not be so

3   arrogant as to substituted my judgment for that

4   of the license clinical professional hired by

5   the Department of Corrections specifically to

6   advice this panel, and that writer has come to

7   the conclusion that Mr. Agrio, among other

8   things, has a global assessment functioning,

9   which Commissioner Mitchell has said is very

10  high and indeed it is.  It's unusual but that

11  appears in inmates, and that just shows someone

12  who can get a long in society, who can resolve

13  disputes in a peaceful law-abiding manner, and

14  there's no doubt that Mr. Agrio will do that.

15  Turning to his parole plans he has three viable

16  sets of plans, which show great thought and

17  effort.  He's preferred location would be Morro

18  Bay, which I believe is San Louis Obispo, county

19  and the panel -- or the board it would then be

20  within its power to order that.  He does have a

21  backup plan in San Diego and then a fallback

22  plan out of state in Pennsylvania and what this

23  means also in the event that he would be ordered

24  to do parole in Morro Bay, he does have this

25  widespread consistent sustained support

26  throughout his family, friends people who have

27  stuck with him over the many, many years, so I

87

1  think it would be appropriate to find Mr. Agrio

2  suitable for parole and to set a date for his

3  release and I'll submit based on that unless

4  there's anything that Mr. Agrio would like to

5  share, and I believe he's prepared a written

6  statement.

7          **PRESIDING COMMISSIONER SAWYER:**  Okay.

8  Thank you.

9          **PRESIDING COMMISSIONER SAWYER:**  Mr.

10  Agrio go ahead and tell us why you feel you're

11  suitable for parole.

12          **INMATE AGRIO:**  Thank you, sir.  If I

13  may, sir, I would like to respond first to some

14  of the comments that the district attorney made.

15          **PRESIDING COMMISSIONER SAWYER:**  Uh-huh.

16          **INMATE AGRIO:**  This question keeps

17  coming up hearing after hearing about my lack of

18  insight into what happened.  My understanding of

19  what insight is, is a clear understanding of

20  what factors came into place that led one to act

21  the way they did.  I have done everything

22  extensive therapy, sir, not only one-on-one but

23  with every self-help group that has come my way.

24  I have applied myself into trying to find out

25  what were the sort of things that made me act

26  the way that I did, and I think that I was

27  accomplished that, sir.  I have responded about

88

1  what brought about the situation on that tragic

2  night that took my wife's life was nothing more

3  than a volatile cocktail of anger and

4  frustration that led to me acting in poor

5  judgment.  I think that's insight.  I always

6  know why I felt that way.  I grew up in a

7  culture that demanded something -- certain

8  things from a man.  They were wrong.  I reject

9  them today, but nevertheless at that time that's

10  how I felt and that's how I perceived things to

11  be.  I am not running away from my actions.  I

12  am taking full responsibility for what I did.

13  If I have committed some omissions in the past

14  in regards of what happened they have been done

15  so because of a faulty memory not because of

16  intent to deceive anyone.  My wife and I had a

17  very good relationship and the whole, but from

18  time to time things would go wrongfully.  This

19  report that the district attorney was eluding to

20  about the San Diego Police Department was a

21  situation that took place on a night that a

22  friend of mine from the marine core came too

23  solicit with me in San Diego and wanted to go

24  out with me.  My wife wanted to come with us and

25  my friend didn't feel like it would be

26  appropriate for her to come with us based on the

27  places that we wanted to visit.  She became very

89

1    upset and we god into an argument and I struck

2    her.  She later was contacted by the Internal

3    Affairs investigator and she made a statement,

4    sir, that I think is relevant to this situation.

5    She said that it is written here that:

6            Mrs. Agrio advised this

7            enterprise that she does not

8            want to pressure charges against

9            letter husband and to the entire

10           incident.  She told him that her

11           husband -- she and her husband

12           have worked out their problems.

13           She was sorry that she called

14           the police and only did so

15           because she was very upset.

16           Lieutenant Price explained to

17           Mrs. Agrio that the defendant

18           has an obligation to investigate

19           incidents of alleged misconduct

20           by police officers because they

21           are in a position of public

22           trust.  Mrs. Agrio explained to

23           Lieutenant Price that she's a

24           very moody person with a quick

25           temper.  She further states that

26           she often regrets doing or

27           saying something soon after one

90

```
 1              of her outburst such as in this
 2              incident.
 3    I would like to follow that up, sir with a
 4    testimony that was given by a friend of the
 5    family Mrs. Jill Brogan (phonetic) at the time
 6    of the trial, sir. She was calling to mediate
 7    some domestic problems that we were having, and
 8    I just want to read this particular part here
 9    where she says that --
10              ATTORNEY FOX:  What are you reading
11    from?
12              INMATE AGRIO:  This is the opening
13    brief of my appeal, sir and this is testimony
14    that was taken out of the trial transcript, and
15    just quick very briefly, sir she said
16              Brogan, which was the person
17              that testified said thought that
18              each knew how to push the others
19              buttons.  She did not think that
20              or everyone hesitated to do that
21              if he or she wanted to Brogan
22              and did think that they loved
23              each other very much.  Other
24              than the occasion at the Super
25              Bowl, Brogan had no personal
26              knowledge of any other
27              disagreement between them.
```

91

1    And of course there's a lot more to that than

2    what I've just read.  What I've just wanted to

3    point out, sir, that when it comes to insight I

4    think that I have gained a tremendous deal of

5    insight that has happened in my life that I

6    needed to change and I have taken steps to do

7    that.  And I think it is an error on the part of

8    the district attorney to continue to hold on to

9    that crutch and claim that I lacked insight in

10   the commitment offence and I also take issue

11   with the position that they take that I'm

12   manipulative.  I'm not disrespecting my wife.  I

13   am not playing one woman against the other.  I

14   am not romantically involved with Rosy.  She's a

15   dear friend who will do anything that she can to

16   help me and if I omitted to bring this up with

17   my wife it's not because I'm trying to deceive

18   her or disrespect her it's just that I don't

19   think that it is anything to be said by that at

20   the time because I don't know where I'm going to

21   be paroling.  It very well could be that if I'm

22   granted parole that I would go to San Louis

23   Obispo or Morro Bay and that's the end of that.

24   Now, I would like to close, sir, with some a

25   brief statement that I've made in terms of where

26   I'm at with this situation here.  If I may

27   proceed?

92

```
1        It is with a deep since of
2        remorse and regret that I
3        express full and complete
4        responsibility for the homicide
5        that resulted in my
6        incarceration.  The homicide was
7        committed during a heating
8        argument in which I was the
9        responsible party.  The act of
10       taking a life goes against the
11       laws of God and the laws of the
12       society that we live in.  My
13       actions were wrong and with my
14       heart and soul I pray daily for
15       forgiveness.  I emphasize my
16       sorry for the life taken, which
17       I'm guilty of taking away.  I
18       shall remain in remorse with
19       prayers for our souls.  I'm
20       begging for forgiveness and
21       (indiscernible) not a day goes
22       by that I don't feel the pain
23       and suffering that my judgment
24       caused those that were left
25       behind to deal with this
26       horrific tragedy.  Indeed the
27       other devastation was felt
```

93

1  immediately upon realizing the

2  magnitude of my error.  I have

3  tried to reach out to those whom

4  I have harmed and have accepted

5  the consequences of my actions

6  by meeting all demands placed

7  upon me by the criminal justice

8  system.  I sympathize and

9  empathize with the surviving

10  relatives of the victim and wish

11  somehow that I could rid them of

12  their pain and suffering.  The

13  loss of life was not necessary

14  and could have been avoided had

15  I'd been willing to seek

16  counseling and advise from those

17  qualified to dispense it.  Since

18  that time, I have subjected

19  myself to therapy at the hands

20  of professionals in an effort

21  understand the underlining

22  factors that triggered by

23  behavior and remain availability

24  to do whatever is necessary to

25  help bring closure of this

26  situation and the life of all

27  those affected.  Over the years

94

1    of incarceration, I have made an

2    honest effort to make amends for

3    the negative behavior that

4    characterized my life in the

5    past, and in order to improve my

6    conscious contact with God, I

7    have relied on daily prayers and

8    meditations and God's work.

9    Fortunately CDC has made this

10   process of improvement possible

11   through self-help programs and I

12   have taken full advantage of

13   these spiritual programs.   It

14   has been a blessing from a life

15   to have a strong support from my

16   family and friends.   My mother

17   has provided a strong heeling

18   foundation for my life.   Through

19   our strong belief in the Lord,

20   we have maintained a heeling

21   fellowship.   Every human life is

22   precious and (indiscernible) in

23   the understanding and guides my

24   daily life.   Indeed all life is

25   a creation under the loving God

26   and every soul is connected in

27   life.   Each one is member of the

95

1    human family.  At the time of
2    this terrible tragedy, I was
3    experiencing a great deal of
4    stress in my life, stress that
5    was created by my attempt to
6    manage simultaneously in my
7    professional career.  My pursuit
8    of a law degree, married life, a
9    newborn baby, and an addiction
10   problem I was not equipped to
11   deal with.  I overextended
12   myself in an attempt to climb
13   the ladder of success and became
14   afraid of the notion that my
15   goals and ambitions were being
16   put in jeopardy by someone that
17   I loved. I felt I was being
18   intentionally deceived and lied
19   to and I sought to obtain
20   answers and explanations that
21   would pacify my fears at a time
22   ill-suited for that.  My fears
23   and concerns caused me to
24   overreact and lose control of my
25   emotions, which in turn led to
26   the horrible tragedy I now live
27   with.  I'm now aware of the

96

1          factors that triggered my

2          response and feel confident I

3          will not face a similar

4          situation.

5    Thank you.

6          **DEPUTY COMMISSIONER MITCHELL:**  I need a

7    piece of clarification?  You mentioned an

8    addiction problem.

9          **INMATE AGRIO:**  Yes, sir.  The addiction

10   was on the part of my wife, sir, I believe that

11   she had a problem with drinking and we sought

12   counseling during our marriage and during the

13   time that we were just dating and the counseling

14   was stopped.  The therapy was not pursued and I

15   felt that I could handle it on my own and I'm

16   stating today that I was not equipped to do that

17   and therefore some of the anger and frustration

18   that I felt with what was going on.

19         **DEPUTY COMMISSIONER MITCHELL:**  Okay.

20   Thank you for clarifying that.

21         **PRESIDING COMMISSIONER SAWYER:**  Ms.

22   Medina, this is your opportunity to tell us why

23   you feel he's not suitable for parole.

24         **MS. MEDINA THROUGH INTERPRETER:**  Can we

25   start with the first day of what happened?  May

26   God forgive him because I am not going to

27   forgive him.  Even if he stayed all this time in

97

1   jail he wouldn't pay for what he did of the

2   crime he did.  I have my grandson at home and

3   day by day I'm remembering the need.  He's

4   really missing his parents.  He's really needed

5   his parents.  It's not easy coming here and

6   hearing everything, and she's up with God and I

7   have to defend her.

8        MS. MEDINA:  That's all.

9        INTERPRETER MORTON:  That's all?

10       MS. MEDINA:  Yeah.

11       INTERPRETER MORTON:  That's it.

12       PRESIDING COMMISSIONER SAWYER:  That's

13  all.  Thank you.

14       ATTORNEY FOX:  Here's a Kleenex.

15       PRESIDING COMMISSIONER SAWYER:  It's

16  3:46 in the afternoon and we will recess for

17  deliberations.

18       ATTORNEY FOX:  Thank you.

19                 R E C E S S

20                  --oOo--

21

22

23

24

25

26

27

98

1      **CALIFORNIA BOARD OF PAROLE HEARINGS**

2              **D E C I S I O N**

3          **DEPUTY COMMISSIONER MITCHELL:** We're on

4   record.

5          **PRESIDING COMMISSIONER SAWYER:** Okay.

6   This is the case of Mr. Agrio and the time is

7   4:12 in the afternoon. We are reconvened. Now

8   the panel's reviewed all the documents -- all

9   the information received from the public and

10  relied on the follow circumstances in concluding

11  that the prison is not suitable for parole and

12  would pose an unreasonable risk of danger to

13  society or threat to public safety if released

14  from prison. We're going to deny your parole

15  for three years, sir, and I'm gong to tell you

16  why. The offense in this case was particularly

17  cruel and callous absolutely no motive. There

18  was no reason for this offense to have ever

19  occurred. It was certainly carried out in a

20  dispassionate manner. I have wouldn't go as far

21  to say it's an execution-style, sir. I would

22  certainly say it's more than unintentional act

23  or more than an accidental death given your --

24  given your history as a police officer, given

25  your history as a Marine around firearm, I just

26  find -- I do not understand how this could have

27  **PABLO AGRIO E-17284 DECISION PAGE 1 12/06/05**

1   happened.  If there wasn't -- without retrying

2   this case at all you are here for second-degree

3   murder.  I think there was certainly a crime of

4   passion.  We think it's a crime of passion.  On

5   the evening of March 26, 1988, at proximately

6   11:30 p.m. your wife Alma age 23-year-old was

7   shot to death by you over an incident that

8   should have never escalated to clearly over that

9   point.  Along with those lines we were really

10  wrestling with some of the things --

11          **ATTORNEY FOX:**  Excuse me Commissioner,

12  Mr. Agrio would like to leave the room and I

13  will conclude the reading with just me present.

14          **PRESIDING COMMISSIONER SAWYER:**  Okay.

15          **ATTORNEY FOX:**  Okay.

16          **PRESIDING COMMISSIONER SAWYER:**  Good

17  luck to you Mr. Agrio.  Several issues as to why

18  we determine three years.  We were really

19  wrestling and we were really -- we really had a

20  problem with his minimalization [sic] in this

21  first of all.  He appears to be attempting to

22  word smith this crime by changes his description

23  of this from accidental to unintentional act.

24  Those are very far apart.  His version of this

25  changing the words from angry and infuriated

26  downsizing those words for a lack of better

27  **PABLO AGRIO E-17284 DECISION PAGE 2 12/06/05**

100

1   terms to upset referring to them as upset, which
2   makes him look a little better a little nicer.
3   Another issue that we felt he is not taking
4   responsibility for this particular crime, which
5   until he takes responsibility for this crime I
6   don't think he'll -- or at least this panel
7   won't receive a date but his honesty to his wife
8   Cathleen as soon as I -- as soon as he said she
9   didn't know -- Ms. Hall, Rosy Hall down in San
10  Diego didn't know that she was part -- that he
11  had not told Cathleen that Ms. Hall was part of
12  his plan and if he got paroled to Morro Bay he
13  would never disclose that.  I think that's
14  deception.  The psychiatric report in this case
15  is -- has been invalidated by the fact that he
16  told the psychiatrist that he had never to
17  quote.  Agrio he said some things here that just
18  totally not taking responsibility.  He may have
19  mishandled the situational stress of being
20  married to a wife who had a drinking problem and
21  would not listen to her attempts to talk.  She
22  would not listen to his attempts to talk to her
23  in a mature manner.  He's making it her fault.
24  He's putting the monkey on her back.  His
25  statement that he never battered his wife was a
26  totally.  And I think there's something to say
27  PABLO AGRIO E-17284 DECISION PAGE 3 12/06/05

101

1   about the fact that he didn't want to hear the

2   truth here and didn't want to face the facts and

3   left the hearing prematurely.  The reason -- one

4   of the reasons that people in law enforcement

5   and people with experience with domestic

6   violence know it happens all the time, and that

7   is when a woman is battered police are called,

8   she calls them as the right thing to do, and

9   then as soon as things settle down then she

10  recants and that's what appears to have happened

11  here when the internal investigation was taking

12  place, she backed off because she's going to

13  lose.  If he looses his job or gets suspended

14  then she's going to lose.  If he gets convicted

15  of battery then she's going to lose and so I

16  mean this is typical where the spouse backs off.

17  I think he was -- the most honest I think he was

18  to us here today or to the system was the

19  statement that I read earlier that he had made

20  in 19 or -- or May 31, 1989, when he analyzed

21  the cultural terms of a Latin family where a man

22  is the boss of the house and ordinarily the wife

23  jumps at the snap of a finger.  He indicates

24  that today's younger people are not

25  traditionalist in an attempt to explain his

26  position.  He states that no matter how much

27  **PABLO AGRIO E-17284 DECISION PAGE 4 12/06/05**

102

1  time he has to do, there's no guarantee that he

2  would not ultimately wind up in a similar

3  position under similar circumstances.  I think

4  he's right on.  I think he's right on, and if

5  you study cultures you know that some cultures a

6  lot of cultures have their cultural things

7  sometimes in different cultures you have to

8  break those.  From those -- those are the

9  reasons that we -- that we're giving him for

10  this multiple year, three year defile.  His

11  previous record absolutely no jail time, no

12  criminal conduct that we know of, however, he

13  does have, as evidenced in more than one place,

14  a record of violence of assaultive behavior

15  leading up to this incident.  His institutional

16  behavior he's had one 128A.  He should be

17  commended for his institutional behavior no 115.

18  He knows how to operate within an institution.

19  He was a good Marine.  He was a good policemen,

20  and he's being a model prisoner and I think that

21  he responds well to institutionalization, and

22  that 128 was in 1991 for contraband and he gave

23  us a reason that sounded pretty reasonable to

24  me.  He was new on the block.  Psychiatric

25  factors as I mentioned before the psychiatric

26  evaluation in conclusion that in terms of

27  **PABLO AGRIO E-17284 DECISION PAGE 5 12/06/05**

103

1  dangerousness and all the terms I believe is

2  invalid because the fact that he with held

3  valuable information from us -- from the

4  psychologist Mr-- Dr. Macumber.  That psych was

5  done in December of '03.  His parole plans

6  outstanding accept for one problem as I

7  explained to him and in particular we see a lot

8  of Morro Bay.  We see a lot of San Louis Obispo

9  because there's a prison there and as we didn't

10  talk about how he met Cathleen Boyd.  There's a

11  lot of marriages that go on and a lot of the

12  spouses live in the San Louis Obispo, Morro Bay,

13  Pismo Beach area and while it's not impossible

14  to parole a person to San Louis Obispo County,

15  it's -- we would like to see an alternative plan

16  particularly San Diego.  I would think that if

17  Cathleen Boyd Agrio loves him and wants to care

18  for him that one of the other options would be

19  that she would move to San Diego and establish a

20  residence, a residence in San Diego.  I --

21  Commissioner Mitchell and I talked about this

22  how dishonest we felt this was to his wife Rosy

23  Hall -- to his wife Cathleen Boyd Agrio as to

24  not disclose to Rosy Hall that he was going to

25  live with another woman.  I know my

26  circumstances and Commissioner Mitchell knows

27  **PABLO AGRIO E-17284 DECISION PAGE 6 12/06/05**

104

1   his circumstances and it wouldn't happen in

2   house household.  It just wouldn't happen.  The

3   other alternative was Philadelphia P.A. and

4   that's not very logical.  In terms of parole

5   plans he does a great job at getting letters

6   back up to his marketable skills.  There's no

7   question that this man could be a success --.

8   The law business on the outside Commissioner

9   Mitchell brought up some ideas for him in terms

10  of starting the process to get his bar card as

11  to how -- he gave suggestion as to how he should

12  be pursuing that in the State of California.

13  The 3042 response the San Diego county District

14  Attorney (indiscernible) was parole for Mr.

15  Agrio, and as you read this I'm going to stop

16  beating this up, but I want to make sure the

17  record reflects the good things that you have

18  done.  You are a disciplinary clerk as of '04,

19  you've done data processing, vocations,

20  (indiscernible) in the kitchen and found out

21  you'd rather be clerking.  You've got

22  satisfactory to exceptional work reports.

23  You've got (indiscernible) which you have

24  accomplished as well as computer repair.  You've

25  obtained your law degree.  You've been through

26  the Impact course.  You've been in the business

27  **PABLO AGRIO E-17284 DECISION PAGE 7 12/06/06**

105

1    course, Cage the Rage, anger management in '04
2    and '05, hazardous materials, Buddhist
3    meditation and AA since year 2000.  You've done
4    the spiritual recovery program.  You were active
5    in the Veterans group, musical therapy, prison
6    ministry as well as a volunteer worker in the
7    arts and hobbies area -- arts and corrections I
8    should say.  You've received numerous laudatory
9    Chronos for your work.  It appears that you have
10   a great work ethic and that you put your heart
11   and soul into your work and into your vocations
12   and into your self-help projects that you have
13   been involved in.  In a separate finding we are
14   going to say that you are to confront your
15   demons in terms of the insight into the crime,
16   your responsibility into this crime.  It just
17   didn't happen there was -- this was a crime of
18   passion and we would encourage you to be honest
19   with your wife and we would encourage you not to
20   have such selective and minimalized [sic]
21   memory.  The recommendations in this case would
22   be to continue your behavior (indiscernible),
23   continue to get self-help, and again your parole
24   denial is three years.  Commissioner Mitchell do
25   you have anything you'd like to say?
26           **DEPUTY COMMISSIONER MITCHELL:**  Good
27   **PABLO AGRIO E-17284 DECISION PAGE 8 12/06/05**

106

1          **PRESIDING COMMISSIONER SAWYER:**    Good

2    luck to you Mr. agree owe --

3          **ATTORNEY FOX:**    Thank you.

4          **PRESIDING COMMISSIONER SAWYER:**    -- and

5    that concludes this parole hearing.

6          **ATTORNEY FOX:**    Thank you.

7          **PRESIDING COMMISSIONER SAWYER:**    The

8    time is now 27 minutes after four.

9                      --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED THREE YEARS

24    THIS DECISION WILL BE FINAL ON: Apr. 5, 2006

25    YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    PABLO AGRIO E-17284 DECISION PAGE 9 12/06/05

107

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, FELICIA TOWNSEND, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that I

have transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 106, and which

recording was duly recorded at CALIFORNIA TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF PABLO

AGRIO, CDC NO. E-17284, on DECEMBER 06, 2005, and that

the foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated DECEMBER 23, 2005, at Sacramento,

California.

Felicia Townsend
Transcriber
**PETERS SHORTHAND REPORTING**