# EXHIBIT E
# Part 2 of 3

# SHAPUTIS' CASE

## CRIMINAL LAW AND PROCEDURE

*Decision that inmate is unsuitable for parole is not proper where evidence does not support inmate currently poses unreasonable threat to society.*

Cite as 2005 DJDAR 14892

In re RICHARD SHAPUTIS
on
Habeas Corpus.

No. D046356
(San Diego County
Super. Ct. No. HC18007)
California Court of Appeal
Fourth Appellate District
Division One
Filed December 28, 2005

Petition for Writ of Habeas Corpus. Kerry Wells, Judge. Petition granted.

Law Offices of Marc Elliot Grossman and Marc Elliot Grossman for Petitioner.

Bill Lockyer, Attorney General, James M. Humes, Chief Assistant Attorney General, Frances T. Grunder, Assistant Attorney General, Michelle Des Jardins and Heather Bushman, Deputy Attorneys General, for Respondent.

Petitioner Richard Shaputis was sentenced to 15 years to life following a 1987 conviction for second degree murder.[1] Shaputis, now 69 years old, has remained in prison for the past 18 years and has been an exemplary prisoner with an unblemished record of rehabilitative progress. Nevertheless, the Board of Prison Terms (the BPT)[2] found him unsuitable for parole at hearings conducted in 1997, in 2002, and finally in 2004. The most recent denial, challenged by the petition for writ of habeas corpus, was based on the BPT's conclusion that Shaputis posed an unreasonable risk of danger to public safety were he to be released from prison, even though the third party evaluations have consistently concluded he posed a "low" risk of danger to the public were he paroled.

Shaputis asserts the BPT's conclusion has no evidentiary support and therefore violates his due process right to parole. He argues the BPT's conclusion was improperly based on the circumstances of his offense and his interpersonal skills prior to 1987, and there is no evidence he poses a risk of danger in his *current* condition.

I

FACTS

A. The Offense

In 1987, a jury convicted Shaputis of the second degree murder of his wife, Irma, and found true that he used a firearm in the commission of the offense. He was sentenced to 15 years to life with the possibility of parole, plus a determinate two-year sentence for the firearm use.

Shaputis and Irma had been married for 23 years and their relationship was marked by domestic violence. Two years earlier, Irma complained that Shaputis had beaten her and cracked her ribs, and approximately 18 months earlier Shaputis had shot at his wife when they had been drinking and arguing. Shaputis apparently beat Irma at least two or three times per year and had threatened her with a knife. However, none of these alleged events resulted in criminal charges.

On the night of the murder, Shaputis called 9-1-1 around 10:00 p.m. and stated he had fought with his wife and killed her, but claimed it was an accident.[3] When police arrived at Shaputis's home, he emerged and surrendered without incident. When police entered the house, they found Irma's body in the living room with a handgun lying nearby. The autopsy report concluded Irma was killed some time between 8:30 p.m. and 12:30 a.m. and her death was caused by a single gunshot wound to the neck. The shot had been fired from close range, possibly as close as two feet, and had entered the neck between the junction of the neck and jaw. Death was apparently instantaneous. Shaputis was a heavy drinker who became violent when intoxicated, and he had been drinking on the night of the murder.

B. Shaputis's Background

Shaputis's mother deserted the family when he was nine years old, and he raised his siblings with the assistance of his grandparents. His father physically abused him. Shaputis moved out of the home when he was 18 years old and began working.

Shaputis, who was married twice, had a substantial alcohol problem. His first marriage lasted nine years and produced four daughters, of whom he was awarded custody after the divorce. Shaputis subsequently married Irma and, although the marriage lasted 23 years, it was marked by domestic violence. Additionally, in 1978 Shaputis pleaded no contest to a misdemeanor soliciting or engaging in a lewd act with one of his daughters. Except for a 1975 "nonsupport" offense, the 1978 lewd act offense with one of his daughters was the extent of his criminal record.

Shaputis's work history showed greater stability. He worked for SDG&E for seven years, owned his own business for approximately 17 years, and worked for Bechtel for the 13 years prior to the murder.

C. Shaputis's Performance in Prison

Shaputis's record during his 17 years of incarceration was impeccable. He has been discipline-free for his entire term and his work record is unblemished. He fully participated in all available AA and NA programs since 1991, and completed all applicable therapy programs. He has the lowest classification score possible for a life-term inmate, and has numerous commendations for his work, conduct and reform efforts from prison staff.

1 Although this court reversed the original conviction and remanded the matter for retrial, the jury in the second proceeding again convicted him of second degree murder. (*People v. Shaputis* (May 21, 1991, D012507) [nonpub. opn.] at pp. 1, 4.)

2 Now known as the Board of Parole Hearings.

3 The BPT concluded the gun could not have been fired accidentally because the hammer must be pulled back manually to a cocked position before pulling the trigger and there was a "transfer bar" to prevent accidental discharges. Although this information is recited in the "Life Prisoner Evaluation Report" (LPER) prepared for the 2004 Parole hearing by correctional department counselors, the factual basis for the conclusions in the LPER does not appear in the probation report filed in connection with the 1987 conviction, and the source of this information is unclear.

II

HISTORY OF PROCEEDINGS

A. The 1997 and 2002 BPT Proceedings

Shaputis's minimum eligible parole date was in September 1998. At his first parole hearing in 1997, the LPER prepared by his prison counselor for submission at the 1997 BPT hearing stated his "progress in state prison could best be described as exemplary," and concluded Shaputis "would probably pose a low degree of threat to the public at this time, if released from prison." The BPT denied parole, apparently based on an unsuitability determination, and recommended he remain discipline free and participate in self-help and therapy groups. At Shaputis's second parole hearing conducted in 2002, the LPER confirmed he had remained discipline free and participated in self-help groups, and again expressed the opinion (based on Shaputis's commitment offense, his prior record, and his prison adjustment) that Shaputis "would probably pose a low degree of threat to the public at this time, if released from prison." The BPT again denied parole, apparently based on an unsuitability determination, and again recommended he remain discipline free and participate in self-help and therapy groups.

B. The 2004 BPT Proceedings

*The Forensic Evaluations*

Dr. Mura, a forensic psychologist, evaluated Shaputis's psychological condition and submitted his report to the BPT in connection with Shaputis's 2004 parole hearing. Dr. Mura's report stated Shaputis had feasible and appropriate plans for his life if granted parole and appeared very committed to maintaining his sobriety through continued involvement with AA. When assessing Shaputis's risk for violence if paroled, Dr. Mura concluded he presented a low risk for violence absent a relapse into alcoholism.[4]

The LPER prepared by Shaputis's prison counselor for the 2004 BPT hearing again noted his exemplary prison record and that he had fully adhered to the BPT's prior recommendations. The report again concluded, considering the commitment offense, his prior criminal record, and his adjustment in prison, Shaputis would "probably pose a low degree of threat to the public at this time, if released from prison."[5]

*The Determination*

The BPT considered the materials presented, including the forensic evaluations, and concluded Shaputis was not suitable for parole because he posed "an unreasonable risk of danger to society or a threat to the public safety if released from prison." The BPT cited two findings for this conclusion. First, the BPT found the commitment offense was "carried out in an especially cruel and/or callous manner" and was "carried out in a dispassionate and/or calculated manner" because the murder was committed at close range with a single shot. Second, the BPT found Shaputis had a "history of unstable and tremulous [sic] relationships with others," and had assaulted his wife.

B. The Habeas Proceedings

Shaputis petitioned the San Diego County Superior Court for a writ of habeas corpus alleging the BPT violated his due process rights because its unsuitability determination was not supported by the evidence and was therefore arbitrary and capricious. The court denied the writ, concluding the BPT's decision was supported by some evidence.

Shaputis then petitioned this court for a writ of habeas corpus. We issued an order to show cause, the BPT filed a return, and Shaputis filed a traverse. Shaputis's petition asserts the BPT's decision to deny parole because of its conclusion he posed an unreasonable risk of danger violated due process because it was (1) contrary to the only reliable evidence of his current dangerousness and (2) relied on findings unsupported by any evidence.

III

LEGAL FRAMEWORK

A. Parole Suitability

Penal Code section 3041 provides the framework for parole decisions for indeterminate life inmates. Subdivision (a) requires that, one year prior to the inmate's minimum release date, the BPT meet with the inmate and "normally set a parole release date" according to specified criteria. However, subdivision (b) provides that if the BPT determines the inmate is not suitable for parole because "consideration of the public safety requires a more lengthy period of incarceration," it need not set a release date. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1078-1080.)

In making the section 3041, subdivision (b) suitability determination, the BPT is charged with considering "[a]ll relevant, reliable information" (Cal. Code Regs., tit. 15, § 2402, subd. (b)),[6] including the nature of the commitment offense and behavior before, during, and after the crime, the prisoner's social history, mental state, criminal record, attitude towards the crime, and parole plans. (§ 2402, subd. (b).) The circumstances tending to show *unsuitability* for parole include that the inmate: (1) committed the offense in a particularly heinous, atrocious, or cruel manner;[7] (2) possesses a previous record of violence; (3) has an unstable

---

4 Mura's risk of violence assessment evaluated three elements: Shaputis's history and background, his clinical presentation, and management of future risk. Because Shaputis's history of violence appeared intertwined with his alcoholism, Mura concluded the risk based on this history was low absent a relapse into alcoholism. Shaputis's clinical presentation showed some growth in insight and Mura believed this factor evidenced a low risk for violence as long as he remained sober and involved in activities that held his interest. Finally, Mura stated Shaputis's ability to handle future stress in a nonviolent manner was also largely rooted in his ability to remain sober. Mura believed Shaputis's prison record (e.g., his commitment to his AA program and his demonstrated ability to comply with rules) and his current physical condition (a senior citizen with chronic health problems that would limit concerns over acting out in inappropriate ways) made Shaputis a low risk for future violence.

5 The Life Prisoner Evaluation Reports, prepared by Shaputis's prison counselors for submission to his 1997 and 2002 parole hearings, expressed the same opinion that Shaputis posed a low degree of threat to the public if released from prison.

6 All further references to section 2402 are to title 15 of the California Code of Regulations, section 2402.

7 Factors that support the finding the crime was committed "in an especially heinous, atrocious or cruel manner" (§ 2402, subd. (c)(1)) include the following: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense.

(3)



social history; (4) has previously sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (§ 2402, subd. (c).) A factor that alone might not establish unsuitability for parole may contribute to a finding of unsuitability. (§ 2402, subd. (b).)

Circumstances tending to show *suitability* for parole include that the inmate: (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress had built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use on release; and (9) has engaged in institutional activities that suggest an enhanced ability to function within the law on release. (§ 2402, subd. (d).)

These criteria are "general guidelines," illustrative rather than exclusive, "and the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the BPT." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 679 (*Rosenkrantz*); § 2402, subds. (c), (d).) The BPT's task is to try "to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts." (*Rosenkrantz*, at p. 655.)

B. Standard of Review

The court below denied relief, and therefore this writ proceeding is an original proceeding that requires we independently review the record. (*In re Scott* (2004) 119 Cal.App.4th 871, 884 (*Scott*).)

In *Rosenkrantz*, the California Supreme Court addressed the standard the courts apply when reviewing parole decisions by the executive branch. The court first held that "the judicial branch is authorized to review the factual basis of a decision of the [BPT] denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the [BPT] supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Rosenkrantz, supra*, 29 Cal.4th at p. 658.) The court further held that "courts properly can review a Governor's decisions whether to affirm, modify, or reverse parole decisions by the [BPT] to determine whether they comply with due process of law, and that such review properly can include a determination of whether the factual basis of such a decision is supported by *some evidence* in the record that was before the [BPT]." (*Id.* at p. 667, italics added.)

The "some evidence" standard is "extremely deferential" and requires only "'a modicum of evidence.'" (*Rosenkrantz, supra*, 29 Cal.4th at pp. 664-665.) A court may not vacate an administrative decision subject to the "some evidence" review simply because it disagrees with the BPT's assessment. (*Id.* at p. 679.) The decision must be "devoid of a factual basis" to be overturned. (*Id.* at p. 658.) Because judicial review of a parole denial is to ensure that a decision of the BPT is not arbitrary and capricious, thereby depriving the prisoner of due process of law, "the court may inquire only whether some evidence in the record before the [BPT] supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Id.* at pp. 657-658.)

The BPT's discretion over parole suitability determinations, although broad, is not absolute. (*Scott, supra*, 119 Cal.App.4th at p. 884.) *Rosenkrantz* explained that if "the [BPT's] decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the [BPT] to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (*Rosenkrantz, supra*, 29 Cal.4th at p. 658.)

IV

ANALYSIS

The BPT does not dispute the only evidence on all relevant parole *suitability* factors, as well as the only evidence on all but two of the parole *unsuitability* factors, militated in favor of finding Shaputis suitable for parole. Notwithstanding this evidentiary milieu, the BPT found he was unsuitable for parole because it concluded two of the unsuitability factors--the commitment crime itself and Shaputis's pre-incarceration history of relationships with others--made him a danger to society if released on parole. We are charged with the obligation to ensure the BPT's decision comports with the requirements of due process of law, and we can discharge that obligation only if we are satisfied there is some evidence in the record before the BPT to support the factual basis for its findings. (*Rosenkrantz, supra*, 29 Cal.4th at p. 658; *In re Dannenberg, supra*, 34 Cal.4th at pp. 1095-1096 and fn. 16.)

A. The Commitment Offense

The BPT concluded Shaputis posed an unreasonable risk of danger if released on parole because he committed the offense in an especially cruel and/or callous manner (apparently under section 2402, subdivision (c)(1)(D)) and an especially dispassionate and/or calculated manner (apparently invoking section 2402, subdivision (c)(1)(B)).[8]

*Evidence the Murder Was Especially Cruel and/or Callous*

Section 2402, subdivision (c)(1)(D), describing one of the factors that supports a finding the crime was committed "in an especially heinous, atrocious or cruel manner," provides the offense was "carried out in a manner which demonstrates an exceptionally callous disregard for human suffering." Shaputis contends there is no evidence to support this finding. The BPT's only reference to the *evidence* supporting this finding--the victim died from a single gunshot wound fired at close range that perforated her larynx, spinal cord column and spinal cord--shows the crime was *not* committed in an exceptionally callous manner, disregarding the victim's suffering, because the forensic evidence appears to confirm the gunshot induced instantaneous death rather than a painful or lingering death.

We agree with the observation made by several courts, recently rearticulated in *Scott, supra*, 119 Cal.App.4th at p. 891, that "'[A]ll second degree murders by definition involve some callousness--i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others. [Citation.]' As noted

---

8. Section 2402, subdivision (c)(1) also lists as factors that support the finding the crime was committed "in an especially heinous, atrocious or cruel manner" (§ 2402, subd. (c)(1)) that multiple victims were involved, the victim was abused, defiled, or mutilated during or after the offense, and the motive for the crime was inexplicable or very trivial in relation to the offense. The BPT did not cite these factors, and we do not further consider them.

however, parole is the rule, rather than the exception, and a conviction for second degree murder does not automatically render one unsuitable.' [Quoting *In re Smith* (2003) 114 Cal.App.4th 343, 366.]" Accordingly, the BPT cannot rely on the bare conviction for second degree murder to deny parole under the exceptionally callous or cruel factor. As *Rosenkrantz* cautioned,[9] to deny parole on that ground there must be some evidence Shaputis engaged in conduct, apart from and beyond the minimum conduct necessary to convict him of second degree murder (*In re Dannenburg*, *supra*, 34 Cal.4th at p. 1098), that cruelly or callously exacerbated the victim's suffering.

The record is devoid of any evidence of aggravated conduct reflecting an exceptionally callous disregard for human suffering.[10] As in *In re Smith*, *supra*, 114 Cal.App.4th 343, there is no evidence Shaputis "tormented, terrorized, or injured [his victim] before deciding to shoot [her]; or that he gratuitously increased or unnecessarily prolonged her pain and suffering. ... Was the crime callous? Yes. However, are the facts of the crime some evidence that [Shaputis] acted with exceptionally callous disregard for [the victim's] suffering; or do the facts distinguish this crime from other second degree murders as exceptionally callous? No. [Citation.]" (*Id.* at p. 367.)

Because the relevant evidence shows no conduct (beyond the minimum required for conviction of second degree murder) showing a callous disregard for human suffering, the BPT's use of this factor was arbitrary and capricious. (*Scott*, *supra*, 119 Cal.App.4th at pp. 891-892.)

*Evidence the Murder Was Dispassionate or Calculated*

Section 2402, subdivision (c)(1)(B), describing a factor that can support a finding the crime was committed "in an especially heinous, atrocious or cruel manner," provides that the offense was one "carried out in a dispassionate and calculated manner." Shaputis contends there is no evidence to support this finding. The BPT's only reference to the *evidence* supporting this finding was again to note the manner of the death (e.g. the victim died from a single gunshot wound fired at close range that perforated her larynx, spinal cord column and spinal cord). The same report from which this manner of death was drawn also noted Shaputis was an alcoholic who became violent when drunk and he had been drinking the night of the shooting.[11] Moreover, he made no attempt to conceal the crime or the weapon, but instead called police and surrendered within 90 minutes of the shooting and appeared upset when interviewed by police that night.

The BPT's finding that Shaputis acted in a dispassionate and calculated manner, in addition to being inconsistent with the jury's verdict acquitting him of first degree murder (cf. *Scott*, *supra*, 119 Cal.App.4th at pp. 889-890), is unsupported by (and indeed may be irreconcilable with) the evidence on which BPT purported to rely. Accordingly, the BPT's reliance on this factor was arbitrary and capricious. (*Scott*, at pp. 891-892.)

B. Unstable Social Relationships

The only other finding cited by the BPT to support its prognostication that Shaputis posed an unreasonable risk of danger to society if released on parole was that he had a "history of unstable and [tumultuous] relationships with others." However, the evidence showed that, apart from his alcohol-related marital disharmony and his misconduct with one of his daughters, apparently also while he was intoxicated, Shaputis had no history of unstable or tumultuous relationships.[12] To the contrary, the evidence showed that he persevered (despite his mother's desertion of the family) by surrogate-parenting his siblings until he left home to begin his adult life. He thereafter maintained relative stability in his occupational endeavors and continued to be in contact with his workmates even after he was imprisoned. His first marriage lasted nine years (slightly longer than the national average) and he was a sufficiently stable father that he was awarded custody of the children of that union, although he did plead no contest to misdemeanor soliciting or engaging in a lewd act with one of his daughters. His second marriage, ended by the commitment offense, lasted 23 years. Finally, his postincarceration conduct was exemplary (evidencing no inability to maintain stable interpersonal relationships) and he has feasible and appropriate postrelease plans for housing, employment, and familial and community support networks.

Shaputis concedes there was some evidence (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 667) he had a tumultuous relationship with Irma.[13] However, the

---

9 *Rosenkrantz*, explaining why the nature of the offense must involve particularly egregious acts beyond the minimum necessary to sustain a conviction for second degree murder, stated that: "In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—*for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense*. Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public ....' [Citation.] 'The [BPT's] authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is "normally" to be granted. ... Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date.' [Quoting *In re Ramirez* (2001) 94 Cal.App.4th 549, 570.]" (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 683, italics added.)

10 Under the BPT's matrices used to set the base term for a life prisoner, the circumstances of this offense would facially qualify Shaputis for one of the lowest base terms applicable to a person who directly caused the death of the victim, because death was almost immediate and was not the result of severe trauma (such as beating, clubbing, stabbing, strangulation, suffocation, burning or multiple wounds) or following a period of torture. (Cal. Code Regs., tit. 15, § 2282, subds. (b), (d).)

11 The forensic psychological evaluation stated Shaputis and his wife were both drunk and arguing immediately before the shooting. The evidence at Shaputis's trial showed the victim had a blood alcohol level of .22 and Shaputis, when tested some six hours after the shooting, still had a blood alcohol level of .14. (*People v. Shaputis*, *supra*, D012507, at p. 3.)

12 BPT asserts there was other evidence supporting this finding. For example, BPT notes it was undisputed Shaputis was an alcoholic. However, it does not appear substance abuse (standing alone) can support a finding of a history of unstable relationships, and instead Shaputis's alcoholism is only germane insofar as it was a contributing cause of his unstable relationships. (Cf. *In re DeLuna* (2005) 126 Cal.App.4th 585, 594-595.) BPT also asserts Shaputis's estrangement from his siblings (after he left home to begin his adult life) and the absence of any contacts with his daughters (since his imprisonment) is evidence he has "trouble maintaining relationships." However, the complete *absence* of any relationship between Shaputis and his siblings necessarily precludes that relationship from being either tumultuous or unstable. Similarly, the fact Shaputis's daughters shunned him after he was imprisoned is necessarily inconsistent with a finding that such relationships were either tumultuous or unstable.

13 Because the language of the relevant subdivision permits the BPT to consider whether Shaputis had "a history of unstable or tumultuous relationships with others" (§ 2402, subd. (c)(3), italics added), the language appears to contemplate that a prisoner can be deemed unsuitable if he was chronically unable to form stable relationships. We therefore question whether this criterion can be satisfied by evidence of a *single* tumultuous relationship.