# EXHIBIT E
# Part 3 of 3

evidence was uncontradicted that Shaputis's abusive behavior toward Irma (including the commitment offense) was intertwined with his alcoholism, and the only evidence was that he posed a low risk for future violence so long as he did not relapse into alcoholism. Because the only evidence was that Shaputis had actively participated in AA and NA since 1991 and his alcoholism was in "sustained remission," and the BPT neither found nor cited any evidence suggesting Shaputis's commitment to his sobriety was feigned or tenuous, there is no evidence to support the conclusion that Shaputis posed an unreasonable risk to public safety if paroled.

In *In re Smith, supra*, 114 Cal.App.4th 343, the court evaluated an analogous determination denying parole to an inmate convicted of the second degree murder of his wife. In *Smith*, the Governor cited the inmate's history of social instability, substance abuse, and violence against his wife to conclude there was a danger the inmate might become violent if released into the community. (*Id.* at p. 368.) *Smith* concluded the implied rationale for the finding of dangerousness—the inmate's deeply entrenched substance abuse problem raised a danger he would relapse into drug use and become violent—was unsupported by any evidence. First, all of the evidence on the issue was to the contrary: the inmate had remained clean and sober for many years; he had fully participated in therapy and treatment programs; and had remained discipline-free in prison; and the opinions of both the prison staff and a psychologist was that his drug problem was in full remission and he posed a low degree of threat to the public. (*Id.* at pp. 371-372.) Against this evidentiary showing, *Smith* concluded the Governor's contrary finding was arbitrary and capricious reasoning.

In sum, the sole factor cited by the Governor—Smith's entrenched desire for drugs due to long-term abuse—does not constitute some evidence that Smith might start using drugs and become violent again, and therefore that he *currently* poses an unreasonable risk of danger without further treatment. Indeed, if Smith's past use of drugs did invariably establish his unsuitability, then the Governor could deny parole for the rest of Smith's life based on this immutable factor without regard to or consideration of subsequent circumstances and evidence indicating that he has no current desire for drugs and that there is little current likelihood of drug relapse, let alone a return to violent conduct as a result of it. Moreover, the Governor's conclusion that Smith currently would pose an unreasonable risk of violent criminal conduct if released without further drug treatment appears to be arbitrary and capricious because, as noted, his decision omits any consideration of, or even reference to, the undisputed evidence noted above. [¶] In this regard, we point out that in *Rosenkrantz* the court stated, that to ensure due process, the Governor's decision "must [reflect] due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards." [Quoting *Rosenkrantz, supra*, 29 Cal.4th at p. 677.] Here, however, the Governor's decision omits any consideration of relevant evidence and the numerous factors that tend to show suitability, including that Smith committed the crime while under stress, he has shown great remorse for the crime, his age makes him less of a potential threat, he has developed marketable skills, he has wide support and realistic plans for the future, and during his lengthy incarceration he has long participated in drug treatment and psychotherapy and has devoted himself to self-improvement and volunteer work with other troubled prisoners." (*Smith*, at p. 372.)

We are similarly convinced the BPT's reliance on Shaputis's former alcoholism-related violence toward his marital partner, the sole evidence conceivably supporting the finding he had "unstable or tumultuous relationships" with other persons, cannot justify a finding Shaputis currently poses an unreasonable threat to others if released on parole, absent some evidence there is a *current* likelihood Shaputis will be unable to maintain his sobriety on parole. (*In re Smith, supra*, 114 Cal.App.4th at p. 372; cf. *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 916 [although reliance on conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law, where inmate over time continues to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of prior conduct would raise serious questions involving his liberty interest in parole]; accord *Irons v. Warden of California State Prison-Solano* (E.D. Cal. 2005) 358 F.Supp.2d 936, 947 and fn. 2.)

Shaputis exhibited no violent tendencies toward anyone other than his wife and one of his daughters, and the violence he demonstrated was intertwined with his alcohol problem. The only evidence before the BPT was that Shaputis had more than a decade of demonstrated commitment to remaining sober, and there was not a scintilla of violence in this nearly two decades of incarceration. Accordingly, the BPT's conclusion Shaputis remained a danger to society, to the extent it was premised on a former lifestyle that all of the evidence showed was a historical relic, is so lacking in any medical, psychological or behavioral evidentiary support that it is arbitrary and capricious, within the deferential standards articulated by *Rosenkrantz, supra*, 29 Cal.4th 616.

V

THE APPROPRIATE DISPOSITION

We recognize the BPT's task is difficult because it seeks to predict which inmates may safely be released to society. Although *Rosenkrantz* cautions that a reviewing court must not engage in second-guessing what necessarily are subjective decisions, we are at the same time bound to ensure that the inmate is accorded the basic requirements of due process, and where there is no evidence to support the BPT's decision that an inmate is unsuitable for parole and would pose an unreasonable risk of danger to society if released, those minimum requirements have not been met.

In the present case, we conclude the record contains no evidence to support the BPT's articulated reasons for denying parole, and there is nothing in the record to suggest the BPT would have determined Shaputis posed an unreasonable risk of danger to society without the reasons we have found are unsupported by the record. It follows that we cannot conclude Shaputis received the basic requirements of due process and the BPT's decision must therefore be reversed. Accordingly, we reverse the BPT's decision and the matter is remanded to the BPT with directions to conduct a new parole suitability hearing consistent with this opinion and to issue a new decision within 45 days of the date of this order becoming final.

Although we conclude the record before us contains no evidence to support the BPT's decision finding Shaputis unsuitable for parole, we recognize we cannot predict in advance what evidence will be available when the BPT conducts the new parole suitability hearing, particularly

cause more than 18 months have elapsed since the hearing challenged in this proceeding. Because "a reviewing court is precluded from independently resolving conflicts in the evidence, determining the weight to be given the evidence, or deciding the manner in which the specified factors relevant to parole suitability are to be considered and balanced, because these are matters exclusively within the discretion of the [BPT]" (*Scott, supra*, 119 Cal.App.4th at p. 899), we are precluded from directing the BPT's consideration of new evidence that has yet to be presented. We therefore conclude, although the BPT may not find Shaputis unsuitable for parole based on the same evidence and findings articulated at the 2004 hearing, if new evidence is presented different from the evidence presented at the 2004 hearing, the BPT may consider Shaputis's suitability considering that new evidence, if any.

## VII

## DISPOSITION

Shaputis's petition for writ of habeas corpus is granted. The BPT is ordered to vacate the denial of parole and to conduct a new parole suitability hearing for Shaputis, and to issue a new decision within 45 days.

McDONALD, J.

I CONCUR:
McINTYRE, J.

BENKE, J.

I dissent.

Respectfully, there is no legal basis for granting relief in this case.

In *In re DeLuna* (2005) 126 Cal.App.4th 585, 591, the court held: "When a decision by the Board denying parole is challenged, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation. [Citation.]" (See *In re Rosenkrantz* (2002) 29 Cal.4th at pp. 658, 677.) The *Rosenkrantz* court stated "in some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." (*Id.* at p. 683.)

*In re Dannenberg* (2005) 34 Cal.4th 1061 (*Dannenberg*) further clarified the applicable standard under which the Board of Prison Terms fixes parole release dates for those imprisoned for indeterminate terms. It holds: "[T]he Board, exercising its traditional broad discretion, may protect public safety in each discrete case by considering the dangerous implications of a life-maximum prisoner's crime individually. While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." (*Id.* at p. 1071, italics omitted.) The court rejected the argument that once an indeterminate life prisoner reaches the minimum parole eligibility date, the board must fix a date for parole release unless it finds the prisoner's crime particularly egregious in comparison with other offenses of the same class. Instead, the court held the board may decline to set a parole date in an individual case "if it concludes, on relevant grounds with support in the evidence, that the grant of a parole date is premature for reasons of public safety." (*Ibid.*)

Clearly, if an inmate is not suitable for parole, because considerations of public safety demand a more lengthy period of incarceration, the Board of Prison Terms is not required to set a release date. "Our review of the board's decisions is highly deferential and only a modicum of evidence is needed to support the board's decision." (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 667.) This deference is based on two important considerations: first, we are reviewing the discretionary actions of a separate branch of government; and second, the board has far greater expertise and experience in dealing with determining public safety than do the courts.

With these considerations in mind, there is certainly a modicum of evidence to support the denial of parole in this case.

The board gave two general reasons for concluding petitioner is an unreasonable risk of danger to society or a threat to public safety if released from prison. The first was the cruel and callous manner of the murder petitioner committed, and the second was petitioner's history of unstable and tremulous relationships with others.

What clearly concerned the board, the district attorney and the prison psychologist who evaluated petitioner was his long history of alcoholism and the physically abusive behavior in which he engaged when drunk. The crime here which my colleagues euphemistically refer to as "alcohol related marital disharmony" (majority opn. p. 15) consisted of petitioner shooting his wife in the neck at close range, killing her instantly. Her death followed domestic violence over the course of years consisting in part of routine beatings, cracked ribs and a previous incident where petitioner shot at her and missed. The underlying cause of the murder and previous violence was petitioner's drinking.

As one might expect, and as my colleagues emphasize, when petitioner is away from alcohol he is a model inmate. His prison disciplinary history at the time of the hearing was spotless. He had done well. The crucial discretionary task, however, was to make a prediction of his behavior outside the highly structured and restrictive setting of prison. The psychologist who evaluated petitioner qualified his conclusion that if released petitioner would be a low risk to the community by stating repeatedly this was true *only* if petitioner avoided the use of alcohol. As is expressly noted in the psychologist's report: "The above information suggested that Mr. Shaputis presented at *low risk for violence, providing that he maintains his sobriety and keeps busy with activities which hold his interest.*"

Importantly, the psychologist's report, attached as Exhibit B to the petition, notes that the underlying causes of petitioner's alcoholism have *not* been eliminated during his time in prison. Thus despite a "low risk" profile, his ability to remain alcohol-free outside prison is problematic. The report notes: "During the evaluation, the inmate evidenced some insight. However he still maintains a high level of denial and rationalization which are likely to remain with him forever, since they serve was (sic) protective and help him handle behaviors which he cannot accept in himself. In other words, as Dr. Saunders so aptly noted in 1994 and 1997, due to personality factors (Mr. Shaputis is) unlikely to seek further improvement." The report further notes that while there are positive factors supporting parole, there are also negative factors. "In this inmate's case, the primary destabilizer would be alcohol relapse. Characterological issues are firmly entrenched and unlikely to change." The report also concludes: "Mr. Shaputis has yet to accept full responsibility for the controlling offense and still seems to



rely on denial and rationalization to handle stress. However, at this point in his life, such defenses are firmly entrenched and unlikely to change."

Given petitioner's long history of alcoholism and the psychologist's conclusion that his basic character was unchanged, the prison board could rationally conclude that if released at this time to a less structured setting, petitioner would pose an unreasonable risk to the community.

My colleagues return this case to the board with instructions to hold a new hearing, at which time more information or evidence must be introduced than was introduced at the hearing from which this petition arose. Assuming there is no different evidence, it appears my colleagues favor the setting of a release date for petitioner. It is apparently their conclusion that, despite the psychologist's report, petitioner does not remain a risk to public safety, will not get drunk and will not relapse into dangerous conduct. With all due respect, such conclusions are not the prerogative of this court as long as the record supports the board's action by a modicum of evidence. Respectfully, what is ultimately lacking is not a modicum of evidence but a modicum of judicial restraint.

I would deny the petition for writ of habeas corpus.

BENKE, Acting P. J.

GROUND 2. THE BPT'S REPEATED RELIANCE ON THE CRIME AND BEHAVIOR LEADING UP TO THE CRIME TO FIND PETITIONER UNSUITABLE FOR PAROLE VIOLATES THE STATE AND FEDERAL DUE PROCESS.

INTRODUCTION

Our Supreme Court has made it clear that parole consideration must be guided in large measure on post-conviction history. The Court explained that a court presented with a habeas corpus petition, should examine the proceedings before the Board and ascertain whether the Board's factual determinations are supported by "some evidence."

FACTS

In this case, the Board concluded that Petitioner "is not suitable for parole and would pose and unreasonable risk of danger to society or a threat to public safety if released from prison [for the FOURTH TIME]. We are going to deny your parole for three years, sir, and I'm going to tell you why. The offense in this case was particularly cruel and callous absolutely no motive. There was no reason for this offense to have occured. It was certainly carried out in a dispassionate manner. I [] wouldn't go as far to say it's an execution-style, sir. I would certainly say it's more than unintentional act or more than an accidental death given your history as a Marine around firearm, I just find -- I do not understand how this could have happened. If these wasn't -- without retrying this case at all you are here for second degree murder. **I think there was certainly a crime of passion. We think it's a crime of passion.** On the evening of March 26, 1988, at approximately 11:30 p.m. your wife Alma age 23-years-old was shot to death by you over an incident that should have never escalated to clearly over that point." (Exhibit A, HT, Page 98)

Petitioner's minimum eligible parole date was April 30, 2000. His initial hearing was scheduled for August 23, 1999. However, it was postponed to the next available calendar due to recusal by Commissioner Giaquinto, who was a member of the same police department as Petitioner.

On December 14, 1999, the Board denied parole for three (3) years based solely on the nature of the crime. The panel's recommendations were to "remain disciplinary free, participate in self-help and therapy."

On December 6, 2002, Petitioner appeared before the Board for his first subsequent hearing. The Board denied parole for one (1) year. The panel's recommendations again were remain disciplinary free, participate in self-help and therapy. The Presiding Commissioner also stated that although the current Psych report prepared by Dr. Bakeman indicated that Petitioner had a very good record while in the controlled setting of the prison, was not normally violent, and did not seem to have an anger problem, the report did not predict what sort of threat Petitioner would pose if released to the community.

Petitioner's second subsequent hearing was scheduled for December 12, 2003. However, it was not held until May 18, 2004, approximately 5 months later. Again, the Board denied parole for one (1) year. A new Psych report was provided as requested by the December 6, 2002, panel. The report was prepared by Dr. Macomber. Dr. Macomber reported that, "[a]t this point in his life, his potential for violence in the unstructured setting of the community is definitely below

average in comparison to other inmates. In comparison to the average citizen in the community and based upon his knowledge and experience, his potential for violence is even lower than that." Petitioner remained disciplinary free, continued his involvement in self-help and therapy. Yet, the Board denied parole for one (1) year based on the commitment offense.

On December 6, 2005, Petitioner appeared before the Board for his third (3) subsequent hearing. As stated above, the Board denied parole for three (3) years. Again, the decision was based on the commitment offense. Upon hearing that he was denied 3 years, Petitioner respectfully asked to be excused from the hearing. This was the fourth panel that determined that Petitioner, "is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." The determination included, "[t]he offense in this case was particularly cruel and callous ... it was carried out in a dispassionate manner."

The 2002 panel (Presiding Commissioner Angele and Deputy Commissioner Johnson); the 2004 panel (Presiding Commissioner Welch and Deputy Commissioner Garner-Easter); and, the 2005 panel (Presiding Commissioner Sawyer and Deputy Commissioner Mitchell) all had before them the same documents and information received from the public regarding Petitioner not having any prior criminal history as well as his post-conviction gains.

Presiding Commissioner Angele (2002 panel) stated:

"No matter what we do today you'd have more time to serve. You've done an outstanding job as far as self-help and therapy programming while in custody. There is a question in regards to your temper. That may be explained away one way or another, but what happened that day that you shot your wife, obviously, would indicate to me that there is some sort of a problem. I'd like to see that maybe addressed a little bit more in the next psychological evaluation also. And also for them to place a degree of threat on you. They didn't bother doing that for some reason or another. And once we get that I think it will be helpful also. Like I said, this is for a period of one year and we expect you to keep on doing what you're doing, and I just wish you the best of luck."

Presiding Commissioner Welch (2004 panel) stated:

"The Board reviewed all information ... and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or threat to public safety if released from prison. One, the offense was carried out in an especially cold hearted or cruel manner. The offense was carried out in a dispassionate manner. The motive for the crime was inexplicable."

Yet, earlier in the hearing Deputy Commissioner Garner-Easter noted:

"The latest psychiatric report was dated August 11th of 2003 and it's by Melvin Macomber. Dr. Macomber thoroughly reviews your record and again goes over many of the factors that the Board has already looked at. So I will just go to diagnostic impressions on page one, he says basically that there are no clinical disorders, personality disorder

or physical disorder. So no mental health issues or any of that. He concludes in his report on page three by stating he feels you have matured and that you're no longer driven by the perfectionist tendencies to control your life and that you've learned to negotiate differences with others and come to a positive resolution. After he's talked to you he says he feels like you have a good sense of concern and empathy toward others at this point in his life. His potential for violence in the unstructured setting of the community is definitely below average in comparison with other inmates. In comparison to the average citizen in the community, based upon knowledge and experience, his potential is even lower than that."

Presiding Commissioner Sawyer (2005 panel) states:

"Several issues as to why we determine three (3) years. We were really wrestling and we were really -- we really had a problem with his minimalization [sic] in this first of all. He appears to be attempting to **word smith** this crime by chang[ing] his description of this from accidental to unintentional act. Those are very far apart. His version of this changing the words from angry and infuriated downsizing those words for a lack of better term to upset referring to them as. upset, which makes him look a little better a little nicer. Another issue that we felt he is not taking responsibility for this particular crime, which until he takes responsibility for this crime I don't think he'll -- or at least this panel won't receive a date but his honesty to his wife Cathleen as soon as I -- as soon as he said she didn't know -- Ms. Hall, Rosy Hall down in San Diego didn't know that she was a part -- that he had not told Cathleen that Ms. Hall was part of his plan and if he got paroled to Morro Bay he would never disclose that. I think that's deception. The psychiatric report in this case is -- has been invalidated by the fact that he told the psychiatrist that he had never to quote. Agrio he said some things here that just totally not taking responsibility. He may have mishandled the situation stress of being married to a wife who had a drinking problem and would not listen to her attempts to talk. She would not listen to his attempts to talk to her in a mature manner. He is making her fault. He's putting the monkey on her back. His statement that he never battered his wife was a totally. And I think there is something to say about the fact that he didn't want to hear the truth here and didn't want to face the facts and left the hearing prematurely. The reason -- one of the reasons that people in law enforcement and people with experience with domestic violence know it happens all the time, and that is when a woman is battered police are called, she calls them as the right thing to do, and then as soon as things settle down then she recants and that's what appears to have happened here when the internal investigation was taking place, she backed off because she's going to lose. If he looses his job or gets suspended then she's going to lose. If he gets convicted of battery then she's going to lose and so I mean this is typical where the spouse backs off. I think he was -- the most honest I think he was to us here today ot to the system was the statement that I read earlier that he had made in 19 or -- or May 31, 1989, when he analyzed the cultural terms of a latin family where a man

is the boss of the house and ordinarily the wife jumps at the snap of
a finger. He indicates that today's younger people are not traditionalist
in an attempt to explain his position. He states that no matter how much
time he has to do, there's no guarantee that he would not ultimately wind
up in a similar position under similar circumstances. I think he's right
on. I think he's right on, and if you study cultures you know that some
cultures a lot of cultures have their cultural things sometimes in
different cultures you have to break those. From those -- those are
the reasons that we -- that we're giving him for this multiple year,
three year denial." (Exhibit A, HT, Pages 98-106)

## CONCLUSION

The Board's repeated use of the offense as justification for parole denial essentially "resentences" Petitioner to "Life Without the Possibility of Parole" in that the factors are immutable.

Therefore, Petitioner most respectfully requets an order from this Honorable Court for a re-hearing of the 2005 suitability hearing without a re-hash of previously decided issues absent new information.

Additionally, that the order include directions to the Board to adhere to the guidelines set forth in the regulations regarding factors that tend to show suitability vs. factors that tend to show unsuitability as they apply to the requirements codified in Penal Code section 3041.

Note: Tom Sawyer, the Presiding Commissioner at Petitioner's hearing, is no
    longer with the BPT. He resigned from the BPT prior to Senate confirmation
    hearings.

### WHO'S WHO (Continued)

**Edward Martinez**, 48, of Modesto, has been appointed as a commissioner on the BPH. He has been self-employed as a P.I. with EM Investigations since 2005. Martinez previously was a field investigator with the workers' compensation firm Freese & Gianelli from 2000 to 2005, deputy sheriff and detective for the Stanislaus Co. Sheriff's Dept. from 92 to 2000 & deputy sheriff for the Orange Co. Sheriff's Dept. from 82 - 92. Republican. Not confirmed as yet.

**Michael Porter**, 41, of San Juan Capistrano, served as a deputy sheriff for the Los Angeles County Sheriff's Department from 1988 to 2001. Porter previously served in the United States Marine Corps from 82 -88. Republican. Not confirmed as yet.

**Linda Shelton**, 55, of Redding, has served as chief probation officer for Glenn Co. since 99. She was a division director responsible for the Shasta Co. Juv. Hall from 90-99. She joined the Shasta Co. Probation Dept. as a deputy p. o. in 80. Shelton is past president of the Chief Probation Officers of CA. & was a faculty member for the Shasta College Admin. of Justice Dept. from 92-98. Democrat. Not confirmed as yet.

**Edward Williams**, 69, of Rancho Mirage, has served as a member of the Gambling Control Commission since 05. Previously, Williams served on the BPT from 98-99. He was the sheriff of SLO Co. from 87-98 & chief of police for the City of Pismo Beach from 80-87. He has also served as a member of the CA Council on Criminal Justice & the Governor's Council on Drugs & Alcohol. Republican. Not confirmed as yet.

PLEASE EXCUSE THE TARDINESS IN GETTING THIS NEWLSETTER TO YOU. WE WANTED TO GIVE YOU UPDATED INFORMATION ON THE BPH.

### SENATE CONFIRMATION RESULTS

On 6-14-06, the Senate Rules Committee met to vote on the confirmations of Commissioners **Biggers**, **Inglee**, **Fisher** and **Farmer** to the BPH. **Biggers** and **Inglee**, as noted above, passed confirmation...easily.

Commissioner **Farmer** faced a grueling Committee that challenged him on several matters that included questions surrounding his term as the Board's chief legal counsel. Adding to the fire were several that spoke in opposition to his confirmation. Ultimately, **Farmer** was denied confirmation by a 3-1 vote.

**Susan Fisher** was questioned extensively about her role and duties at the BPH. Senator Perata's dissatisfaction with her responses was made obvious when he took the unusual move of putting the vote off for one week until such time as he was able to get answers from the Governor's office. That was extended for another week and before that time expired, Ms. Fisher withdrew and was appointed to the new Victims Advocate position recently created by the Governor. She will receive $95,000. per year and there is no Senate confirmation required.

### TWO COMMISSIONERS WALK....BEFORE CONFIRMATION!

Steven Lee resigned from the BPH a week before his confirmation. Sources tell us opposition was expected with a common complaint that he "relitigated cases."

Tom Sawyer resigned from the BPH one day before he was set to appear before Senate Rules for confirmation. We have been told, though it has not been confirmed, that Sawyer has accepted another appointment from the Governor.

# THE PRISON LINK

A NEWSLETTER FOR CALIFORNIA PRISONERS
By Benjamin Ramos, Attorney
and Cheryl Montgomery, Attorney

LEGAL ADVERTISEMENT
SECOND QUARTER, 2006

## WHO'S WHO AT THE BPH
(Adult Matters)

In June of 2006, **James Davis**, 53, of El Cajon, was appointed **Chair** of the BPH after having served as a Commissioner since February 06. and is currently a consultant for Civilian Police International & Citygate Associates. Davis previously served 30 years in the El Cajon Police Dept., beginning as a patrol officer in 1974 & retiring in 04 after four years as chief. He is the co-founder, past president & a board member of the El Cajon Youth Development Advisory Council & a former chair of the Automated Regional Justice Information System Management Committee. This position requires Senate confirmation and the compensation is $103,317. Republican.

**Archie "Joe" Biggers**, 61, of San Diego County, has served on the Youth Authority Bd since 05. Prior to that, he served as executive director of the Greater San Diego Inner-City Games. Biggers served for 24 years in the United States Marine Corps, retiring in 91 as a lieutenant colonel. From 92 - 94 he was operations director for the S. D. Police Athletic League and from 94 to 96 was executive director of the S.T.A.R. program (Sports Training, Academic & Recreation). Biggers is active in many organizations including the San Diego Unified School Interscholastic Athletics Council & the San Diego Marine Corps Historical Society Bd. He is also a past member of the San Diego Crime Commission, the Social Service Advisory Board of San Diego Co. & the Girl Scouts Council of San Diego & Imperial Counties. Republican. **Confirmed 6-06 by Senate Rules.**

**Sandra Bryson**, 60, of Markleeville, most recently served as a support services & reserve deputy for the Alpine County Sheriff's Dept. Since 86, Bryson has served as director of Bryson & Associates, a law enforcement and canine consulting company that includes among its clients the Office of Emergency Services & the *Federal Emergency Management Agency*. She is also an instructor for California Peace Officer Standards & Training. Bryson is a member of the CA Narcotics Officers Association & the National Association of Search & Rescue. Democrat. (Senate Confirmation hearing possibly 8-06.)

**Jack Garner**, 61, of Gold River, has been appointed to the BPH as a Commissioner. He is currently the bureau chief for the Commission on Peace Officer Standards & Training. Garner has served with the Commission since 90, beginning his tenure as senior law enforcement consultant. He was previously the city manager & chief of police for the City of Martinez. Garner is a member of the FBI National Academy of Graduates Association, the California Police Chiefs Association & the California Peace Officers Association. Republican. (Senate Confirmation hearing possibly 8-06.)

**Philip S. Inglee**, 68, of Orange County, has served on the Board of Prison Terms since 2005. Prior to that, he served as a commissioner on the Orange County Parole Board from 01 - 05. Inglee worked as a banking executive for 33 years, serving as president & chief executive officer of Liberty National Bank from 82 - 98. In addition, he has served as chair of the Huntington Beach Planning Commission & foreman of the Orange County Grand Jury from 99 to 2000. He served as an officer in the U. S. Marine Corps from 59 - 62 on active duty & as a member of the reserves from 62 until his retirement as a colonel in 89. Republican. **Confirmed 6-06 by Senate Rules.**

8. Did you appeal from the conviction, sentence, or commitment? ☐ Yes. ☐ No. If yes, give the following information:
   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"): _____
   
   b. Result: _____   c. Date of decision: _____
   
   d. Case number or citation of opinion, if known: _____
   
   e. Issues raised: (1) _____
   
      (2) _____
   
      (3) _____
   
   f. Were you represented by counsel on appeal? ☐ Yes. ☐ No. If yes, state the attorney's name and address, if known:
   _____

9. Did you seek review in the California Supreme Court? ☐ Yes. ☐ No. If yes, give the following information:
   
   a. Result: _____   b. Date of decision: _____
   
   c. Case number or citation of opinion, if known: _____
   
   d. Issues raised: (1) _____
   
      (2) _____
   
      (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
    _____

11. Administrative Review:
    a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:
    _____

    b. Did you seek the highest level of administrative review available? ☐ Yes. ☐ No.
    *Attach documents that show you have exhausted your administrative remedies.*

MC-275 [Rev. January 1 1999]   PETITION FOR WRIT OF HABEAS CORPUS   Page five of six

12. Other than direct appeal, have you filed any other petition, applications, or motions with respect to this conviction, commitment, issue in any court? [X] Yes. If yes, continue with number 13. [ ] No. If no, skip to number 15.

13.a. (1) Name of court: __SAN DIEGO SUPERIOR COURT__

    (2) Nature of proceeding (for example, "habeas corpus petition"): __HABEAS CORPUS__

    (3) Issues raised: (a) __SAME AS HERE__

    (b) _____

    (4) Result (Attach order or explain why unavailable): __DENIED (ATTACHED)__

    (5) Date of decision: __APRIL 11, 2006__

b. (1) Name of court: _____

    (2) Nature of proceeding: _____

    (3) Issues raised: (a) _____

    (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (6) Date of decision: _____

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims petition. (See *in re Swain* (1949) 43 Cal.2d 300, 304.)

16. Are you presently represented by counsel? [ ] Yes. [X] No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court? [ ] Yes. [ ] No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true and correct.

Date: 7/23/06 ▶ _____
(SIGNATURE OF PETITIONER)

MC-275 [Rev. January 1, 1999]      **PETITION FOR WRIT OF HABEAS CORPUS**      Page six of six.