# EXHIBIT F
# Part 1 of 2

S150537

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

---

In re PABLO AGRIO on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

Werdegar, J., was absent and did not participate.

SUPREME COURT
FILED

JUL 2 5 2007

Frederick K. Ohlrich Clerk

DEPUTY

GEORGE

Chief Justice

Name    PABLO AGRIO

Address    P. O. BOX 689    Z-130U

SOLEDAD, CA 93960-0689

CDC or ID Number    E17284

**SUPREME COURT**
# FILED

FEB 27 2007

**Frederick K. Ohlrich Clerk**

Deputy

CALIFORNIA SUPREME COURT

## RECEIVED

FEB 27 2007

CLERK SUPREME COURT

_(Court)_

---

PABLO AGRIO,

Petitioner

vs.

CA BOARD OF PRISON TERMS,

Respondent

**PETITION FOR WRIT OF HABEAS CORPUS**

No.    # S150537

_(To be supplied by the Clerk of the Court)_

## INSTRUCTIONS — READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form _before_ answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

---

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. January 1, 1999]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.,
Cal. Rules of Court, rules 56.5, 201(h)

## TO THE JUSTICES OF THE CALIFORNIA SUPREME COURT:

RECEIVED

FEB 2 7 2007

CLERK SUPREME COUR

Petitioner is an indigent litigant. He provided the San Diego Courts with an extensive record of what was available to the Board at the 2005 hearing. The copying of these documents was a tremendous expense. Petitioner does not have the funds to duplicate that record all over again. Petitioner is requesting that this Court order the entire record of the case transferred from the 4th Appellate District to this Court for a comprehensive review of these claims. Petitioner is not a lawyer and may not have presented his claims properly but he does aver and believe in his heart that he is being discriminated against and that the San Diego Courts are bias against him.

PABLO AGRIO, E17284

This petition concerns:

☐ A conviction                          ☒ Parole

☐ A sentence                            ☐ Credits

☐ Jail or prison conditions             ☐ Prison discipline

☐ Other (specify): _____

1. Your name:        PABLO AGRIO

2. Where are you incarcerated?    CORRECTIONAL TRAINING FACILITY-SOLEDAD

3. Why are you in custody?    ☒ Criminal Conviction    ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      SECOND DEGREE MURDER WITH USE OF WEAPON

   b. Penal or other code sections:    187 PC    / 12022.5 PC

   c. Name and location of sentencing or committing court:    SAN DIEGO SUPERIOR COURT

   d. Case number:    CR95364

   e. Date convicted or committed:    APRIL 7, 1989

   f. Date sentenced: _____

   g. Length of sentence:    17 YEARS TO LIFE

   h. When do you expect to be released?    UNKNOWN

   i. Were you represented by counsel in the trial court?   ☒ Yes.   ☐ No.   If yes, state the attorney's name and address:

      _____

      _____

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty    ☐ Guilty    ☐ Nolo Contendere    ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☒ Jury    ☐ Judge without a jury    ☐ Submitted on transcript    ☐ Awaiting trial

6. GROUNDS FOR RELIEF

Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

SEE ATTACHED

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

SEE ATTACHED

b. Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

SEE ATTACHED

**GROUND ONE. PETITIONER CONTENDS THAT THIS COURT'S DECISION IN IN RE SHAPUTIS, DJDAR 14892, IS ON POINT WITH PETITIONER'S CASE AND THEREFORE PETITIONER SHOULD BE ENTITLED TO A SIMILAR RESULT UPON REVIEW. PETITIONER RESPECTFULLY INVOKES THE DUE PROCESS AND EQUAL PROTECTION CLAUSES OF THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

## INTRODUCTION

On DECEMBER 6, 2005, Petitioner PABLO AGRIO, E17284 (hereinafter "Petitioner"), was provided a Life Term Parole Consideration Hearing before the Board of Prison terms (hereinafter "Board," "BPT," or "Panel"); Please refer to Exhibit "A," which is the Hearing Transcript (hereinafter "HT" or "Transcript"). Said Hearing was Petitioner's FOURTH parole suitability hearing. Petitioner's Minimum Eligible Parole Date (hereinafter "MEPD"), was APRIL 30, 2000.

On December 28, 2005, the California Court of Appeal, Fourth Appellate District, GRANTED Shaputis' petition for writ of habeas corpus. The BPT was ordered to vacate the denial of parole and to conduct a new parole suitability hearing for Shaputis and to issue a new decision within 45 days. (2005 DJDAR 14892 - No. D046356)

On April 11, 2006, the Superior Court for the County of San Diego DENIED Petitioner's sixth petition for writ of habeas corpus adapting as the underlying reason for declining to overturn the Board's December 6, 2005, determination the dissenting opinion in Shaputis. (See attached order denying the writ.)

### I

### FACTS

### A.

In 1987 a jury convicted Shaputis of the second degree murder of his wife, Irma, and found true that he used a firearm in the commission of the offense. He was sentenced to 15 years to life with the possibility of parole, plus a determinate two-year sentence for the firearm use. (DAR Page 14892)

In 1989, after two trials, a jury convicted Petitioner of the second degree murder of his wife, Alma, and found true that he used a firearm in the commission of the offense. Petitioner was sentenced to 15 years to life with the possibility of parole, plus a determinate two-year sentence for the firearm use.

B.

Shaputis and Irma had been married for 23 years and their relationship was marked by domestic violence. Two years earlier, Irma complained that Shaputis had beaten her and cracked her ribs, and approximately 18 months earlier Shaputis had shot at his wife when they had been drinking and arguing. Shaputis apparently beat Irma at least two or three times per year and had threatened her with a knife. However, none of these alleged events resulted in criminal charges. (DAR Page 14892)

Petitioner and Alma had been married less than a year and the relationship was at times tumultuous and combative, due to her heavy drinking. In October of 1987, approximately 5 months before her death, Alma complained to the San Diego Police Department that Petitioner battered her. However, she later withdrew her complain explaining that, "she is a very moody person with a quick temper. She further states that she often regrets doing or saying something soon after one of her outburst such as in this incident." (HT-89:22-27; as documented in Internal Affairs Report) Alma did not suffer any injuries, did not have to go to the hospital, and was not threatened with a weapon. In spite of their tumultuous relationship, Alma was never injured and Petitioner was never arrested or charged with criminal conduct.

C.

On the night of the murder, Shaputis called 9-1-1 around 10:00 p.m. and stated he had fought with his wife and killed her, but claimed it was an accident. When police arrived at Shaputis home, he emerged and surrendered without incident. When police entered the house, they found Irma's body in the living room with a handgun lying nearby. The autopsy report concluded Irma was killed some time between 8:30 p.m. and 12:30 a.m. and her death was caused by a single gunshot wound to the neck. The shot had been fired from close range, possibly as close as two feet, and had entered the neck between the junction of the neck and jaw. Death was apparently instantaneous. Shaputis was a heavy drinker who became violent when intoxicated, and he had been drinking on the night of the murder. (DAR Page 14892)

On the night of the murder, Petitioner called 9-1-1 around 10:30 p.m. and stated that his wife had been shot during an argument. Petitioner assisted the police in finding the correct condominium and was so distraught he begged them to shoot him. Police found Alma's body in the master bedroom with the handgun lying nearby. Petitioner was arrested, waived his Miranda rights and gave a complete statement to investigators. The autopsy report concluded that Alma died from a single gunshot wound to the back of her head, administered when the gun was partially touching her skin. Death was apparently instantaneous. Petitioner was not drunk, but the autopsy report revealed Alma had a .26 BAC at the time of her death.

D.

Shaputis' mother asserted the family when he was nine years old, and he raised his siblings with the assistance of his grandparents. His father physically abused him. Shaputis moved out of the home when he was 18 years old and began working. (DAR Page 14892)

Petitioner arrived in the United States from Panama still a teenager. His parents remained behind caring for his siblings. He joined the United States Marine Corps on his 18th birthday.

### E.

Shaputis, who was married twice, had a substantial alcohol problem. His first marriage lasted nine years and produced four daughters, of whom he was awarded custody after the divorce. Shaputis subsequently married Irma and although the marriage lasted 23 years, it was marked by domestic violence. Additionally, in 1978 Shaputis pleaded no contest to a misdemeanor soliciting or engaging in a lewd act with one of his daughters. Except for a 1975 "nonsupport" offense, the 1978 lewd act offense with one of his daughters was the extent of his criminal record. (DAR Page 14892)

Petitioner's marriage to Alma was his first. Alma gave birth to a baby boy prior to the marriage. The boy was less than a year old at the time of her death. Other than the instant offense, Petitioner has no criminal record.

### F.

Shaputis work history showed greater stability. He worked for SDG&E for seven years, owned his own business for approximately 17 years, and worked for Bechtel for the 13 years prior to the murder. (DAR Page 14892)

Petitioner's work and educational history are as follows: Petitioner was attending his first year of law school. He served honorably in the Marines and was so discharged after 7 years. Immediately after leaving the Marines Petitioner began working as a Police Officer. He held that position until the day of his arrest.

### G.

Shaputis' record during his 17 years of incarceration was impeccable. He has been discipline-free for his entire term and his work record is unblemished. He fully participated in all available AA and NA programs since 1991, and completed all applicable therapy programs. He has the lowest classification score possible for a life-term inmate, and has numerous commendations for his work, conduct and reform efforts from prison staff. (DAR Page 14892)

Petitioner's record during his 17 years of incarceration is also impeccable. He has been discipline free for his entire term and his work record is unblemished. He continues to participate in NA and has availed himself of all available therapy programs with an emphasis on Anger

Management. He has the lowest classification score possible for a life-term inmate, and has numerous commendations for his work, conduct and reform efforts from prison staff. He has obtained his law degree during this time.

### H.

Shaputis' minimum eligible parole date was in September 1998. At his first parole hearing in 1997, the LPER prepared by his prison counselor for submission at the 1997 BPT hearing stated his "progress in state prison could best be described as exemplary" and concluded Shaputis "would probably pose a low degree of threat to the public at this time, if release from prison." The BPT denied parole, apparently based on an unsuitability determination, and recommended he remain disciplinary free and participate is self-help and therapy groups. (DAR Page 14893)

Mr. Agrio's minimum eligible parole date was in April 30, 2000. At his first parole hearing in 1999, the LPER prepared by his prison counselor for submission at the 1999 BPT hearing stated, "[C]onsidering the commitment offense, the writer believes the prisoner would pose a moderate degree of threat to the public at this time, if released from prison." The BPT denied parole for 3 years based solely on the nature of the offense.

### I.

At Shaputis's second parole hearing conducted in 2002, the LPER confirmed he had remained discipline free and participated in self-help groups, and again expressed the opinion (based on Shaputis' commitment offense, his prior record, and prison adjustment) that Shaputis "would probably pose a low degree of threat to the public at this time if released from prison." The BPT again denied parole, apparently based on an unsuitability determination, and again recommended he remain discipline free and participate in self-help and therapy groups. (DAR Page 14893)

On December 12, 2002, Petitioner appeared before the Board for his second hearing. The Board denied parole for 1 year and requested a new Psych Report. The presiding commissioner stated that although the current Psych Report prepared by Dr. Bakeman indicated that Petitioner had a very good record while in the controlled setting of the prison, was not normally a violent person, and did not seem to have an anger problem, the report did not predict what sort of threat Petitioner would pose if released to the community. The commissioner also stated, "no matter what we do today you'd have more time to serve."

### J.

Dr. Mura, a forensic psychologist, evaluated Shaputis' psychological condition and submitted his report to the BPT in connection with Shaputis' 2004 parole hearing. Dr. Mura's report stated Shaputis had feasible and appropriate plans for his life if granted parole, and appeared very committed to maintaining his sobriety through continued involvement with

AA. When assessing Shaputis' risk for violence if paroled, Dr. Mura concluded he presented a low risk of violence absent a relapse into alcoholism. (DAR Page 14893)

The LPER prepare by Shaputis' prison counselor for the 2004 BPT hearing again noted his exemplary prison record and that he had fully adhered to the BPT's prior recommendation. The report again concluded considering the commitment offense, his prior criminal record, and his adjustment in prison, Shaputis would "probably pose a low degree of threat to the public at this time if released from prison." (DAR Page 14893)

The BPT considered the materials presented, including the forensic evaluations, and concluded Shaputis was not suitable for parole because he posed "an unreasonable risk of danger to society or a threat to the public safety if released from prison." The BPT cited two findings for this conclusion. First, the BPT found the commitment offense was "carried out in an especially cruel and/or callous manner" and was "carried out in a dispassionate and/or calculated manner" because the murder was committed at close range with a single shot. Second, the BPT found Shaputis had a "history of unstable and tremulous [sic] relationship with others" and had assaulted his wife.

<center>K.</center>

On May 18, 2004, Petitioner appeared before the Board for a third time. A new Psych Report was prepared by Dr. Macomber. Dr. Macomber reported that, "At this point in his life, his potential for violence in the unstructured setting of the community is definitely below average in comparison to other inmates. In comparison to the average citizen in the community and based upon his knowledge and experiences, his potential for violence is even lower than that." The Board ignored the report and once again denied parole for 1 year based on the commitment offense. (Exhibit B)

<center>L.</center>

Shaputis petitioned the San Diego County Superior Court for a writ of habeas corpus alleging the BPT violated his due process rights because its unsuitability determination was not supported by the evidence and was therefore arbitrary and capricious. The Court denied the writ, concluding the BPT's decision was supported by some evidence.

Mr. Agrio petitioned the San Diego County Superior Court for a writ of habeas corpus alleging the BPT violated his due process rights because its unsuitability determination was not supported by the evidence and was therefore arbitrary and capricious. The Court denied the writ, concluding the BPT's decision was supported by some evidence.

II

## HISTORY OF PROCEEDINGS

### A. The 1999, 2002, and 2004 BPT Proceedings.

Again, Petitioner's minimum eligible parole date was April 30, 2000. At his first parole hearing in December 1999, the Board denied parole for 3 years based solely on the nature of the offense.

On December 12, 2002, he appeared before the Board for his second hearing. The Board denied parole for 1 year and requested a new Psych Report. The presiding commissioner stated that although the current Psych Report prepared by Dr. Bakeman indicated that Petitioner had a very good record while in the controlled setting of the prison, was not normally a violent person, and did not seem to have an anger problem, the report did not predict what sort of threat Petitioner would pose if released to the community. The commissioner also stated, "no matter what we do today you'd have more time to serve."

On May 18, 2004, Petitioner appeared before the Board for a third time. A new Psych Report was prepared by Dr. Macomber. Dr. Macomber reported that, "At this point in his life, his potential for violence in the unstructured setting of the community is definitely below average in comparison to other inmates. In comparison to the average citizen in the community and based upon his knowledge and experiences, his potential for violence is even lower than that." The Board ignored the report and once again denied parole for 1 year based on the commitment offense.

### B. The 2005 BPT Proceedings.

*The Forensic Evaluation.*

Dr. Macomber, a forensic psychologist, prepared the report for the 2004 hearing. Dr. Macomber stated, "Inmate Agrio has remained entirely disciplinary free throughout his 15 years of custody, which is a very difficult thing to do. This shows excellent self-control and ability to get along with others in a stressful environment. His potential for violence within the institutional environment is definitely below average in comparison to other inmates. Inmate Agrio has matured. He no longer is driven by his perfectionist tendencies to maintain control of his life. He has learned how to negotiate differences with others, and come to positive resolutions of conflict." Dr. Macomber concluded Petitioner presented a low risk for violence. (Exhibit B)

The LPER prepared by Petitioner's Prison Counselor for the 2004 hearing stated, "Considering the commitment offense, the writer believes Agrio would probably pose a low degree of threat to the public at this time, if released from prison. This is based on that he has received 2 certificates in Vocational Computer Repair, as a legal assistant in paralegal, and BA degree in Criminal Justice, and a Juris Doctor (JD) in law. Agrio remained disciplinary free, and an active member of AA."

LAUDATORY CHRONOS        (Exhibit C)

On August 26, 2002, Facility Captain I. Guerra, wrote: "Inmate AGRIO, E-17284, has successfully completed the thirteen-week IMPACT workshop. The IMPACT program is a self-help group designed to provide an opportunity for education and awareness as to the profound negative impact of crime on its victims. Throughout the thirteen weeks, the inmate participants were actively engaged in an open dialogue covering many areas of crime to include Child Abuse, Domestic Violence, Drugs and Alcohol, Gang Violence, Murder, and Theft and Property Crimes. Guest speakers and survivors of various crimes presented topics that included Anger Management, Child Abuse, Domestic Violence, Gang Violence, and Sexual Assault. Inmate AGRIO is to be commended for his participation and willingness to gain insight and empathy for the victims of crime." (Attached as Exhibit))

On September 4, 2002, Imam Antar Jannah, wrote: "Inmate AGRIO has successfully participated in and completed the Muslim Development Center's Anger Management Course. The course is based on principles rooted in Interfaith Religious Scripture and spiritual models of exemplary social behavior. Inmate AGRIO is commended for his outstanding participation and completion of the Interfaith based Anger Management Course and was awarded a Certificate of Completion." (Attached as Exhibit)

On November 7, 2002, Supervisor of Vocational Instruction E. R. Parham, wrote: "I have known Mr. AGRIO, E17284, for close to eight years now. I have spoken to Mr. Agrio about the circumstances of his offense and about his past and present programming. Mr. Agrio accepts full responsibility for the tragic homicide, is remorseful, and recognizes the gravity and impact of his errors. I find Mr. Agrio to be insightful and mature and believe he possesses the skills to be an asset to any community if released from prison. In addition, I don't personally believe Mr. Agrio would pose an unreasonable risk of danger to society or a threat to public safety if placed on parole." (Attached as Exhibit)

On August 31, 2005, Correctional Sergeant G. Verdesoto, wrote: "I have known, and daily supervised, Mr. AGRIO, E17284, for over a year now. In my years as a Correctional Sergeant, I have been reluctant to write laudatory chronos for term to life inmates because of lack of personal observation. However, in this case I make an exception because I talk to Mr. Agrio regularly, I have read his C-File, I am familiar with his background, and I've had a chance to observe him interact with other Staff and inmates alike continuously. Agrio is a mature, thoughtful, and intelligent individual. He understands and has insight into the factors that led to his incarceration. He lives with the pain and suffering caused to self and others. I honestly and sincerely believe that he is not now nor will he be a threat to public safety or an unreasonable risk of danger to society if released on parole." (Attached as Exhibit)

On September 23, 2005, Correctional Lieutenant D. Benedetti, wrote: "I have observed Inmate AGRIO, E17284, for approximately nine months. I have observed Agrio interact in the general population. He does this with respect towards the inmate population and Staff. It is noted that Agrio is

participating in the f _owing self-help programs! - Buddhist Meditation; 2- Anger Management through Creative Options; 3- Aroma Therapy; 4- Narcotics Anonymous. He has also informed me that he has purchased and read Doctor Thomas Harbin's "Beyond Anger" - all of which reflects the fact that Agrio is working to better himself and accept full responsibilities for his actions. Agrio is one that I would consider a model prisoner." (Attached as Exhibit)

On November 13, 2005, Facility Captain R. Pope, wrote: "Inmate Agrio, E17284, is currently assigned as the Unit I Disciplinary Clerk. Agrio fills his of duty hours with activities to keep himself fit, both physically and mentally, through running and studies. Normally Agrio is very quiet about his past and his commitment offense - which is appropriate, although he and I have had several conversations about both. When he speaks about his commitment offense, he is extremely remorseful, both about the actual crime and the subsequent effect it had on the lives impacted; the victims left behind." (Attached as Exhibit)

*The Determination.*

The BPT considered the materials presented, including the forensic evaluation, and concluded Petitioner was not suitable for parole because he posed "an unreasonable risk of danger to society or a threat to public safety if released from prison." The BPT cited the following reasons to justify their findings: 1- The offense was carried out in an exceptionally cruel and callous manner; 2- The offense was carried out in a dispassionate manner; and, 3- The offense was carried out in a manner that demonstrates an exceptionally callous disregard for the safety of others.

C: The Habeas Proceedings.

As noted, Petitioner petitioned the San Diego County Superior Court for a writ of habeas corpus alleging the BPT violated his due process rights because its unsuitability determination was not supported by any evidence bearing an indicia of reliability and was therefore arbitrary and capricious. The court denied the writ, concluding the BPT's decision was supported by some evidence. (See attached order)

CONCLUSION

Petitioner respectfully requests that, upon review by this Court, he receives the same disposition accorded to Richard Shaputis. Petitioner submits this case was one of public interest. However, Petitioner does not have any prior criminal history. He served as a Marine for 7 years, discharging with the rank of Sergeant. Before the commitment offense, Petitioner was a San Diego Police Officer for 5 years, where he worked as a DARE Officer in local elementary schools. During these years, he earned a BA Degree in Public Administration with an emphasis in criminal justice. He was attending law school at the time of the offense. While in prison he completed a Paralegal course and later obtained his law degree (JD) through correspondence courses. Petitioner has remained disciplinary free

absent. a minor infracti   i for possession of un-iss  i property 16 years ago. He has been an active member of NA and every self-help program available at this institution. He has been assessed a low risk inmate. His parole plans are realistic, with job offers. The only difference between Shaputis' situation and that of Petitioner's is race and former employment. Petitioner respectfully requests that this Court hold Petitioner to the same standard as other offenders in this category and confine its review to the same documentation the Board had before it when it made its decision.

Note: (The Shaputis case is attached as an exhibit)

(BPT) that inmate posed unreasonable risk of danger to society if released on parole based on his "unstable social relationships"; inmate had been involved in stable relationships throughout his life, his alcoholism was in sustained remission, and his postincarceration conduct was exemplary. West's Ann.Cal.Penal Code § 3041; 15 CCR § 2402(g)(3).

12. Pardon and Parole ⇐62

Remand to Board of Prison Terms (BPT) for new suitability hearing was proper remedy for BPT's denial of parole based on findings of unsuitability that were not supported by some evidence. West's Ann.Cal.Penal Code § 3041.

13. Pardon and Parole ⇐62

A court reviewing a parole decision by the Board of Prison Terms (BPT) is precluded from independently resolving conflicts in the evidence, determining the weight to be given the evidence, or deciding the manner in which the specified factors relevant to parole suitability are to be considered and balanced; these are matters exclusively within the discretion of the BPT. West's Ann.Cal.Penal Code § 3041; 15 CCR § 2402.

Law Offices of Marc Elliot Grossman and Marc Elliot Grossman, Upland, for Petitioner.

Bill Lockyer, Attorney General, James M. Humes, Chief Assistant Attorney General, Frances T. Grunder, Assistant Attorney General, Michelle Des Jardins and Heather Bushman, Deputy Attorneys General, for Respondent.

McDONALD, J.

Petitioner Richard Shaputis was sentenced to 15 years to life following a 1987 conviction for second degree murder.[1] Shaputis, now 69 years old, has remained in prison for the past 18 years and has been an exemplary prisoner with an unblemished record of rehabilitative progress. Nevertheless, the Board of Prison Terms (the BPT)[2] found him unsuitable for parole at hearings conducted in 1997, in 2002, and finally in 2004. The most recent denial, challenged by the petition for writ of habeas corpus, was based on the BPT's conclusion that Shaputis posed an unreasonable risk of danger to public safety were he to be released from prison, even though the third party evaluations have consistently concluded he posed a low risk of danger to the public were he paroled.

Shaputis asserts the BPT's conclusion has no evidentiary support and therefore violates his due process rights to parole. He argues the BPT's conclusion was improperly based on the circumstances of his offense and his interpersonal skills prior to 1987, and there is no evidence he poses a risk of danger in his *current* condition.

FACTS

A. *The Offense*

In 1987 a jury convicted Shaputis of the second degree murder of his wife, Irma, and found true that he used a firearm in the commission of the offense. He was sentenced to 15 years to life, with the possibility of parole, plus a determinate two-year sentence for the firearm use.

Shaputis and Irma had been married for 23 years and their relationship was marked by domestic violence. Two years earlier, Irma complained that Shaputis had beaten her and cracked her ribs and approximately 18 months earlier Shaputis had shot at his wife when they had been drinking and arguing. Shaputis apparently beat Irma at least two or three times per year and had threatened her with a knife. However, none of these alleged events resulted in criminal charges.

On the night of the murder, Shaputis called 9-1-1 around 10:00 p.m. and stated he had fought with his wife and killed her, but claimed it was an accident.[3] When police arrived at Shaputis's home, he emerged and surrendered without incident. When police entered the house, they found Irma's body in the living room with a handgun lying nearby. The autopsy report concluded Irma was killed some time between 8:30 p.m. and 12:30 a.m. and her death was caused by a single gunshot wound to the neck. The shot had been fired from close range, possibly as close as two feet, and had entered the neck between the junction of the neck and jaw. Death was apparently instantaneous. Shaputis was a heavy drinker who became violent when intoxicated, and he had been drinking on the night of the murder.

B. *Shaputis's Background*

Shaputis's mother deserted the family when he was nine years old, and he raised his siblings with the assistance of his grandparents. His father physically abused him. Shaputis moved out of the home when he was 18 years old and began working.

Shaputis, who was married twice, had a substantial alcohol problem. His first marriage lasted nine years and produced four daughters, of whom he was awarded custody after the divorce. Shaputis subsequently married Irma and, although the marriage lasted 23 years, it was marked by domestic violence. Additionally, in 1978 Shaputis pleaded no contest to a misdemeanor soliciting or engaging in a lewd act with one of his daughters. Except for a 1975 "nonsupport" offense, the 1978 lewd act offense with one of his daughters was the extent of his criminal record.

Shaputis's work history showed greater stability. He worked for SDG & E for seven years, owned his own business for approximately 17 years, and worked for Bechtel for the 18 years prior to the murder.

C. *Shaputis's Performance in Prison*

Shaputis's record during his 17 years of incarceration was impeccable. He has been discipline-free for his entire term and his work record is unblemished. He fully participated in all available AA and NA programs since 1991, and completed all applicable therapy programs. He has the lowest classification score possible for a life-term inmate, and has numerous commendations for his work, conduct and reform efforts from prison staff.

1. Although this court reversed the original conviction and remanded the matter for retrial, the jury in the second proceeding again convicted him of second degree murder. (*People v. Shaputis* (May 21, 1991, D012507) [nonpub. opn.] at pp. 1-4.)

2. Now known as the Board of Parole Hearings.

3. The BPT concluded the gun could not have been fired accidentally because the hammer must be pulled back manually to a cocked position before pulling the trigger and there was a transfer bar to prevent accidental discharges. Although this information is recited in the "Life Prisoner Evaluation Report" (LPER), prepared for the 2004 Parole hearing by correctional department counselors, the factual basis for the conclusions in the LPER does not appear in the probation report filed in connection with the 1987 conviction, and the source of this information is unclear.

(5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (§ 2402, subd. (c).) A factor that alone might not establish unsuitability for parole may contribute to a finding of unsuitability. (§ 2402, subd. (b).)

Circumstances tending to show *suitability* for parole include that the inmate: (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress had built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use on release; and (9) has engaged in institutional activities that suggest an enhanced ability to function within the law on release. (§ 2402, subd. (d).)

[1, 2] These criteria are general guidelines, illustrative rather than exclusive, and the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the BPT. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 679, 128 Cal.Rptr.2d 104, 59 P.3d 174 (*Rosenkrantz*); § 2402, subds. (c), (d).) The BPT's task is to try to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts. (*Rosenkrantz*, at p. 655, 128 Cal. Rptr.2d 104, 59 P.3d 174.)

## B. *Standard of Review*

[3] The court below denied relief, and therefore this writ proceeding is an original proceeding that requires we independently review the record. (*In re Scott* (2004) 119 Cal.App.4th 871, 884, 15 Cal. Rptr.3d 32 (*Scott*).)

In *Rosenkrantz*, the California Supreme Court addressed the standard the courts apply when reviewing parole decisions by the executive branch. The court first held that the judicial branch is authorized to review the factual basis of a decision of the [BPT] denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the [BPT] supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 658, 128 Cal.Rptr.2d 104, 59 P.3d 174.) The court further held that courts properly can review a Governor's decisions whether to affirm, modify, or reverse parole decisions by the [BPT] to determine whether they comply with due process of law, and that such review properly can include a determination of whether the factual basis of such a decision is supported by *some evidence* in the record that was before the [BPT]. (*Id.* at p. 667, 128 Cal.Rptr.2d 104, 59 P.3d 174, italics added.)

[4–6] The "some evidence" standard is "extremely deferential" and requires only "a modicum of evidence." (*Rosenkrantz*, *supra*, 29 Cal.4th at pp. 664–665, 128 Cal.Rptr.2d 104, 59 P.3d 174.) A court may not vacate an administrative decision subject to the some evidence review simply because it disagrees with the BPT's assessment. (*Id.* at p. 679, 128 Cal. Rptr.2d 104, 59 P.3d 174.) The decision must be "devoid of a factual basis" to be overturned. (*Id.* at p. 658, 128 Cal.Rptr.2d 104, 59 P.3d 174.) Because judicial review of a parole denial is to ensure that a decision of the BPT is not arbitrary and capricious, thereby depriving the prisoner of due process of law, the court may

inquire only whether some evidence in the record before the [BPT] supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Id.* at pp. 657–658, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

[7] The BPT's discretion over parole suitability determinations, although broad, is not absolute. (*Scott*, *supra*, 119 Cal. App.4th at p. 884, 15 Cal.Rptr.3d 32.) *Rosenkrantz* explained that if "the [BPT's] decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the [BPT] to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 658, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

## IV

## ANALYSIS

The BPT does not dispute the only evidence on all relevant parole *suitability* factors, as well as the only evidence on all but two of the parole *unsuitability* factors, militated in favor of finding Shaputis suitable for parole. Notwithstanding this evidentiary milieu, the BPT found he was unsuitable for parole because it concluded two of the unsuitability factors—the commitment crime itself and Shaputis's preincarceration history of relationships with others—made him a danger to society if released on parole. We are charged with the obligation to ensure the BPT's decision comports with the requirements of due process of law, and we can discharge that obligation only if we are satisfied there is some evidence in the record before the BPT to support the factual basis for its findings. (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 658, 128 Cal.Rptr.2d 104, 59 P.3d 174; *In re Dannenberg*, *supra*, 34 Cal.4th at pp. 1095–1096 and fn. 16, 23 Cal.Rptr.3d 417, 104 P.3d 783.)

## A. *The Commitment Offense*

The BPT concluded Shaputis posed an unreasonable risk of danger if released on parole because he committed the offense in an especially cruel and/or callous manner (apparently under section 2402, subdivision (c)(1)(D)) and an especially dispassionate and/or calculated manner (apparently invoking section 2402, subdivision (c)(1)(B)).[8]

### *Evidence the Murder Was Especially Cruel and/or Callous*

[8] Section 2402, subdivision (c)(1)(D), describing one of the factors that supports a finding the crime was committed "in an especially heinous, atrocious or cruel manner," provides the offense was "carried out in a manner which demonstrates an exceptionally callous disregard for human suffering." Shaputis contends there is no evidence to support this finding. The BPT's only reference to the *evidence* supporting this finding—the victim died from a single gunshot wound fired at close range that perforated her larynx, spinal cord column, and spinal cord—shows the crime was *not* committed in an exceptionally callous manner disregarding the victim's suffering, because the forensic evidence appears to confirm the gunshot

8. Section 2402, subdivision (c)(1) also lists as factors that support the finding the crime was committed "in an especially heinous, atrocious or cruel manner" (§ 2402, subd. (c)(1)) that multiple victims were involved; the victim was abused, defiled, or mutilated during or after the offense; and the motive for the crime was inexplicable or very trivial in relation to the offense. The BPT did not cite these factors, and we do not further consider them.