**EXHIBIT F**
**Part 2 of 2**

7. Ground 2 or Ground _____ (it applicable):

SEE ATTACHED

_____

_____

_____

_____

a. Supporting facts:

SEE ATTACHED

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b. Supporting cases, rules, or other authority:

SEE ATTACHED

_____

_____

_____

_____

GROUND 2. THE BPT'S REPEATED RELIANCE ON THE CRIME AND BEHAVIOR LEADING UP TO
THE CRIME TO FIND PETITIONER UNSUITABLE FOR PAROLE VIOLATES THE STATE AND FED-
ERAL DUE PROCESS.

INTRODUCTION

    Our Supreme Court has made it clear that parole consideration must be guided
in large measure on post-conviction history. The Court explained that a court
presented with a habeas corpus petition, should examine the proceedings before
the Board and ascertain whether the Board's factual determinations are support-
ed by "some evidence."

FACTS

    In this case, the Board concluded that Petitioner "is not suitable for parole
and would pose and unreasonable risk of danger to society or a threat to public
safety if released from prison [for the FOURTH TIME]. We are going to deny your
parole for three years, sir, and I'm going to tell you why. The offense in this
case was particularly cruel and callous absolutely no motive. There was no
reason for this offense to have occured. It was certainly carried out in a dis-
passionate manner. I [] wouldn't go as far to say it's an execution-style, sir.
I would certainly say it's more than unintentional act or more than an acciden-
tal death given your history as a Marine around firearm, I just find -- I do not
understand how this could have happened. If these wasn't -- without retrying
this case at all you are here for second degree murder. I think there was cer-
tainly a crime of passion. We think it's a crime of passion. On the evening of
March 26, 1988, at approximately 11:30 p.m. your wife Alma age 23-years-old was
shot to death by you over an incident that should have never escalated to clear-
ly over that point." (Exhibit A, HT, Page 98)

    Petitioner's minimum eligible parole date was April 30, 2000. His initial
hearing was scheduled for August 23, 1999. However, it was postponed to the
next available calendar due to recusal by Commissioner Giaquinto, who was a
member of the same police department as Petitioner.

    On December 14, 1999, the Board denied parole for three (3) years based
solely on the nature of the crime. The panel's recommendations were to "remain
disciplinary free, participate in self-help and therapy."

    On December 6, 2002, Petitioner appeared before the Board for his first
subsequent hearing. The Board denied parole for one (1) year. The panel's re-
commendations again were remain disciplinary free, participate in self-help and
therapy. The Presiding Commissioner also stated that although the current Psych
report prepared by Dr. Bakeman indicated that Petitioner had a very good record
while in the controlled setting of the prison, was not normally violent, and
did not seem to have an anger problem, the report did not predict what sort of
threat Petitioner would pose if released to the community.

    Petitioner's second subsequent hearing was scheduled for December 12, 2003.
However, it was not held until May 18, 2004, approximately 5 months later.
Again, the Board denied parole for one (1) year. A new Psych report was provided
as requested by the December 6, 2002, panel. The report was prepared by Dr.
Macomber. Dr. Macomber reported that, "[a]t this point in his life, his potential
for violence in the unstructured setting of the community is definitely below

average in comparison to other inmates. In comparison to the average citizen in the community and based upon his knowledge and experience, his potential for violence is even lower than that." Petitioner remained disciplinary free, continued his involvement in self-help and therapy. Yet, the Board denied parole for one (1) year based on the commitment offense.

On December 6, 2005, Petitioner appeared before the Board for his third (3) subsequent hearing. As stated above, the Board denied parole for three (3) years. Again, the decision was based on the commitment offense. Upon hearing that he was denied 3 years, Petitioner respectfully asked to be excused from the hearing. This was the fourth panel that determined that Petitioner, "is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." The determination included, "[t]he offense in this case was particularly cruel and callous ... it was carried out in a dispassionate manner."

The 2002 panel (Presiding Commissioner Angele and Deputy Commissioner Johnson); the 2004 panel (Presiding Commissioner Welch and Deputy Commissioner Garner-Easter); and, the 2005 panel (Presiding Commissioner Sawyer and Deputy Commissioner Mitchell) all had before them the same documents and information received from the public regarding Petitioner not having any prior criminal history as well as his post-conviction gains.

Presiding Commissioner Angele (2002 panel) stated:

"No matter what we do today you'd have more time to serve. You've done an outstanding job as far as self-help and therapy programming while in custody. There is a question in regards to your temper. That may be explained away one way or another, but what happened that day that you shot your wife, obviously, would indicate to me that there is some sort of a problem. I'd like to see that maybe addressed a little bit more in the next psychological evaluation also. And also for them to place a degree of threat on you. They didn't bother doing that for some reason or another. And once we get that I think it will be helpful also. Like I said, this is for a period of one year and we expect you to keep on doing what you're doing, and I just wish you the best of luck."

Presiding Commissioner Welch (2004 panel) stated:

"The Board reviewed all information ... and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or threat to public safety if released from prison. One, the offense was carried out in an especially cold hearted or cruel manner. The offense was carried out in a dispassionate manner. The motive for the crime was inexplicable."

Yet, earlier in the hearing Deputy Commissioner Garner-Easter noted:

"The latest psychiatric report was dated August 11th of 2003 and it's by Melvin Macomber. Dr. Macomber thoroughly reviews your record and again goes over many of the factors that the Board has already looked at. So I will just go to diagnostic impressions on page one, he says basically that there are no clinical disorders, personality disorder

or physical disorder. So no mental health issues or any of that. He
concludes in his report on page three by stating he feels you have
matured and that you're no longer driven by the perfectionist
tendencies to control your life and that you've learned to negotiate
differences with others and come to a positive resolution. After he's
talked to you he says he feels like you have a good sense of concern
and empathy toward others at this point in his life. His potential
for violence in the unstructured setting of the community is
definitely below average in comparison with other inmates. In
comparison to the average citizen in the community, based upon
knowledge and experience, his potential is even lower than that."

Presiding Commissioner Sawyer (2005 panel) states:

"Several issues as to why we determine three (3) years. We were really
wrestling and we were really -- we really had a problem with his
minimalization [sic] in this first of all. He appears to be attempting
to **word smith** this crime by chang[ing] his description of this from
accidental to unintentional act. Those are very far apart. His version
of this changing the words from angry and infuriated downsizing those
words for a lack of better term to upset referring to them as upset,
which makes him look a little better a little nicer. Another issue that
we felt he is not taking responsibility for this particular crime, which
until he takes responsibility for this crime I don't think he'll -- or
at least this panel won't receive a date but his honesty to his wife
Cathleen as soon as I -- as soon as he said she didn't know -- Ms. Hall,
Rosy Hall down in San Diego didn't know that she was a part -- that he
had not told Cathleen that Ms. Hall was part of his plan and if he got
paroled to Morro Bay he would never disclose that. I think that's
deception. The psychiatric report in this case is -- has been invalidated
by the fact that he told the psychiatrist that he had never to quote.
Agrio he said some things here that just totally not taking responsibility.
He may have mishandled the situation stress of being married to a wife
who had a drinking problem and would not listen to her attempts to talk.
She would not listen to his attempts to talk to her in a mature manner.
He is making her fault. He's putting the monkey on her back. His
statement that he never battered his wife was a totally. And I think
there is something to say about the fact that he didn't want to hear the
truth here and didn't want to face the facts and left the hearing pre-
maturely. The reason -- one of the reasons that people in law enforcement
and people with experience with domestic violence know it happens all
the time, and that is when a woman is battered police are called, she
calls them as the right thing to do, and then as soon as things settle
down then she recants and that's what appears to have happened here when
the internal investigation was taking place, she backed off because she's
going to lose. If he looses his job or gets suspended then she's going to
lose. If he gets convicted of battery then she's going to lose and so I
mean this is typical where the spouse backs off. I think he was -- the
most honest I think he was to us here today ot to the system was the
statement that I read earlier that he had made in 19 or -- or May 31,
1989, when he analyzed the cultural terms of a latin family where a man

is the boss of the house and ordinarily the wife jumps at the snap of
a finger. He indicates that today's younger people are not traditionalist
in an attempt to explain his position. He states that no matter how much
time he has to do, there's no guarantee that he would not ultimately wind
up in a similar position under similar circumstances. I think he's right
on. I think he's right on, and if you study cultures you know that some
cultures a lot of cultures have their cultural things sometimes in
different cultures you have to break those. From those -- those are
the reasons that we -- that we're giving him for this multiple year,
three year denial." (Exhibit A, HT, Pages 98-106)

## CONCLUSION

The Board's repeated use of the offense as justification for parole denial
essentially "resentences" Petitioner to "Life Without the Possibility of
Parole" in that the factors are immutable.
Therefore, Petitioner most respectfully requets an order from this Honorable
Court for a re-hearing of the 2005 suitability hearing without a re-hash of
previously decided issues absent new information.
Additionally, that the order include directions to the Board to adhere to
the guidelines set forth in the regulations regarding factors that tend to show
suitability vs. factors that tend to show unsuitability as they apply to the
requirements codified in Penal Code section 3041.


Note: Tom Sawyer, the Presiding Commissioner at Petitioner's hearing, is no
      longer with the BPT. He resigned from the BPT prior to Senate confirmation
      hearings.

**GROUND 3. THE SAN DIEGO SUPERIOR COURT AND THE 4TH APPELLATE DISTRICT HAVE VIOLATED PETITIONER'S RIGHT TO DUE PROCESS AND EQUAL PROTECTION OF THE LAWS, AND HAVE DISCRIMINATED AGAINST PETITIONER BECAUSE OF HIS RACE. BOTH COURTS HAVE CONSISTENTLY RE-PROSECUTED PETITIONER'S CASE AND HAVE FAILED TO CONDUCT AN EVIDENTIARY HEARING TO ESTABLISH TRUE FACTS, AND THE NATURE OF THE EVIDENCE USED BY THE BOARD TO CONCLUDE THAT PETITIONER POSES A <u>CURRENT</u> RISK OF DANGER.**

As indicated in GROUND 1 of this writ, the circumstances of Petitioner's offense are similar to those of the petitioner in <u>In re Shaputis</u>, supra. The 4th Appellate District granted relief to Shaputis, a White man, but denied relief to Petitioner, a Hispanic man. The 4th Appellate District states that Petitioner cannot use <u>In re Shaputis</u> because this case was ordered de-published by this Court on May 17, 2006. Petitioner is confused.

Petitioner appeared before the Board on December 5, 2005. <u>Shaputis</u> was decided and published on December 28, 2005. (A nice Christmas present for Mr. Shaputis and his family). Petitioner did not receive his hearing transcript until about 45 days after the hearing. Thereafter, he quickly filed a writ in the San Diego Superior Court relying on <u>Shaputis</u>. As is customary, the Superior Court proceeded to deny the writ by stating, inter alia, that <u>Shaputis</u> was not on point. (See attached ORDER). On May 17, 2006, while Petitioner was preparing his writ to the 4th Appellate District, this Court ordered <u>Shaputis</u> de-published.

California Rules of Court, Rule 977(b), allows for exceptions to the rule of not citing de-published opinions. When the opinion is relevant under the doctrine of law of the case, etc., and a copy of the opinion is furnished to the court, the court must consider the opinion. The 4th Appellate District knows this but failed to do their job. [See <u>People v. Stanley</u> (1995) 10 C.4th 764 – Law of the case. An appellate decision in a case usually binds the parties, even though it is not published. For example, if a review court renders a decision concerning a petition for a writ, that decision becomes the law of the case. <u>People v. Veitch</u> (1982) 128 CA3d 460 – Summary denial of a writ petition, however, has no res judicata effect. <u>People v. Durrett</u> (1985) 164 CA3d 947 – The law of the case doctrine also applies to other reviewing courts concerning the same case unless adherence to the doctrine would result in an unjust ruling.]

Petitioner has been experiencing this kind of bias and discrimination with San Diego courts since he first filed against the Board for violating his due process rights. Petitioner doesn't understand how the 4th Appellate District was able to grant <u>Shaputis</u> relief, but not Petitioner. Was it because <u>Shaputis</u> had a lawyer and Petitioner is pro se? Is it because <u>Shaputis</u> is White and Petitioner is not? And why was the opinion de-published?

Mindful of the bias scrutiny he has been receiving, Petitioner filed peremptory challenges against 4 judges of the 4th Appellate District. Petitioner's concerns were ignored. (See attached ORDER). Instead, the 4th Appellate District proceeded to take "judicial notice" of their own decision on the direct appeal of this case. What is the relevance of that decision in connection with the claims against the Board? How does that decision justify what the Board did or did not do? The law and numerous court decisions have clearly established that the Board is supposed to be looking for evidence that Petitioner is a **current** threat to society if released from prison. That means today, now – not some 20 years ago.

Petitioner is certain that there exists a conspiracy on the part of San Diego law enforcement types to convert Petitioner's sentence from 2nd Degree Murder to First Degree

Murder. This is unconscionable! Courts have consistently ruled that at some point the commitment offense can no longer be used to justify denying parole.

Petitioner cannot help but to be frustrated with the constant mischaracterizations by the Board and the San Diego Courts of his testimony, all intended to further the conspiracy of violating his constitutional rights. For example:

DECEPTIVE PAROLE PLANS: Petitioner's current wife resides in Morro Bay. She is a long time resident of the area and was there when Petitioner appeared before the Board for his initial hearing. Petitioner made it clear at that time that he intended to live with his wife if granted parole. The Board denied parole and requested that Petitioner provide parole plans for San Diego at future hearings. Petitioner then contacted his old roommate from his days with the Marines and secured her support as an alternative parole plan. Now the Board says that petitioner has "deceptive parole plans" because he did not share this with his wife. The truth is that Petitioner does not want to return to San Diego. He never did. Petitioner was just trying to satisfy the Board's requirement. Petitioner does not understand the games the Board plays. Petitioner's wife does not care where Petitioner paroles to as long as he is free. Petitioner's wife is 67 years old for Christ sake! And guess what? The Board still stated at this hearing that they required parole plans for San Diego. Is that nuts or what? If what Petitioner presented is not acceptable then what is Petitioner to do?

RESPONSIBILITY FOR THE CRIME: Petitioner has stated over and over that he takes full responsibility for the offense and expressed remorse from the time of his arrest. Yet, when he states the facts as they are, the Board claims he is blaming the victim. Nonsense! What is Petitioner supposed to do? Ignore the facts and the evidence, as only he knows them? That cannot be. Truth is truth. Facts are facts.

PSYCHOLOGICAL EVALUATION: The Board and the Courts now say that the outstanding psychological evaluation by Dr. Macomber is invalid because Petitioner failed to reveal an alleged incident of spousal abuse. This is ridiculous. During a domestic dispute, initiated by Petitioner's wife, a scuffle took place. When Petitioner left the house, his wife called the police and made false allegations in a moment of ire. She later retracted those allegations and stated so to investigators. Petitioner has never viewed this incident as any spousal abuse, and quite honestly did not have a present recollection of the incident at the time he was interviewed by the psychologist, and was ignorant of the perception until the San Diego District Attorney brought it up at the December 2005 trial. What is ludicrous about this is that these evaluations are not based solely on what Petitioner says to the mental health professional. They are based on his/her observations, a review of the record, previous evaluations, personal experience as a psychologist, and so on and so forth. It is impossible to relate to the psychologist every aspect and detail of one's existence during the one hour interview usually allotted to these evaluations. One omission does not in itself invalidate the professional assessment made of future dangerousness. What about age, maturity, and all the therapy Petitioner has undergone over the past 15 years? And incredibly, the Board did not request a new psych evaluation. How about that?

THE COURTS HAVE FAILED TO COMPARE PETITIONER'S OFFENSE WITH THAT OF OTHER OFFENDERS WHO ARE NOW FREE: Again, the San Diego Courts continue to rehash Petitioner's trial. They have not taken into account offenders like Rosenkrantz [premeditated murder masquerading as second degree], Wen Lee [multiple victims], and Jeffrey Elkins [first degree murder/robbery with a baseball bat]. All these men are now free. What about the time served? When will that come into play? And why are the San Diego Courts considering trial testimony that was not presented to the Board? The Courts must look for what evidence of **current threat** the Board cited to justify denying parole. There is none. All the factors tending to show suitability were met.

PETITIONER LEFT THE HEARING ABRUPTLY BECAUSE HE DID NOT WANT TO HEAR "THE TRUTH": How convenient. Petitioner left the hearing abruptly because he could not believe he was being denied parole for 3 more years in spite of his record as a model prisoner, and the rumors floating around the penitentiary that the Board was denying multiple years in an attempt to reduce the backlog of hearings. This issue had been brought to the attention of a Marin County Superior Court in a class action lawsuit known as In re Rutherford, with the Prison Law Office as attorney of record. (See attached update) The Marin County Superior Court later confirmed and ruled in plaintiffs favor and ordered that the Board could not deny multiple years after a one-year denial. But the damage was done. Petitioner was denied 3 years at his initial hearing in 2000. His two subsequent hearings resulted in one-year denials. Now the Board was telling Petitioner that instead of getting closer to being released he was farther along even though his record had improved over the years. Needless to say, Petitioner found it difficult to digest this. His attorney asked him if he wanted to leave and he assented. Petitioner's attorney interrupted the reading of the decision and informed the Board that Petitioner wanted to leave. The commissioner gratuitously commented that Petitioner wanted to leave because he did not want to hear "the truth." What truth? That he had just retried and re-sentenced Petitioner for the 6th time. And to add injury to insult, this commissioner is no longer working for the Board.

Petitioner is an indigent litigant. He provided the San Diego Courts with an extensive record of what was available to the Board at the 2005 hearing. The copying of these documents was a tremendous expense. Petitioner does not have the funds to duplicate that record all over again. Petitioner is requesting that this Court order the entire record of the case transferred from the 4th Appellate District to this Court for a comprehensive review of these claims. Petitioner is not a lawyer and may not have presented his claims properly but he does aver and believe in his heart that he is being discriminated against and that the San Diego Courts are bias against him. **The fact of the matter is that In re Shaputis was a published decision when Petitioner's writ was being considered by the Superior Court.** Petitioner had no way of knowing that forces beyond his control would fight to keep that decision in house and prevent others from benefiting of the gift to the White petitioner. Petitioner respectfully requests that an order to show cause be issued and that counsel be appointed to represent him in these proceedings.

UNCOMMON LAW
130Q CLAY STREET, SUI   600
OAKLAND, CA 94612
(510) 350-2787
(510) 350-7176 (FAX)

KEITH WATTLEY
THOMAS MASTER

February 2007

This is an update about the case involving overdue parole consideration hearings and some other problems lifers experience with the parole consideration process. That class action lawsuit in Marin County Superior Court is called In re Rutherford (Case Number SC 135399A). Since Mr. Rutherford passed away earlier this year, the Court substituted Inez Tito Lugo as a class representative. (The case is sometimes now called In re Lugo.) If you are a lifer who has served enough time to be eligible for parole, you are automatically included in the class. You don't have to do anything to join. The Court has ordered the Board of Parole Hearings (BPH) and the CDCR to make certain changes and eliminate the backlog of overdue parole hearings. The Court has also ordered that prisoners cannot "opt out" of the class. Although the Rutherford case does not necessarily require the Board to provide every lifer's hearing right away, we can bring certain cases of extreme delays or misconduct to the Board's attention and ask that those problems be addressed (and a hearing scheduled) as soon as possible.

Every Rutherford class member should have already been provided with his or her own copy of the Notice of Judgment in this case. In addition, these notices should be posted in housing units, law libraries and other areas throughout the institution. The highlights of the case are explained on the backside of this page.

The Rutherford Court often holds hearings to get an update about the Board's progress in eliminating the parole hearing backlog, and to hear from us about most other issues in the case. Set forth below are some of the biggest issues. If you have any additional information regarding these issues, please let us know. Since there are nearly ten thousand Rutherford class members, we cannot always respond to individual letters, but we do keep track of all the information provided by class members so that we can inform the Court of the ongoing (or the new) problems, and so that we can advocate for class members in cases of extreme delays or misconduct.

Hearing Transcripts

We have made the Rutherford Court aware of the extreme delays in processing transcripts from parole hearings. Apparently, the delays were related to some problems with the company hired to transcribe the audiotapes from hearings. The Board now reports that they have hired several additional transcribing companies to catch up. The Board also reported that they would be up-to-date on providing transcripts by the end of January 2007. The Court also ordered the Board to provide prisoners with the transcript from any scheduled hearing that results in a postponement, waiver, or stipulation. Prisoners should not have to request these transcripts; they should be provided automatically – in the same manner they provide transcripts for full hearings.

Multiple-Year Denials

The Court ordered that the Board cannot issue a multiple-year parole denial at a hearing immediately following a one-year denial unless there is some significant change in circumstances to justify the increased denial period. The Board appealed that order. The Court of Appeal has issued a stay of the order, meaning it will not be enforced until after the Board's appeal on this issue has been decided, which will take several more months. In the meantime, we want to hear from people who have been denied for two or more years in the hearing immediately following either a one-year denial or a parole grant.

Stipulations and Postponements

We continue to hear from lifers that the Board is encouraging them to stipulate to being unsuitable for parole or to postpone their hearings for no good reason. Please let us know if this has happened to you, and include details about who encouraged you to stipulate or postpone, when, where and why. Also, if the discussion regarding a stipulation or postponement took place during the week of your scheduled hearing (as opposed to an earlier time), that discussion must be recorded.

8. Did you appeal from the conviction, sentence, or commitment?  ☐ Yes.  ☐ No.  If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"): _____

   b. Result: _____     c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised:  (1) _____

      (2) _____

      (3) _____

   f. Were you represented by counsel on appeal?  ☐ Yes.  ☐ No.  If yes, state the attorney's name and address, if known:
   _____

9. Did you seek review in the California Supreme Court?  ☐ Yes.  ☐ No.  If yes, give the following information:

   a. Result: _____     b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised:  (1) _____

      (2) _____

      (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal: _____

11. Administrative Review:

    a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:
    _____

    b. Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.
    *Attach documents that show you have exhausted your administrative remedies.*

MC-275 [Rev. January 1, 1999]          **PETITION FOR WRIT OF HABEAS CORPUS**          Page five of six

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☐ Yes. If yes, continue with number 13. ☐ No. If no, skip to number 15.

13. a. (1) Name of court: _____

    (2) Nature of proceeding (for example, "habeas corpus petition"): _____

    (3) Issues raised: (a) _____

       (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  b. (1) Name of court: _____

    (2) Nature of proceeding: _____

    (3) Issues raised: (a) _____

       (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

_____

16. Are you presently represented by counsel? ☐ Yes. ☐ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☐ No. If yes, explain:

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 2/25/07

▶ _____
(SIGNATURE OF PETITIONER)