IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PABLO J. AGRIO,<br><br>              Petitioner,<br> vs.<br><br>BEN CURRY, Warden,<br><br>              Respondent. | No. C 07-04201 JW (PR)<br><br>ORDER DENYING PETITION FOR<br>WRIT OF HABEAS CORPUS |

Petitioner, a California prisoner proceeding pro se, filed a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the December 2005 decision of the California Board of Parole Hearings ("Board") finding petitioner unsuitable for parole. The Court ordered respondent to show cause why the petition should not be granted. Respondent filed an answer, and petitioner filed a traverse.

**PROCEDURAL BACKGROUND**

In April 1989, petitioner was convicted of second degree murder and sentenced to seventeen years-to-life, which included a two year enhancement for use of a firearm. On December 6, 2005, petitioner was denied parole by the Board for the fourth time. On February 17, 2006, petitioner filed a habeas petition in the state superior court, which

denied the petition in a reasoned opinion on April 11, 2006.  On July 27, 2006, petitioner filed a petition in the California Court of Appeal, which also denied with a reasoned opinion on October 6, 2006.  On February 27, 2007, petitioner filed a petition for review with the California Supreme Court, which summarily denied review on July 25, 2007. Petitioner filed the instant federal petition on August 16, 2007.

# FACTUAL BACKGROUND

A.   The Commitment Offense

   The following summary of facts is taken from the unpublished opinion of the California Court of Appeal denying petitioner's direct appeal[1]:

> Alma was killed by a gunshot wound to her head which occurred during an altercation with [petitioner] in the bedroom of their home in March 1988.  Although [petitioner] and Alma at the time of her death had been married slightly less than one year, they had known each other for a considerably longer period and had a child born in July 1986. [Petitioner] was the only witness to the killing, and hence much of the evidence adduced at trial pertained to the apparent relationship between Alma and [petitioner], which might indicate circumstantially [petitioner]'s mental state at the time of Alma's death, leading to a correct characterization of the homicide.
>
> At the time of the crime [petitioner] was a police officer with the City of San Diego.  Alma had been attending the San Diego sheriff's department's academy and was about to graduate therefrom.  She intended to work in the San Diego County Jail as a correctional officer.  The couple had had interpersonal problems and fights, which led to periods of separation before their marriage and altercations after marriage.  One such incident, on Super Bowl Sunday in 1988, led to Alma's leaving their home for a night and then seeking the assistance of a mediator to facilitate her return.  After that incident the mediator noticed scratches on [petitioner]'s cheeks and bruises on Alma's wrists.
>
> [Petitioner] drank little alcohol, and the couple generally did not have alcohol in their home, but Alma had previously experienced drinking problems, had attended AA sessions, and on the occasion of the Super Bowl incident became noticeably intoxicated, causing her to be boisterous, agitated and aggressive with [petitioner].
>
> Notwithstanding their occasional marital disputes, all witnesses agreed that Alma and [petitioner] were a loving couple.  Their babysitter and housekeeper of 11 months testified she thought they loved each other.  A friend who witnessed the Super Bowl argument acknowledged that each

---

[1] People v. Agrio, No. D010237, slip op. at 2-7 (Jan. 16, 1991) (Resp't Ex. B).

knew how to "push [the other's] buttons," but thought they loved each other very much. Their activities and relationship in the period just preceding Alma's death did not seem unusual. On Saturday, March 26, the day of the death, [petitioner] had played tennis, which was his usual Saturday custom. He picked Alma up in the afternoon from her academy session and, in fact, came early to watch her participate in exercise and group races. They were planning for Alma's graduation exercises and had printed invitations for same.

The testimony about the events immediately preceding Alma's death came from Nelly Cordova, the baby-sitter who was present in the home on Saturday; Tami Hahn, a fellow student of Alma's at the academy who had accompanied her to a social event on the evening of her death; and [petitioner]. Nelly testified that everything in the Agrio household seemed normal until late in the afternoon. At that time Alma and Tami came home and Alma changed clothes. [Petitioner] was on the phone talking to his mother. Alma spoke briefly to the mother, then kissed [petitioner] and departed the residence for the party along with Tami. After they had left, [petitioner] evidenced anger at Alma's going to the party without his specific consent, threw their child's shoes in the house, and made comments such as "She wants to do like the fucking American whores" ([Petitioner] was originally from Panama). When Alma did not return from the party when expected, [petitioner] insisted on taking Nelly home. At that time he was still angry and, Nelly testified, stated "What Alma just did is going to cost her; [it] is going to cost her a lot."

Tami Hahn testified that late Saturday afternoon she and Alma went to the Agrio residence, where Alma changed clothes. Leaving while [petitioner] was talking on the telephone, Hahn and Alma arrived at the party between 7 and 7:30 p.m. They departed at around 10 p.m., Alma having drunk at least three glasses of wine. Hahn did not enter the Agrio residence with Alma, but later called there to check on her, being concerned about her inebriation. [Petitioner] answered the phone, sounded agitated, and when asked if Alma were there said "Yes, but I'm not finished with her."

[Petitioner] testified he was irritated that Alma wished to spend time on Saturday evening with her classmates rather than at home and with her family. He became angry when Alma brought Hahn home with her to the home to change clothes, the presence of the third party making it indelicate for [petitioner] to raise objections to the party. He expected Alma to return from the party much earlier than she did, and when she was so late he became concerned and angrier. When Alma did arrive she was obviously drunk, and she declined to participate in a discussion of her conduct, even though [petitioner] angrily demanded explanations. Their dispute eventually erupted into a physical confrontation in their bedroom, including Alma's locking the door followed by [petitioner]'s breaking it in, the pulling of telephones out of the wall, the striking of each by the other, and [petitioner]'s tearing up Alma's graduation invitations.

The Agrios had three guns in their home. At one point, Alma opened the bedroom cabinet where the guns were kept, took one out, and according to [petitioner] pointed it at him as if she were going to fire. [Petitioner] wrestled the gun away from Alma, forcing her to the floor. A video reenactment of the struggle, which [petitioner] testified was accurate, showed him shaking her by the shoulders while holding the gun. The gun

went off, impacting Alma at very close range in the back of the head. [Petitioner] denied any intent to pull the trigger and testified he did not know how the weapon had been caused to fire. He immediately called 911, reported the shooting, and thereafter gave statements to investigating police officers. The police officers testified [petitioner] was in tears, affirmed that he loved his wife, and evidenced great concern and regret over her death. They also testified, however, that he made certain deprecatory statements about his wife, complaining that she was a young girl who wanted to party instead of staying home and serving as mother and wife. At one point he stated: "You can't buy a Toyota and turn it into a Cadillac."

Expert testimony added some significant evidence. Alma's blood alcohol at the time of her death was .26 percent, meaning she could have had as many as 11 drinks during the evening. The weapon which had caused the death was in working order, with a light but not hair trigger. A ballistics expert testified as to the various ways in which the gun might have been cocked and fired, including accidental cocking and firing during [petitioner]'s tussling with Alma. Alma's body showed minor bruising injuries other than the gunshot wound and minor abrasions. She died from a single gunshot wound to the back of her head, administered when the gun was partially touching her skin.

B.  <u>Parole Suitability Hearing</u>

On December 6, 2005, petitioner appeared with counsel before the Board for his fourth parole suitability hearing. (Resp't Ex. C at 2.) The Board first reviewed petitioner's pre-commitment record and noted that he had been a Marine and a police officer, and had no prior criminal record. (<u>Id.</u> at 22-23.) The Board then looked at petitioner's post-commitment record and noted that petitioner had remained free of disciplinary violations, except for one CDC 128A (custodial counseling chrono) in 1991. (<u>Id.</u> at 54-55.) Petitioner presented evidence that he had availed himself of many self-help, self-improvement, and community programs in prison. (<u>Id.</u> at 48-66.) Moreover, petitioner had received a law degree during his incarceration. (<u>Id.</u> at 30.) Regarding his parole plans, petitioner told the Board that if he was found suitable for parole his preference was to live in Morro Bay with his second wife. (<u>Id.</u> at 26.) However, the Board noted that his wife was not aware of petitioner's alternate parole plan of living in San Diego with another woman. (<u>Id.</u> at 26-28.) Also, during the hearing petitioner admitted that he had battered his wife in the past, but had previously stated in a psychiatric report that he had never battered his wife. (<u>Id.</u> at 72-74.)

The Board then heard closing statements from the Deputy District Attorney

opposing parole, from counsel for petitioner in favor of parole, and from petitioner himself explaining his parole suitability. (Id. at 79-96.) Lastly, the Board heard a statement opposing parole from the victim's mother. (Id. at 96-97.) The Board then took a recess before rendering its decision finding petitioner unsuitable for parole. (Id. at 98-106.)

## DISCUSSION

### A. Standard of Review

Because this case involves a federal habeas corpus challenge to a state parole eligibility decision, the applicable standard is contained in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002). Under AEDPA, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000). A federal court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1).

Where, as here, the highest state court to reach the merits issued a summary opinion which does not explain the rationale of its decision, federal court review under § 2254(d) is of the last state court opinion to reach the merits. Bains v. Cambra, 204 F.3d 964, 970-71, 973-78 (9th Cir. 2000). In this case, the last state court opinion to address the merits of petitioner's claim is that of the California Court of Appeal.

### B. Analysis of Legal Claims

Petitioner claims that he was denied due process because the Board's decision finding him unsuitable for parole relied on the commitment offense and was not supported by "some evidence" that he would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. (Pet. at 27.)

Respondent argues that California inmates do not have a federally protected liberty interest in parole release. (Resp't at 5.) However, the Ninth Circuit has held that California prisoners have a constitutionally protected liberty interest in release on parole, and therefore they cannot be denied a parole date without adequate procedural protections necessary to satisfy due process. See Irons v. Carey, 505 F.3d 846, 850 (9th Cir. 2007). The Supreme Court has clearly established that a parole board's decision deprives a prisoner of due process if the board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary." Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1129 (9th Cir. 2006) (adopting "some evidence" standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). The "some evidence" standard identified in Hill is clearly established federal law in the parole context for AEDPA purposes. Sass, 461 F.3d at 1128-29. Additionally, the evidence underlying the board's decision must have some indicia of reliability. McQuillion, 306 F.3d at 904; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987). Accordingly, if the board's determination of parole suitability is to satisfy due process, there must be some evidence, with some indicia of reliability, to support the decision. Rosas v. Nielsen, 428 F.3d 1229, 1232 (9th Cir. 2005); McQuillion, 306 F.3d at 904.

Recently, the Ninth Circuit reheard en banc the panel decision in Hayward v. Marshall, 512 F.3d 536 (9th Cir. 2007), reh'g en banc granted, 527 F.3d 797 (9th Cir. 2008), which presented a state prisoner's due process habeas challenge to the denial of parole. The panel had concluded that the gravity of the commitment offense had no predictive value regarding the petitioner's suitability for parole and held that because the Governor's reversal of parole was not supported by some evidence, it resulted in a due process violation. 512 F.3d at 546-47. The Ninth Circuit has not yet issued an en banc decision in Hayward. Unless or until the en banc court rules otherwise, the holdings in Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir. 2003), Sass, and Irons are still the law in this circuit.

When assessing whether a state parole board's suitability determination was

supported by "some evidence," the court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state. Irons, 505 F.3d at 850. Accordingly, in California, the court must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision constituted an unreasonable application of the "some evidence" principle. Id.

California law provides that a parole date is to be granted unless it is determined "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . ." Cal. Penal Code § 3041(b). The California Code of Regulations sets out the factors showing suitability or unsuitability for parole that the Board is required to consider. See 15 Cal. Code Regs. tit. 15 § 2402(b). These include "[a]ll relevant, reliable information available," such as:

> . . . the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in finding of unsuitability.

Id.

Circumstances tending to show unsuitability for parole include the nature of the commitment offense and whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." Id. at (c). This includes consideration of whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out in a manner which demonstrated an exceptionally callous disregard for human suffering," and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Id. Other circumstances tending to show unsuitability for parole are a previous record of violence, an unstable social history,

previous sadistic sexual offenses, a history of severe mental health problems related to the offense, and serious misconduct in prison or jail.  Id.

Conversely, circumstances tending to support a finding of suitability for parole include: no juvenile record; a stable social history; signs of remorse; that the crime was committed as a result of significant stress in the prisoner's life; a lack of criminal history; a reduced possibility of recidivism due to the prisoner's present age; that the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release; and that the prisoner's institutional activities indicate an enhanced ability to function within the law upon release.  See id. at (d).

In making its determination, the Board analyzed numerous factors weighing for and against suitability for parole.  The Board began by reviewing the commitment offense and determined that the offense was particularly cruel and callous with "absolutely no motive," and that it was carried out in a dispassionate manner.  (Resp't Ex. C at 98.)  The Board concluded that, given petitioner's history as a Marine and police officer around firearms, the shooting was more than unintentional or accidental.  (Id.)  Moreover, the Board noted that petitioner was being deceptive with his current wife because he had not told her about his alternate parole plan of living in San Diego with another woman.  (Id. at 100.)  Furthermore, the Board found that petitioner's statement in a psychiatric report that he had never battered his wife was a "[total lie]," citing "a record of violence and assaultive behavior leading up to the incident."  (Id. at 100-102.)  The Board concluded that petitioner had failed to take responsibility for his crime.  (Id. at 105.)

With respect to suitability factors, the Board noted that petitioner had no previous criminal record, exhibited exemplary institutional behavior, was a good Marine and police officer, and was a model prisoner.  (Id. at 102.)  Additionally, petitioner had been active in a number of programs, including participation in: anger management; meditation; Alcoholics Anonymous; spiritual recovery program; Veterans group; musical therapy; prison ministry; and various other self-help workshops.  (Id. at 105.)  Petitioner received numerous laudatory chronos for his work in the prison, with satisfactory to exceptional

work reports. (Id. at 104-105.) However, the Board determined that the factors tending to show suitability were outweighed by factors showing unsuitability and denied parole.

The California appellate court reviewed the Board's decision and found that the Board properly based its decision on the facts of the crime, petitioner's deceptions regarding his parole plans, and false statements to the evaluating psychologist. (Resp't Ex E at 4.) The state court rejected petitioner's claim, concluding that the Board "considered the proper factors in an individualized manner" and that "[s]ome evidence support[ed] the Board's decision." (Id.)

It cannot be said that the state court was unreasonable in concluding there was some evidence to support the Board's decision that petitioner would pose a danger to society if released. First of all, it appears from the record that petitioner had not yet served the minimum number of years required under his seventeen years-to-life sentence at the time of the challenged parole suitability hearing.[2] Pursuant to Irons, petitioner's right to due process was not violated when he was deemed unsuitable for parole prior to the expiration of his minimum term. See Irons, 505 F.3d at 665. Furthermore, the Board's decision that petitioner was unsuitable for parole and that his release would unreasonably endanger public safety was supported by "some evidence" that bore "some indicia of reliability." See Jancsek, 833 F.2d at 1390. A review of the record shows that the Board relied on the circumstances of petitioner's commitment offense as well as his false statements to the evaluating psychologist, the deception involving his wife regarding his parole plans, and the lack of motive for the crime. These factors constitute "some evidence" supporting the Board's decision to deny parole in consideration of the public safety. See Sass, 469 F.3d at 1129; see also Irons, 505 F.3d at 665.

This Court also notes that in Biggs, the Ninth Circuit expressed the concern that

---

[2] Petitioner was convicted on April 4, 1989, and his parole was denied on December 6, 2005. Even with credit for 73 days of time served at the time of sentencing, it appears from the record that he had not yet served his minimum sentence at the time of the 2005 hearing. (See Resp't Ex. A at 1-4.)

1  "over time" the Board's "continued reliance in the future on an unchanging factor, the
2  circumstance of the offense and conduct prior to imprisonment" would "raise serious
3  questions involving his liberty interest in parole." 334 F.3d at 916. However, as
4  discussed above, petitioner had not yet served his minimum term of seventeen years to
5  implicate the concerns raised in Biggs. See Irons, 505 F.3d at 661. Thus, this case has
6  not yet reached the point where a continued reliance on an unchanging factor such as the
7  circumstances of the offense in denying parole has resulted in a due process violation.
8  Furthermore, there were factors other than the commitment offense which the Board
9  relied on in determining that petitioner would pose a current threat to public safety if
10 released on parole. See *supra* at 8. Accordingly, petitioner is not entitled to relief based
11 on his claim that the Board's decision to deny parole at the December 6, 2005 hearing
12 violated his right to due process. See Sass, 461 F.3d at 1129; see also Irons, 505 F.3d at
13 664-65.
14      Petitioner also claims his case is factually similar to In re Shaputis, where the
15 California Court of Appeal granted a writ of habeas corpus based on a denial of parole by
16 the Governor. (Pet at 11.) However, petitioner's claim is rendered moot by the California
17 Supreme Court decision reversing the appellate court's ruling in Shaputis. See In re
18 Shaputis, 44 Cal.4th 1241 (2008). The state high court found that the Governor's
19 determination that the petitioner remained a current danger to the safety of the public was
20 supported by some evidence. Id. at 1261.
21      Accordingly, the state court's decision rejecting this claim was neither contrary to
22 nor an unreasonable application of clearly established federal law, nor was it an
23 unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C.
24 § 2254(d).
25 ///
26 ///
27 ///
28 ///

**CONCLUSION**

For the reasons set forth above, the petition for a writ of habeas corpus is DENIED on the merits.

DATED: August 18, 2009

JAMES WARE
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

PABLO AGRIO,

        Petitioner,

v.

BEN CURRY, Warden,

        Respondent.
                                 /

Case Number: CV07-04201 JW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on  8/19/2009 , I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Pablo J. Agrio E-17284
Correctional Training Facility-CTF Soledad
P. O. Box 689
Soledad, Ca 93960-0689

Dated:  8/19/2009

                                            Richard W. Wieking, Clerk
                                 /s/  By: Elizabeth Garcia, Deputy Clerk